Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ELIZABETH GREWAL, an

individual,

          Plaintiff,

vs.

AMIT CHOUDHURY, an individual,

          Defendant.

_____/

**CERTIFIED COPY**

No. C-07-4218 CRB

Videotaped Deposition of

AMIT CHOUDHURY

Thursday, January 10, 2008

Reported by:
COLLEEN M. REDAMONTI
CRP, CSR No. 7012
Job No.: 782CMR


*Bay City*

41 Aptos Avenue   San Francisco, CA 94127-2518
Ph: [415] 587-2000   Fx: [415] 587-2110
Email: Info@baycityreporting.com

```
 1                        APPEARANCES

 2

 3    For the Plaintiff:

 4          KASTNER BANCHERO LLP

 5          By:  E. JEFFREY BANCHERO

 6          Attorney at Law

 7          20 California Street, Seventh Floor

 8          San Francisco, California 94111

 9          (415) 398-7000

10          E-mail: ejb@kastnerbanchero.com

11

12

13    For the Defendant:

14          REED SMITH LLP

15          By:  HARVEY L. LEIDERMAN

16          Attorney at Law

17          Two Embarcadero Center, Suite 2000

18          San Francisco, California 94111

19          (415) 543-8700

20          E-mail:  hleiderman@reedsmith.com

21

22    Also Present:

23          CYRIL SUSZCKIEWICZ, Video Operator

24          ELIZABETH GREWAL

25
```

| | | |
|---|---|---|
| 09:58:39 | 1 | account took place on December 13, 2000. Can you |
| 09:58:42 | 2 | testify as to how many days subsequent to December 13th, |
| 09:58:47 | 3 | 2000 elapsed before this discussion took place? |
| 09:58:52 | 4 | A.    No. I'm sorry. |
| 09:58:54 | 5 | Q.    Was it within a day or two of December 13, |
| 09:58:57 | 6 | 2000? |
| 09:58:58 | 7 | A.    I -- I don't know. |
| 09:59:00 | 8 | Q.    Was it within a week or two? |
| 09:59:03 | 9 | A.    Probably. |
| 09:59:05 | 10 | Q.    Was it before you presented her with a |
| 09:59:09 | 11 | promissory note? |
| 09:59:10 | 12 | A.    I don't remember. |
| 09:59:12 | 13 | Q.    What did you do with the $880,000 that |
| 09:59:42 | 14 | Ms. Grewal wired to you? |
| 09:59:43 | 15 | A.    I invested it. |
| 09:59:46 | 16 | Q.    Did you invest it in Ms. Grewal's name? |
| 09:59:51 | 17 | A.    No. |
| 09:59:52 | 18 | Q.    Did you invest it in your name? |
| 10:00:01 | 19 | A.    Yes. |
| 10:00:02 | 20 | Q.    Where did you invest it? |
| 10:00:06 | 21 | A.    With the bank. |
| 10:00:08 | 22 | Q.    Which bank? |
| 10:00:09 | 23 | A.    Golden Gate Bank. |
| 10:00:16 | 24 | Q.    You purchased a certificate of deposit? |
| 10:00:19 | 25 | A.    Yes. |

| | | |
|---|---|---|
| 10:00:20 | 1 | Q.        The certificate of deposit was in whose name? |
| 0:00:23 | 2 | A.        I believe it was in my name. |
| 10:00:29 | 3 | Q.        What were the terms of that certificate of |
| 10:00:32 | 4 | deposit? |
| 10:00:33 | 5 | A.        I don't remember, but I think you have the -- |
| 10:00:40 | 6 | you have the document. |
| 10:00:43 | 7 | Q.        Was the certificate of deposit in the amount of |
| 10:00:55 | 8 | $1 million? |
| 10:00:56 | 9 | A.        Yes. |
| 10:00:57 | 10 | Q.        What was the term of the certificate of |
| 10:01:01 | 11 | deposit? |
| 10:01:02 | 12 | A.        I don't remember. |
| 10:01:03 | 13 | Q.        Do you know what the interest rate was? |
| 10:01:05 | 14 | A.        I think it's on the document somewhere. |
| 10:01:09 | 15 | Q.        In any event, you don't remember what it was? |
| 10:01:12 | 16 | A.        I don't remember. |
| 10:01:12 | 17 | Q.        You purchased the $1 million CD in your name |
| 10:01:24 | 18 | with Golden Gate Bank using the $880,000 that Elizabeth |
| 10:01:33 | 19 | Grewal sent you on December 13, 2000; is that right? |
| 10:01:37 | 20 | A.        Yes. |
| 10:01:42 | 21 | Q.        When did you purchase the certificate of |
| 10:02:04 | 22 | deposit? |
| 10:02:06 | 23 | A.        I don't remember the exact date, but I think |
| 10:02:10 | 24 | it's on the document. |
| 0:02:13 | 25 | Q.        We do have some documents, and we will get to |

10:02:17  1    those.

0:02:17  2         Did you purchase the certificate of deposit

10:02:20  3    prior to presenting Ms. Grewal with the term promissory

10:02:26  4    note?

10:02:26  5    A.      I don't remember.

10:02:26  6    Q.      Did you tell Ms. Grewal that you were using the

10:02:32  7    $880,000 to purchase the certificate of deposit from

10:02:45  8    Golden Gate Bank?

10:02:47  9    A.      No.  No.

10:02:55  10        MR. BANCHERO:  Okay.  Let's mark as Exhibit 1 a

10:03:37  11   document numbered AC-001-2.

10:03:47  12        MR. LEIDERMAN:  I'm sorry.  What's that number

10:03:49  13   again?

10:03:49  14        MR. BANCHERO:  AC-001-002.

10:03:55  15        MR. LEIDERMAN:  Two pages?

10:03:57  16        MR. BANCHERO:  Yeah.

10:03:58  17        MR. LEIDERMAN:  Okay.

10:04:22  18             (Discussion.)

10:04:23  19        MR. BANCHERO:  I have a copy for you.  You

10:04:25  20   don't want a copy?

10:04:26  21        MR. LEIDERMAN:  I've got copies of those

10:04:28  22   documents.  That's fine.

10:04:29  23        In fact, if you want to speed things along, the

10:04:33  24   court reporter could just mark it in pencil or

10:04:35  25   something, not have to fill out the whole sticker, and

| | |
|---|---|
| 10:04:38 | 1 | we could do that later.  Whatever you want to do. |
| 3:04:40 | 2 |                  (Plaintiff's Exhibit 1 was marked.) |
| 10:04:40 | 3 |                  MR. BANCHERO:  That's fine. |
| 10:04:41 | 4 | Q.        Mr. Choudhury, I'm showing you what's been |
| 10:04:44 | 5 | marked as Exhibit 1.  Could you please take a moment to |
| 10:04:46 | 6 | look at this? |
| 10:04:46 | 7 |           (Pause in proceedings for document review.) |
| 10:04:55 | 8 | Q.        BY MR. BANCHERO:  Exhibit 1 is a copy of the |
| 10:04:57 | 9 | Golden Gate Bank statement for an account that you had |
| 10:05:02 | 10 | at the bank, number 2241161, yes? |
| 10:05:08 | 11 | A.        It appears to be that. |
| 10:05:09 | 12 | Q.        You'll see in the middle of the first page the |
| 10:05:13 | 13 | phrase, "Wire transfer credit, 12/13, $880,000." |
| 10:05:19 | 14 |           That wire transfer credit reflects the $880,000 |
| 10:05:25 | 15 | that Ms. Grewal transferred into this account on that |
| 10:05:29 | 16 | date, yes? |
| 10:05:29 | 17 | A.        I believe so. |
| 10:05:32 | 18 | Q.        You'll see two lines down it says, "Wire |
| 10:05:38 | 19 | transfer credit, $250,000," dated 12/22. |
| 10:05:44 | 20 |           From what source did those funds come? |
| 10:05:48 | 21 | A.        I don't remember. |
| 10:05:50 | 22 | Q.        Turn, if you would, to page 2 of this exhibit. |
| 10:06:10 | 23 | In the middle of the page you'll see, "Transfer to CD |
| 10:06:16 | 24 | 209593," December 27, amount $1 million. |
| 10:06:21 | 25 |           Do you see that? |

10:06:22    1    A.        Yes.

0:06:22     2    Q.        Is that the transfer of these monies for the

10:06:29    3    purpose of purchasing the certificate of deposit that

10:06:32    4    you referred to a few moments ago in your testimony?

10:06:36    5            MR. LEIDERMAN:  Object to the form of the

10:06:37    6    question.  The phrase "these monies," I don't know what

10:06:40    7    you're referring to, Counsel.

10:06:42    8    Q.        BY MR. BANCHERO:  You may answer.

10:06:45    9            MR. LEIDERMAN:  Do you know what he's talking

10:06:47    10   about?

10:06:48    11           THE WITNESS:  If you're saying was this

10:06:50    12   $1 million used to purchase the CD, the answer is yes.

10:06:54    13           MR. BANCHERO:  That is my question.

10:06:56    14   Q.        As far as you know, the CD was identified as

10:07:00    15   209593?

10:07:02    16   A.        I believe so.

10:07:45    17           MR. BANCHERO:  Okay.  Let's go off the record

10:07:46    18   for a moment.

10:07:47    19           VIDEOTAPE OPERATOR:  Off the record at

10:07:50    20   10:08 a.m.

10:07:52    21                   (Discussion.)

10:08:44    22           VIDEOTAPE OPERATOR:  We're back on the record

10:08:49    23   at 10:09 a.m.

10:08:52    24           MR. BANCHERO:  Let's mark as the next exhibit

10:08:55    25   in order a three-page document -- pardon me, two-page

10:16:51 1    there would need to be a million dollar, I guess,

0:16:5? 2    collateral.

10:17:14 3        MR. BANCHERO:  Let's mark as the next exhibit

10:17:15 4    in order a document entitled, "Assignment of Deposit

10:17:25 5    Account."  AC-006 is the first page.

10:17:2? 6        What exhibit is this?

10:17:3? 7        MS. REPORTER:  3.

10:17:39 8            (Plaintiff's Exhibit 3 was marked.)

10:17:40 9        MR. LEIDERMAN:  Counsel, for the record, would

10:17:41 10   you identify all the pages of the exhibit that is being

10:17:44 11   marked as Exhibit 3?

10:17:48 12       MR. BANCHERO:  The pages are AC-006 through

10:17:54 13   009.

10:17:54 14       MR. LEIDERMAN:  Thank you.

10:18:03 15   Q.    BY MR. BANCHERO:  Mr. Choudhury, please review

10:18:05 16   Exhibit 3.

10:18:14 17       MR. LEIDERMAN:  When you ask the witness to

10:18:15 18   review it, do you want him to read the entire document?

10:18:19 19       MR. BANCHERO:  No, I don't.

10:18:25 20       MR. LEIDERMAN:  Why don't you tell him what

10:18:27 21   you'd like him to do about it.

10:18:31 22   Q.    BY MR. BANCHERO:  Mr. Choudhury, I'm going to

10:18:32 23   ask you some questions that are specific to certain

10:18:34 24   paragraphs.  I would like you to familiarize yourself

'0:18:38 25   generally with the document.  And when I ask you a

10:18:43  1    question, if you need to read a specific sentence or

0:18:44  2    paragraph, please take the time to do so.

10:18:49  3          I realize that there is a lot of language in

10:18:51  4    this document that I will not be questioning you about.

10:19:04  5          (Pause in proceedings for document review.)

10:19:04  6    Q.       BY MR. BANCHERO:  Mr. Choudhury, you'll see by

10:19:06  7    the date stamp to Silverspoon, Exhibit 3, that this

10:19:10  8    document, the Assignment of Deposit Account, was sent to

10:19:15  9    Silverspoon along with the promissory note, Exhibit 2;

10:19:20  10   is that correct?

10:19:20  11   A.       Yes.

10:19:22  12   Q.       You received both the promissory note and the

10:19:27  13   Assignment of Deposit Account in form on December 8,

10:19:34  14   2000 when you were at your brother's office in Dallas?

10:19:37  15   A.       Um, I wasn't there on December 8th.

10:19:40  16   Q.       Did you arrive at the office sometime after

10:19:43  17   December 8th and read the documents then?

10:19:46  18   A.       It would be around Christmas.

10:19:50  19   Q.       Okay.  Had you seen the promissory note or

10:19:58  20   Assignment of Deposit Account prior to arriving at the

10:20:01  21   offices around Christmas in Dallas?

10:20:04  22   A.       No.

10:20:04  23   Q.       Turn to the last page of Exhibit 3, please.

10:20:54  24          Your signature appears on the lines there under

10:20:59  25   "Borrower" and "Grantor"?

| | | |
|---|---|---|
| 10:21:00 | 1 | A.          Yes. |
| 0:21:00 | 2 | Q.          Above the signature in all caps are the words |
| 10:21:06 | 3 | "Borrower and Grantor acknowledge having read all the |
| 10:21:09 | 4 | provisions of this Assignment of Deposit Account and |
| 10:21:13 | 5 | agree to its terms.  This agreement is dated |
| 10:21:17 | 6 | December 21, 2000." |
| 10:21:20 | 7 | Reading that sentence, does it refresh your |
| 10:21:30 | 8 | recollection as to when you signed Exhibit 3? |
| 10:21:34 | 9 | MR. LEIDERMAN:  Objection.  He did not say that |
| 10:21:36 | 10 | he couldn't recall when he signed Exhibit 3. |
| 10:21:43 | 11 | MR. BANCHERO:  All right.  I'll rephrase.  I'll |
| 10:21:46 | 12 | withdraw the question. |
| 10:21:47 | 13 | Q.          When did you sign Exhibit 3? |
| 10:21:48 | 14 | A.          Sometime after Christmas. |
| 10:21:50 | 15 | Q.          Would it be sometime after December 25, 2000 |
| 10:21:57 | 16 | and before December 31st, 2000? |
| 10:22:02 | 17 | A.          Yes. |
| 10:22:03 | 18 | Q.          Did you sign the documents when you were in |
| 10:22:04 | 19 | your brother's offices in Dallas? |
| 10:22:06 | 20 | A.          Yes. |
| 10:22:06 | 21 | Q.          After signing the deposit account and |
| 10:22:14 | 22 | promissory note at your brother's offices in Dallas, did |
| 10:22:18 | 23 | you then fax them to the bank? |
| 10:22:21 | 24 | A.          I believe so. |
| 0:22:24 | 25 | Let me take that back.  I'm not sure who I |

10:22:27    1    faxed it to.  I know I faxed it, but I don't recall if I

0:22:31    2    faxed it to the bank or to -- to the company, who

10:22:40    3    then -- to Dave Hayford, who then may have walked it

10:22:43    4    over.  I don't know.

10:22:44    5    Q.        Okay.  Turning your attention to the first page

10:22:56    6    of Exhibit 3, you'll see under the words "Collateral"

10:23:01    7    about a third of the way down the page, the document

10:23:05    8    reads:

10:23:06    9            "The word 'Collateral' means the following

10:23:11   10    described deposit account:  Certificate of Deposit

10:23:19   11    205953 issued by Lender in an amount not less than

10:23:24   12    $1,000,000.00."

10:23:25   13            Is that the certificate of deposit that was in

10:23:28   14    your name that you purchased from Golden Gate Bank?

10:23:32   15    A.        I think 209593.  I believe so, yes.

10:23:40   16    Q.        Did Finexa, Inc. in fact open up a $1 million

10:24:43   17    line of credit with Golden Gate Bank in late December

10:24:52   18    2000 or early January, 2001?

10:24:54   19    A.        I don't know.

10:24:57   20    Q.        Do these exhibits, the promissory note and the

10:25:03   21    Assignment of Deposit Account, refresh any recollection

10:25:08   22    that you might have about whether Finexa in fact opened

10:25:12   23    up a million dollar line of credit at the end of 2000 or

10:25:16   24    in the early days of 2001?

0:25:19   25    A.        Um, the -- I don't know because I had -- I did

| | | |
|---|---|---|
| 10:36:49 | 1 | A.        Correct. |
| 0:36:50 | 2 | Q.        All right.  Is it accurate then that Finexa, |
| 10:37:10 | 3 | Inc. decided to obtain a line of credit from Golden Gate |
| 10:37:16 | 4 | Bank only after you received the $880,000 from Elizabeth |
| 10:37:19 | 5 | Grewal? |
| 10:37:19 | 6 | A.        I don't know.  You'll have to ask David |
| 10:37:22 | 7 | Hayford. |
| 10:37:24 | 8 | Q.        Do you have any recollection of speaking with |
| 10:37:27 | 9 | David Hayford about setting up a line of credit? |
| 10:37:34 | 10 | A.        No.  I don't have any recollection. |
| 10:37:37 | 11 | Q.        Did you tell David Hayford that Ms. Grewal had |
| 10:37:44 | 12 | transferred $880,000 to you on December 13, 2000? |
| 10:37:50 | 13 | A.        No. |
| 10:37:51 | 14 | Q.        You did not tell David that? |
| 10:37:53 | 15 | A.        That's correct. |
| 10:37:54 | 16 | Q.        Did you have any discussions with Mr. Hayford |
| 10:38:03 | 17 | about the source of the funds for the million dollar CD |
| 10:38:08 | 18 | that you put up as collateral for the line of credit |
| 10:38:13 | 19 | that Golden Gate Bank provided to Finexa, Inc.? |
| 10:38:21 | 20 | A.        If your question is did he know that some of |
| 10:38:29 | 21 | the money came from Ms. Grewal? |
| 10:38:33 | 22 | Q.        No.  My -- I may go there, but this question is |
| 10:38:38 | 23 | did you have any discussions with Mr. Hayford about the |
| 10:38:44 | 24 | source of the funds for the million dollar CD? |
| '0:38:48 | 25 | A.        The source, no. |

1    Q.        Did you tell Mr. Hayford that you were willing

2    to put up the million dollar certificate of deposit to

3    provide collateral for the million dollar Finexa line of

4    credit?

5    A.        At some point he asked me if I could, and I

6    said that may be possible.

7    Q.        Okay.  In fact, you did?

8    A.        Yes.

9    Q.        You did not, however, tell Mr. Hayford that

10   Ms. Grewal had contributed some portion of the funds

11   that went into the certificate of deposit, correct?

12   A.        That is correct.

13   Q.        Ms. Grewal at this time, that is December 2000,

14   was an employee of Finexa, Inc.?

15   A.        Yes.

16   Q.        You worked with her, yes?

17   A.        Yes.

18   Q.        Did you tell her that Finexa, Inc. had obtained

19   a million dollar line of credit from Golden Gate Bank at

20   about the time that the line of credit was opened?

21   A.        I don't believe I did.

22   Q.        Did anyone else at your company tell her?

23   A.        I don't know.

24            MR. LEIDERMAN:  What do you mean by "your

25   company"?  I'm sorry.

| | | |
|---|---|---|
| 10:42:13 | 1 | THE WITNESS:  Exhibits 2 and 3. |
| 0:42:21 | 2 | MR. LEIDERMAN:  Thank you. |
| 10:42:23 | 3 | Q.      BY MR. BANCHERO:  The certificate of deposit |
| 10:42:24 | 4 | was not purchased in Ms. Grewal's name, correct? |
| 10:42:29 | 5 | A.      That is correct. |
| 10:42:29 | 6 | Q.      It was purchased in your name? |
| 10:42:31 | 7 | A.      Yes. |
| 10:43:15 | 8 | MR. BANCHERO:  Let's marked as Exhibit 4 a |
| 10:43:19 | 9 | two-page document numbered AC-10-11. |
| 10:43:31 | 10 | (Plaintiff's Exhibit 4 was marked.) |
| 10:43:33 | 11 | Q.      BY MR. BANCHERO:  Who is Brian Plotner? |
| 10:43:54 | 12 | A.      I think he works at Golden Gate Bank. |
| 10:43:58 | 13 | Q.      Did you send this facsimile and letter to |
| 10:44:01 | 14 | Mr. Plotner on March 30, 2001? |
| 10:44:05 | 15 | A.      I did not. |
| 10:44:08 | 16 | Q.      Do you recognize the handwriting on the first |
| 10:44:11 | 17 | page of Exhibit 4? |
| 10:44:12 | 18 | A.      Yes. |
| 10:44:12 | 19 | Q.      Whose handwriting is that? |
| 10:44:14 | 20 | A.      It belongs to Ana Ramirez. |
| 10:44:18 | 21 | Q.      Who is Ana Ramirez? |
| 10:44:19 | 22 | A.      She was the operations manager for Finexa. |
| 10:44:37 | 23 | Q.      Your signature appears on page 2 of Exhibit 4? |
| 10:44:43 | 24 | A.      That appears to be my signature, yes. |
| 0:44:47 | 25 | Q.      Did you write this letter -- |

10:44:56    1    A.        No.

0:44:56    2    Q.        -- that is attached as the second page of

10:44:59    3    Exhibit 4?

10:44:59    4    A.        No.

10:45:00    5    Q.        Who wrote it?

10:45:02    6    A.        I don't know.

10:45:02    7    Q.        Did you read this letter before you signed it?

10:45:06    8    A.        I didn't sign it.  That's an electronic

10:45:09    9    signature.

10:45:10    10    Q.        Okay.  Explain how this document came to have

10:45:16    11    your electronic signature on it.

10:45:20    12    A.        Um, Ana has a copy of -- or used to have a copy

10:45:24    13    of my electronic signature so she could send

10:45:28    14    communications on. . .

10:45:36    15    Q.        Okay.  Is there something about this particular

10:45:39    16    signature that suggests to you that this is an

10:45:50    17    electronic signature as opposed to a signature that you

10:45:54    18    placed using your own hand?

10:45:57    19    A.        Um, there are a couple of electronic signatures

10:46:01    20    of mine, and that looks like one of them.

10:46:03    21    Q.        Okay.  Did you authorize Ana Ramirez to send

10:46:11    22    this letter to Mr. Plotner?

10:46:13    23    A.        No.

10:46:13    24    Q.        Do you know who did?

10:46:16    25    A.        Um, I would be speculating.

10:46:13   1    Q.        When is the first time you saw this March 30,

0:46:26    2    2001 letter to Brian Plotner?

10:46:23   3    A.        After the complaint was filed.

10:46:33   4    Q.        That is the complaint in this lawsuit?

10:46:35   5    A.        That is correct.

10:46:37   6    Q.        Was it customary at Finexa, Inc. in 2001 for

10:46:55   7    Mr. Hayford to draft letters for you that would be sent

10:47:02   8    out under your signature?

10:47:05   9    A.        It appears to be that way.

10:47:10   10          MR. BANCHERO:  Okay.  Let's mark as Exhibit 5 a

10:47:34   11   document labeled AC-003.

10:47:38   12          (Plaintiff's Exhibit 5 was marked.)

10:48:00   13   Q.        BY MR. BANCHERO:  Exhibit 5 is a copy of your

10:48:10   14   bank account statement from Golden Gate Bank for account

10:48:13   15   number 2241161, yes?

10:48:17   16   A.        Correct.

10:48:19   17   Q.        You'll see that halfway down the page there are

10:48:23   18   words that state, "Transfer from 209593."

10:48:30   19          That is the $1 million CD that was in your

10:48:33   20   name, correct?

10:48:34   21   A.        I believe so, yes.

10:48:37   22   Q.        Opposite those words there is the date

10:48:41   23   April 2nd, the amount $1,014,494.05.  This reflects a

10:48:51   24   transfer into account 2241161 in that amount on that

0:48:56    25   date, yes?

1    A.        I believe so.

2    Q.        At the -- towards the bottom of the page under

3    the heading "Other Debits," you'll see the word "Loan

4    Payment," yes?

5    A.        Yes.

6    Q.        April 2nd, amount $1,666,066.  Do you see that,

7    yes?

8    A.        Yes.

9              MR. LEIDERMAN:  I'm sorry, I believe you

10   misstated the amount, Counsel.  Just so we get it clear

11   for the record.

12             MR. BANCHERO:  I'm sorry.  I'll state it again.

13             MR. LEIDERMAN:  Thank you.

14   Q.        BY MR. BANCHERO:  Under the heading "Other

15   Debits," you'll see the words "Loan Payment" April 2nd,

16   $1,000,666.66, yes?

17   A.        Yes.

18   Q.        That reflects the payment from this account to

19   Golden Gate Bank to pay the balance of the line of

20   credit that Finexa, Inc. had with Golden Gate Bank?

21   A.        It appears to be, yes.

22   Q.        Is it true then that prior to April 2nd, 2001,

23   Finexa, Inc. had drawn down on its line of credit with

24   Golden Gate Bank in an amount that was approximately

25   $1 million?

10:50:41    1    A.        I don't know, but it appears that way.

0:50:44    2    Q.        Okay.  Looking at this document, Exhibit 5,

17:50:51    3    does it refresh any recollection of what Finexa, Inc.

10:50:55    4    used that million dollars for during the period from

10:51:01    5    late December 2000 to early April 2001?

10:51:09    6    A.        No.

10:51:10    7    Q.        Did you have any discussions with David Hayford

10:51:19    8    about paying off the line of credit prior to doing so?

10:51:24    9    A.        No.

10:51:24    10    Q.        Why did Finexa, Inc. pay off the line of credit

10:51:35    11    with Golden Gate Bank when it did so?

10:51:37    12    A.        I don't know.

10:51:33    13    Q.        Did you personally authorize Golden Gate Bank

10:51:46    14    to transfer over $1 million from your account 2241161 in

10:51:55    15    order to pay off the loan to Golden Gate Bank?

10:52:00    16    A.        Um, no.  I think -- if you're referring to this

10:52:05    17    letter, Exhibit 4?

10:52:03    18    Q.        Yes.

10:52:09    19    A.        No, I didn't send that.

10:52:12    20    Q.        Who sent it?

10:52:13    21    A.        Looking at the cover page, maybe it was Ana.

10:52:18    22    Or maybe it was David.  But I don't want to speculate.

10:52:20    23    You'll have to ask them.

10:52:23    24    Q.        Did either David or Ana have authority with

10:52:31    25    Golden Gate Bank to make deposits into or transfers out

1    the effect that the loan was paid off.

2    Q.        This was agreeable to you?

3    A.        Um, I trusted him with the finances.  I didn't

4    question him.

5    Q.        Okay.  You would agree with me that the loan

6    payoff left -- I'll rephrase the question.

7             Did you ever review the Finexa financial

8    statements during this period, that is the first quarter

9    of 2001?

10   A.        No.

11   Q.        Did you have any discussions with Ms. Grewal

12   about Finexa, Inc.'s decision to pay off the $1 million

13   line of credit with Golden Gate Bank at about the time

14   the loan was paid off, that is, in early April 2001?

15   A.        No.

16   Q.        Do you know if Mr. Hayford spoke to her on that

17   subject?

18   A.        I don't know.

19   Q.        Okay.  Would you agree with me that when the

20   million dollars represented by the certificate of

21   deposit was transferred from the certificate to your

22   account 2241161 on April 2nd, that at that moment that

23   would reflect the whereabouts of Ms. Grewal's $880,000

24   investment?

25             MR. LEIDERMAN:  Object to the form of the

1  question.  It's incomprehensible.

2  Q.      BY MR. BANCHERO:  Do you comprehend it?

3  A.      Not really.

4  Q.      Well, let me ask it more open ended then.

5          As of April 2nd, 2001, where was Ms. Grewal's

6  $880,000?

7  A.      Um, it was in the CD.  And I think what you --

8  I think I now understand.  You said was the CD then

9  deposited or cashed in, I guess.  I'm not sure what the

10 right term is.

11 Q.      Well, we'll take it question by question.

12         You would agree with me that the money was in

13 the certificate of deposit --

14 A.      Yes.

15 Q.      -- during the three months that the certificate

16 of deposit was in existence, correct?

17 A.      Yes.

18 Q.      All right.  Then when the certificate of

19 deposit was turned in on April 2nd, then those monies

20 would now reside in your account 2241161 at Golden Gate

21 Bank, correct?

22 A.      It appears that way, yes.

23 Q.      Okay.  Then would you also agree with me that

24 the $880,000 would have been transferred to Golden Gate

25 Bank to pay off a portion of the $1 million line of

1  credit that Finexa, Inc. had with the bank on April 2nd,

2  2001?

3  A.        Um, I think it appears that way, yes.

4  Q.        Okay.  And in fact at that moment, Finexa, Inc.

5  was receiving a benefit by having its line of credit

6  paid off with these funds, yes?

7  A.        I guess.

8  Q.        Okay.  The letter that is marked as Exhibit 4,

9  page 2 states:

10        "It is my understanding that Finexa will pay

11  the interest for March, and that on Monday April 2nd,

12  2001, I will have access to the residual interest from

13  my" certificate of deposit, "CD."

14        Did that happen?

15        MR. LEIDERMAN:  I'm sorry, which of those

16  things that you just read are you referring to as the

17  "it" that happened?

18  Q.        BY MR. BANCHERO:  Well, I think we've

19  established that -- well, I'll rephrase the question.

20        I'll withdraw it.

21        So as of April 2nd, 2001, where was

22  Ms. Grewal's investment?

23  A.        It appears that it went to pay the loan that

24  was between Finexa and Golden Gate Bank.

25  Q.        Okay.  Did you tell Ms. Grewal that?

11:02:19  1    A.        No.

11:02:20  2    Q.        Why not?

11:02:21  3    A.        At that time I didn't know about it.  And later

11:02:27  4    on when I found out about it, I was very embarrassed

11:02:32  5    about it.

11:02:33  6    Q.        Why were you embarrassed?

11:02:35  7    A.        Because that's not what -- that's not what I

11:02:40  8    had planned to do with the investment.

11:02:43  9    Q.        If it was not what you planned to do with the

11:02:47  10   investment, how did it happen?

11:02:49  11   A.        Um, it just did.  It was meant to be in the CD

11:03:04  12   just for a short period of time.

11:03:08  13   Q.        Shorter than three months?

11:03:11  14   A.        Um, no specific.  It was meant to be sort of

11:03:15  15   parked there until I could take that money and invest it

11:03:19  16   differently.

11:03:21  17   Q.        Okay.  How long a time was it supposed to be in

11:03:33  18   the CD?

11:03:35  19   A.        Don't know.  Maybe a few months.  It was

11:03:39  20   nothing specific.

11:03:41  21   Q.        Is it your testimony that the certificate of

11:03:45  22   deposit, with Ms. Grewal's money as part of it, was not

11:03:50  23   supposed to be used to pay off the line of credit for

11:03:54  24   Finexa, Inc.?

11:03:56  25   A.        It was not the intention, if that's your

| | | |
|---|---|---|
| 12:06:35 | 1 | individual's money individually, the answer is no.  And |
| 2:06:40 | 2 | it's Capital LP, sorry, not LLP. |
| 12:06:43 | 3 | Q.        Okay.  Okay.  At this time in December of 2000, |
| 12:06:58 | 4 | did you maintain any licenses from the State of |
| 12:07:07 | 5 | California with respect to the investing of securities? |
| 12:07:14 | 6 | A.        Yes. |
| 12:07:15 | 7 | Q.        What did you maintain? |
| 12:07:16 | 8 | A.        I had a Series 65. |
| 12:07:20 | 9 | Q.        What is that? |
| 12:07:21 | 10 | A.        It's a registered investment advisor license. |
| 12:07:38 | 11 | Q.        Who issues that? |
| 12:07:40 | 12 | A.        Used to be the NASD, and they're now called |
| 12:07:45 | 13 | FINRA, F-I-N-R-A. |
| 12:07:49 | 14 | Q.        Okay.  Any other licenses at that time? |
| 12:07:53 | 15 | A.        No. |
| 12:07:53 | 16 | Q.        When you received Ms. Grewal's money to invest |
| 12:08:06 | 17 | in December 2000, were you acting as an investment |
| 12:08:11 | 18 | advisor under the rules of FINRA? |
| 12:08:15 | 19 |         MR. LEIDERMAN:  As to that money? |
| 12:08:17 | 20 |         MR. BANCHERO:  Yes. |
| 12:08:18 | 21 |         THE WITNESS:  Um, there was no requirement for |
| 12:08:20 | 22 | me to do that. |
| 12:08:24 | 23 | Q.        BY MR. BANCHERO:  Were you? |
| 12:08:25 | 24 | A.        No. |
| 2:08:2? | 25 | Q.        Why not? |

12:08:33  1    A.          Just wasn't.

12:08:39  2    Q.          At any point in your career -- well, let me

12:08:50  3    rephrase.

12:08:51  4                Were you a registered investment advisor

12:08:53  5    Series 65 under FINRA because of the work you did with

12:08:55  6    the two hedge funds?

12:08:58  7    A.          There wasn't a requirement.  And over the

12:09:02  8    years, sometimes there has been a requirement, sometimes

12:09:05  9    there hasn't been a requirement.  So I became a

12:09:07  10   registered investment advisor just so I wouldn't have to

12:09:10  11   deal with any issues.

12:09:13  12   Q.          When did you become a registered investment

12:09:17  13   advisor?

12:09:17  14   A.          In the middle of 2000.

12:09:20  15   Q.          Did you maintain that registration throughout

12:09:26  16   2001?

12:09:26  17   A.          Yes.

12:09:27  18   Q.          Do you maintain it today?

12:09:29  19   A.          Yes.

12:09:30  20   Q.          Has it been maintained throughout the period

12:09:32  21   from 2000 to the present?

12:09:34  22   A.          Yes.

12:09:35  23   Q.          Apart from the Series 65 FINRA registration, do

12:09:43  24   you have any other licenses regarding investments for

2:09:47  25    other people?

| | | |
|---|---|---|
| 12:09:48 | 1 | A.        No. |
| 2:09:53 | 2 |          I no longer manage assets for other people, by |
| 12:10:02 | 3 | the way. |
| 12:10:02 | 4 | Q.        When did you stop doing that? |
| 12:10:04 | 5 | A.        Um, when the -- when the fund was dissolved. |
| 12:10:19 | 6 | Q.        Which fund? |
| 12:10:19 | 7 | A.        Pinnacle Partners Capital, LP. |
| 12:10:24 | 8 | Q.        When was that dissolved? |
| 12:10:27 | 9 | A.        2002, I think, maybe. |
| 12:10:33 | 10 | Q.        Okay.  To summarize, then, you were not acting |
| 12:10:48 | 11 | as a registered investment advisor under the FINRA rules |
| 12:10:54 | 12 | when you agreed to provide investment services to |
| 12:11:04 | 13 | Ms. Grewal, correct? |
| 12:11:05 | 14 | A.        I agreed to invest the money. |
| 12:11:12 | 15 | Q.        Did you make a conscious decision at the time |
| 12:11:26 | 16 | to invest the money without following requirements of |
| 12:11:44 | 17 | FINRA? |
| 12:11:45 | 18 | A.        If you mean -- is your question -- when you say |
| 12:11:54 | 19 | "at the time," you mean end of 2000? |
| 12:11:56 | 20 | Q.        Yes. |
| 12:11:57 | 21 | A.        Um, did I make a conscious decision to invest |
| 12:12:02 | 22 | it without following the rules? |
| 12:12:03 | 23 | Q.        Yes. |
| 12:12:04 | 24 | A.        Um, the money was sent to my personal account, |
| 2:12:08 | 25 | so I was investing it as if I was investing it. |

12:14:35  1    Q.        You don't actually make the decisions about the

12:14:41  2    investments?

12:14:41  3    A.        That's correct.

12:14:42  4    Q.        The businesses that you work with today are

12:14:48  5    free to follow your advice and free to ignore it?

12:14:51  6    A.        Precisely.

12:14:53  7    Q.        Okay.  In 2000 then, there were no other

12:15:06  8    individuals that provided you money to invest as persons

12:15:10  9    other than Ms. Grewal?

12:15:11  10   A.        Outside of the funds?

12:15:14  11   Q.        Yes.

12:15:14  12   A.        No.

12:15:15  13   Q.        Same question with respect to the period from

12:15:19  14   2001 to the present:  Outside of the funds, no

12:15:23  15   individuals have asked you to invest money on their

12:15:27  16   behalf, other than Ms. Grewal, correct?

12:15:30  17   A.        That's correct.  Outside of the items we just

12:15:33  18   covered, companies or -- I was not managing funds or

12:15:35  19   acting as an investment manager for anybody else.

12:15:39  20   Q.        Okay.  Finexa, Inc. hired Ms. Grewal in June of

12:15:58  21   2000, correct?

12:15:59  22   A.        In that time frame.  I don't remember the exact

12:16:02  23   date.

12:16:02  24   Q.        Okay.  At that time what position did you hold

2:16:05   25   with Finexa?

1   A.       I was one of the two co-founders.

2   Q.       The other co-founder was who?

3   A.       Was David Hayford.

4   Q.       Ms. Grewal was hired as director of marketing?

5   A.       I believe so.

6   Q.       Did you and Mr. Hayford jointly decide to hire

7   Ms. Grewal?

8   A.       I had input into it, but I believe David made

9   the offer.

10  Q.       Why did Finexa decide to hire Ms. Grewal?

11  A.       To help us start a business.

12  Q.       What qualities did she possess that Finexa

13  thought would help in the starting of this business?

14  A.       An interest in marketing.

15  Q.       Anything else?

16  A.       She spoke French.

17  Q.       What business was Finexa in?

18  A.       Financial planning software.

19  Q.       That is, the development of financial planning

20  software?

21  A.       The development and sales.

22  Q.       In June 2000, how many employees did Finexa

23  have?

24  A.       Just David and myself.  Before Ms. Grewal was

25  hired.

| | | |
|---|---|---|
| 12:17:33 | 1 | Q.        Ms. Grewal was the third person hired? |
| 2:17:36 | 2 | A.        That's correct. |
| 12:17:36 | 3 | Q.        Was Ms. Grewal full time at Finexa? |
| 12:17:48 | 4 | A.        I believe so. |
| 12:17:49 | 5 | Q.        Was Ana Ramirez working for you at the time? |
| 12:18:05 | 6 | A.        Yes. |
| 12:18:05 | 7 | Q.        Whom was she employed by? |
| 12:18:07 | 8 | A.        Pinnacle Partners, Inc. |
| 12:18:13 | 9 | Q.        Pinnacle Partners, Inc. was different than |
| 12:18:21 | 10 | Pinnacle Partners Capital, LP? |
| 12:18:23 | 11 | A.        Yes. |
| 12:18:23 | 12 | Q.        What was the relationship? |
| 12:18:25 | 13 | A.        Pinnacle Partners, Inc. was the -- is where I |
| 12:18:31 | 14 | work.  It's what employs me. |
| 12:18:42 | 15 | Q.        Was Mr. Hayford employed by Pinnacle Partners, |
| 12:18:46 | 16 | Inc.? |
| 12:18:47 | 17 | A.        At some point, yes.  I don't know the exact |
| 12:18:51 | 18 | dates. |
| 12:18:52 | 19 | Q.        In 2000, did Pinnacle Partners, Inc., Pinnacle |
| 12:19:04 | 20 | Partners Capital, LP, and Finexa all have offices at the |
| 12:19:06 | 21 | same location? |
| 12:19:07 | 22 | A.        Um, initially.  Finexa had an office in Foster |
| 12:19:13 | 23 | City later on. |
| 12:19:14 | 24 | Q.        When? |
| 2:19:15 | 25 | A.        I think like September, October, in -- |

| | | |
|---|---|---|
| 12:19:19 | 1 | somewhere in that time frame. |
| 12:19:22 | 2 | Q.    2000? |
| 12:13:23 | 3 | A.    2000. |
| 12:19:25 | 4 | Q.    Okay.  Were there other employees of these |
| 12:19:30 | 5 | entities at the time besides Ana Ramirez, yourself, |
| 12:19:34 | 6 | Mr. Hayford and Ms. Grewal? |
| 12:19:35 | 7 | A.    Yes.  Finexa grew to over 40 people. |
| 12:19:41 | 8 | Q.    When was that? |
| 12:19:43 | 9 | A.    Between sometime that September, October time |
| 12:19:48 | 10 | frame to the end of the year, early January.  I don't |
| 12:19:52 | 11 | know -- I don't know which month we peaked. |
| 12:19:56 | 12 | Q.    Okay.  Do you recall what Finexa's monthly |
| 12:20:09 | 13 | expenses were? |
| 12:20:10 | 14 | A.    No. |
| 12:20:10 | 15 | Q.    Can you give me an order of magnitude? |
| 12:20:16 | 16 | A.    Maybe 70,000, 100,000.  I don't know.  I'd be |
| 12:20:23 | 17 | guessing.  I'm speculating.  David was responsible for |
| 12:20:25 | 18 | all financials. |
| 12:20:29 | 19 | Q.    Do you have a life insurance policy? |
| 12:20:41 | 20 | A.    I do. |
| 12:20:42 | 21 | Q.    Did you ever tell Elizabeth Grewal that she was |
| 12:20:46 | 22 | a beneficiary of your life insurance policy? |
| 12:20:51 | 23 | A.    A beneficiary?  I'm not sure I said that. |
| 12:20:57 | 24 | Q.    Did you say anything about your life insurance |
| 2:21:00 | 25 | policy with respect to Ms. Grewal? |

1   Internet type, 800 number types of things.

2   Q.        Did Ms. Grewal ever ask you to see a copy of

3   the policies that you have?

4   A.        I don't believe so.  Maybe.  I don't know.

5   Q.        You don't know one way or the other?

6   A.        I don't know one way or the other, no.  Don't

7   recall.

8   Q.        It's true, though, that you did not show her a

9   copy of any of your life insurance policies, correct?

10  A.        I don't believe I showed her anything, no.

11  Q.        Do you know whether Ana Ramirez did?

12  A.        I have no idea.

13            MR. BANCHERO:  All right.  It's a little after

14  12:20.  This would be a good time to take a lunch break.

15            VIDEOTAPE OPERATOR:  We're going off the record

16  at 12:24 p.m.

17                      (Break.)

18       (Plaintiff's Exhibit 7 was marked.)

19            VIDEOTAPE OPERATOR:  Okay.  We're back on the

20  record.  The time is 1:28 p.m.

21  Q.        BY MR. BANCHERO:  Mr. Choudhury, I'm showing

22  you what we have marked as Exhibit 7.  It is a document

23  entitled, "Term Promissory Note," numbered AC-018.

24            Would you take a moment and look at that,

25  please.

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 13:29:22 | 1  | (Pause in proceedings for document review.) |
| 13:29:25 | 2  | Q.        BY MR. BANCHERO:  Is that your signature on |
| 13:29:26 | 3  | Exhibit 7? |
| 13:29:27 | 4  | A.        It appears to be, yes. |
| 13:29:29 | 5  | Q.        Is that your signature by hand?  Did you place |
| 13:29:33 | 6  | it on this document? |
| 13:29:34 | 7  | A.        Yes. |
| 13:29:34 | 8  | Q.        Okay.  Did you prepare the term promissory |
| 13:29:41 | 9  | note? |
| 13:29:42 | 10 | A.        Yes. |
| 13:29:43 | 11 | Q.        Did you physically input the words into a word |
| 13:29:48 | 12 | processor? |
| 13:29:50 | 13 | A.        I don't remember if I typed it or cut and |
| 13:29:55 | 14 | pasted from somewhere else. |
| 13:29:58 | 15 | Q.        Okay.  Do you remember where you got the form |
| 13:29:08 | 16 | of the term promissory note? |
| 13:29:10 | 17 | A.        No.  Sorry. |
| 13:29:13 | 18 | Q.        Did you do this on a word processor that you |
| 13:29:18 | 19 | had in your offices at Finexa? |
| 13:29:20 | 20 | A.        Um, I'm not sure if it was at -- where I was |
| 13:29:23 | 21 | when I typed this. |
| 13:29:26 | 22 | Q.        During this period of 2000, early 2001, did you |
| 13:29:30 | 23 | have one or more than one computer that you used? |
| 13:29:32 | 24 | A.        At that time I had one. |
| 3:29:34  | 25 | Q.        Where was that computer? |

| | | |
|---|---|---|
| 13:29:36 | 1 | A.        It was a laptop. |
| 13:29:33 | 2 | Q.        When physically did you print the form note |
| 13:29:44 | 3 | that you signed? |
| 13:29:44 | 4 | A.        I don't remember. |
| 13:29:46 | 5 | Q.        The note says: |
| 13:29:44 | 6 | "Made at San Francisco, California, this 2nd |
| 13:29:50 | 7 | day of January, 2001." |
| 13:29:53 | 8 | Did you print the note from your word processor |
| 13:29:56 | 9 | on that date? |
| 13:29:57 | 10 | A.        I don't know.  I don't recall. |
| 13:29:58 | 11 | Q.        Did you create this term promissory note before |
| 13:30:07 | 12 | or after you received the $880,000 from Elizabeth |
| 13:30:13 | 13 | Grewal? |
| 13:30:13 | 14 | A.        I don't remember. |
| 13:30:17 | 15 | Q.        Did you sign the term promissory note before or |
| 13:30:23 | 16 | after you received the $880,000 from Elizabeth Grewal? |
| 13:30:28 | 17 | A.        I don't remember. |
| 13:30:29 | 18 | Q.        Did you present this note to Elizabeth Grewal |
| 13:30:43 | 19 | to sign? |
| 13:30:44 | 20 | A.        I believe so, yes. |
| 13:30:46 | 21 | Q.        Did you hand it to her? |
| 13:30:48 | 22 | A.        I think so. |
| 13:30:50 | 23 | Q.        Did she sign it in your presence? |
| 13:30:52 | 24 | A.        I don't remember. |
| 3:30:53 | 25 | Q.        Did she sign it and hand it back to you? |

| | |
|---|---|
| 15:44:28 | 1 |

MR. LEIDERMAN:  That was 15.

MR. BANCHERO:  That was 15.  Thank you.

Exhibit 16 is AC-56, 57.

(Plaintiff's Exhibit 16 was marked.)

Q.      BY MR. BANCHERO:  The first page of Exhibit 16

includes an E-mail message that appears to have been

sent by you to Ms. Grewal on April 24, 2006.

Did you send that to her on that date?

A.      Um, I believe so, yes.

Q.      You write:

"Am pursuing every avenue possible -- and have

racked up substantial expenses trying to accelerate each

one of them, (extra processing fees, lawyers, etc.) but

have not been able to complete any one process, even

though we are making a little progress every day or

two."

What did you mean by that?

A.      As I mentioned earlier, I felt some form of the

right thing to do morally was to try and get some money

back to Ms. Grewal.  So I was trying to, as I again

mentioned earlier, raise the money through whatever

legitimate mean possible.

Q.      That's what that sentence refers to?

A.      Correct.

Q.      Okay.  At any point in 2006, did you tell

1  MS. Grewal that the money that she had invested with you

2  had been lost?

3  A.      No.

4  Q.      At any point in 2005, did you tell Ms. Grewal

5  that the money that she had invested with you had been

6  lost?

7  A.      No.

8  Q.      What about in 2004?

9  A.      No.

10  Q.      2003?

11  A.      No.

12  Q.      2002?

13  A.      No.

14  Q.      2001?

15  A.      No.

16          MR. BANCHERO:  Exhibit 17 is AC-58.

17          (Plaintiff's Exhibit 17 was marked.)

18  Q.      BY MR. BANCHERO:  Did you receive this E-mail

19  message from Ms. Grewal on April 27, 2006?

20  A.      I received the E-mail from her.  I don't know

21  what day I received it or read it.

22  Q.      You recall receiving it from her?

23  A.      Well, only because I printed it out, so I must

24  have received it.

25  Q.      When you produced this E-mail message and

1             REPORTER'S CERTIFICATE

2        I certify that the foregoing proceedings in the

3    within-entitled cause were reported at the time and

4    place therein named; that said proceedings were reported

5    by me, a duly Certified Shorthand Reporter of the State

6    of California, and were thereafter transcribed into

7    typewriting

8             I further certify that I am not of counsel

9    or attorney for either or any of the parties to said

10   cause of action, nor in any way interested in the

11   outcome of the cause named in said cause of action.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand this 24th day of January, 2008.

14

15          Colleen M. Redamonti

16        COLLEEN M. REDAMONTI, CRP, CSR
          Certified Shorthand Reporter

17        Certificate No. 7012

18

19

20

21

22

23

24

25