# Exhibit C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ELIZABETH GREWAL, an )
individual, )
)
Plaintiff, )
)
)Case No.
vs. )  3-07-4218 CRB
)
AMIT CHOUDHURY, an )
individual; AMISIL HOLDINGS, )
LTD, a Cyprus corporation; and )
DOES ONE to FORTY, )
)
Defendants. )
_____ )
)
AND RELATED COUNTER CLAIM )
_____ )

VIDEOTAPED DEPOSITION OF

ELIZABETH GREWAL

Friday, January 11, 2008

REPORTED BY: SHERRI STARR, CSR# 10245 (01-404617)

```
 1                      --oOo--
 2            Deposition of ELIZABETH GREWAL, taken by
 3   the Defendants at the law office of Reed Smith LLP,
 4   Two Embarcadero Center, Suite 2000, San Francisco,
 5   California, commencing at 10:10 a.m., on Friday,
 6   January 11, 2008, before SHERRI STARR, RPR, CRR, CSR
 7   10245, pursuant to Notice.
 8                      --oOo--
 9
10              A P P E A R A N C E S
11
12   FOR THE PLAINTIFF:
13            KASTNER BANCHERO LLP
              20 California Street, 7th Floor
14            San Francisco, CA 94111
              (415)398-7000
15            By:  E. JEFFREY BANCHERO, Attorney at Law
16
17   FOR THE DEFENDANTS:
18            REED SMITH LLP
              Two Embarcadero Center, Suite 2000
19            San Francisco, CA 94111
              (415)543-8700
20            By:  HARVEY L. LEIDERMAN, Attorney at Law
21
     VIDEOGRAPHER:
22            Robert Bazydlo
              Robb Mueller
23
24   ALSO PRESENT:
              AMIT CHOUDHURY
25
```

                                                          5

15:32:42   1    allege in paragraph 10 of the complaint.  And I'd

15:32:44   2    like to know how it came about that the three of you

15:32:4?   3    ended up at dinner that evening.

15:32:53   4        A.   First of all, you say "allege."

15:32:55   5        Q.   That's an allegation when it's in a

15:32:58   6    document like this.

15:32:59   7        A.   I have my Visa statement from that dinner.

15:33:04   8            MR. BANCHERO:  Don't argue with

15:33:05   9    Mr. Leiderman.  Try to answer his question.

15:33:08   10           THE WITNESS:  I wanted to correct when he

15:33:10   11   said "allege."

15:33:11   12           MR. BANCHERO:  It's a term of art, meaning

15:33:13   13   a statement of a complaint.  So don't get caught up

15:33:16   14   in that.

15:33:17   15           THE WITNESS:  Sorry.  What's your

15:33:18   16   question?

15:33:18   17           MR. LEIDERMAN:  Q.  How did it come about

15:33:20   18   that the three of you found yourself in this

15:33:22   19   restaurant on that particular evening?

15:33:25   20       A.   As I recall Amit wanted to give us a

15:33:28   21   pitch.

15:33:29   22       Q.   What else do you recall?

15:33:45   23       A.   How do you want me to answer this in --

15:33:50   24       Q.   I want you to tell me what you recall.

15:33:52   25       A.   What parts do you want me to discuss?

183

| | | |
|---|---|---|
| 15:35:43 | 1 | A.   I don't recall a fight. |
| 15:35:46 | 2 | Q.   Was there an attempt to share the bill? |
| 15:35:44 | 3 | A.   I don't recall. |
| 15:35:50 | 4 | Q.   What do you recall about that dinner |
| 15:35:53 | 5 | meeting conversation that took place? |
| 15:35:56 | 6 | A.   I recall that Amit said that he was here |
| 15:36:01 | 7 | in this country on an investor visa, and therefore |
| 15:36:05 | 8 | that he could legally put money offshore, outside |
| 15:36:10 | 9 | the country.  And he said that if I loaned him |
| 15:36:14 | 10 | money, the interest could come back tax-free because |
| 15:36:17 | 11 | he said that there were tax treaties amongst |
| 15:36:20 | 12 | different countries such that individuals in those |
| 15:36:23 | 13 | countries who were non-US citizens could gift money |
| 15:36:27 | 14 | legally back into the country tax-free. |
| 15:36:32 | 15 | Q.   And was this of interest to you? |
| 15:36:37 | 16 | A.   We asked him lots of questions about it, I |
| 15:36:39 | 17 | remember.  And I remember he said, kind of |
| 15:36:41 | 18 | offhandedly, "It's not worth doing if you don't do |
| 15:36:45 | 19 | about a million." |
| 15:36:47 | 20 | Q.   And were you interested in that? |
| 15:36:50 | 21 | A.   We asked a lot of questions. |
| 15:36:52 | 22 | Q.   Uh-huh.  What did you think about that |
| 15:36:56 | 23 | when you heard it? |
| 15:36:58 | 24 | A.   I don't know what I thought at the time. |
| 15:37:07 | 25 | Q.   And you believe he was asking you |

186

ELIZABETH GREWAL   January 1, 2008

```
15:37:11   1    personally for money for himself?
15:37:17   2         A.   I don't know what he was going to do with
15:37:13   3    it.  He characterized that it would go offshore and
15:37:22   4    that it was perfectly legal, that he had these
15:37:24   5    different entities set up, and he said that he was
15:37:28   6    here on an investor visa.
15:37:30   7         Q.   Based on your experience with him up to
15:37:33   8    that point, did you believe him about all these
15:37:33   9    entities that you say he said were set up?
15:37:40  10         A.   I trusted him and I asked him many
15:37:43  11    questions.
15:37:43  12         Q.   What kind of questions?
15:37:44  13         A.   I don't recall.
15:37:46  14         Q.   But you recall you asked him many
15:37:48  15    questions, but you don't recall any of them?
15:37:50  16         A.   Not the specific questions, no.  I'm sure
15:37:53  17    I asked.  He never told me which countries
15:37:56  18    specifically any of the entities were in.
15:37:58  19              I remember another time him saying that he
15:38:01  20    spent about $100,000 and a lot of time with lawyers
15:38:05  21    setting up different entities in different countries
15:38:09  22    such that money could go legally from Country A to
15:38:13  23    Country B, Country B to Country C, Country C to
15:38:16  24    Country D, back to Country A.  Approximately
15:38:21  25    something like that.
```

187

15:39:21   1        Q.   That wasn't part of the discussion at this

15:39:23   2   dinner that you discuss in paragraph 10 of the

15:39:25   3   complaint though, was it?

15:39:29   4        A.   I believe that particular description was

15:39:30   5   a different time.

15:39:31   6        Q.   So Mr. Choudhury was pitching what, as you

15:39:33   7   understood it?

15:39:43   8        A.   What I just described.

15:39:44   9        Q.   That you would give him money and he would

15:39:47   10   do what with it?

15:39:52   11        A.   It sounded like he would legally invest it

15:39:54   12   offshore, and I did not know what that would be.

15:39:59   13        Q.   And would you ever see the money again?

15:39:01   14        A.   Of course.   That was my presumption or I

15:39:03   15   never would have loaned him money.

15:39:06   16        Q.   I'm sorry, that was your presumption or he

15:39:10   17   said that?

15:39:13   18        A.   As I recall, he said the loan would make

15:39:17   19   interest and that I would get the interest back

15:39:20   20   tax-free if I loaned him the money.

15:39:23   21        Q.   And did he tell you what he was going to

15:39:25   22   do with the money?

15:39:27   23        A.   I don't recall that he did, no.

15:39:29   24        Q.   Tell me again just so I understand, how

15:39:34   25   was the interest to have worked, the gift back?

188

15:56:40    1        A.    That was the understanding.

15:56:42    2        Q.    Okay.  Without a ceiling on it, whatever

15:56:45    3    it was that he could earn on it, it would go to you

15:56:48    4    tax-free?

15:56:49    5        A.    That was how he characterized it.

15:56:51    6        Q.    Was that how you understood it?

15:56:54    7        A.    I believe so.

15:56:56    8        Q.    You wouldn't have done this if you didn't

15:56:59    9    understand it to your own satisfaction; is that

15:57:01   10    right?

15:57:02   11        A.    I certainly never would have done it if I

15:57:05   12    didn't think I would get all my money back plus the

15:57:08   13    interest.

15:57:08   14        Q.    Okay.  And whatever that interest was?

15:57:11   15        A.    Correct.

15:57:14   16        Q.    So at some point, you actually wired some

15:57:16   17    money to Mr. Choudhury, correct?

15:57:20   18        A.    Correct.

15:57:20   19        Q.    And you wired it from your Schwab account,

15:57:23   20    the one that we've seen in Exhibit 12-A; is that

15:57:26   21    right?

15:57:27   22        A.    Correct.

15:57:27   23        Q.    And how did you know where to wire the

15:57:29   24    money to?

15:57:31   25        A.    He gave me an account number and the

201

| | | |
|---|---|---|
| 15:57:34 | 1 | instructions. |
| 15:57:37 | 2 | Q.   Okay.   You wired $880,000; is that |
| 15:57:40 | 3 | correct? |
| 15:57:41 | 4 | A.   Correct. |
| 15:57:43 | 5 | Q.   That wasn't a million dollars? |
| 15:57:45 | 6 | A.   No. |
| 15:57:45 | 7 | Q.   Why? |
| 15:57:49 | 8 | A.   That's what I came up with, 880.   He asked |
| 15:57:53 | 9 | for a million.   I sold California muni bonds, that's |
| 15:57:57 | 10 | how much I came up with.   And I told him that's how |
| 15:58:00 | 11 | much he was getting before I wired him the money. |
| 15:58:03 | 12 | Q.   What happened to the part at dinner, that, |
| 15:58:05 | 13 | you know, if you weren't going to do a million |
| 15:58:06 | 14 | dollars it wasn't worth doing? |
| 15:58:09 | 15 | MR. BANCHERO:   Objection.   Vague. |
| 15:58:12 | 16 | THE WITNESS:   What do you mean, "What |
| 15:58:13 | 17 | happened?" |
| 15:58:14 | 18 | MR. LEIDERMAN:   Q.   Well, he told you that |
| 15:58:17 | 19 | it wasn't worth doing for less than a million |
| 15:58:20 | 20 | dollars at dinner.   That's what you said, right? |
| 15:58:22 | 21 | A.   I believe that's what I said a moment ago. |
| 15:58:26 | 22 | Q.   Right.   Okay.   And you knew that when you |
| 15:58:29 | 23 | wired $880,000, right?   You hadn't forgotten about |
| 15:58:33 | 24 | that, had you? |
| 15:58:35 | 25 | A.   I knew that's what he asked for. |

202

ELIZABETH GREWAL   January   2008

| | | |
|---|---|---|
| 16:03:46 | 1 | had called someone, there's a |
| 16:03:46 | 2 | name on the exhibit, and I |
| 16:03:46 | 3 | don't know which brokerage firm |
| 16:03:46 | 4 | he was with, presumably one of |
| 16:03:46 | 5 | the ones where I owned |
| 16:03:46 | 6 | California muni bonds.  And I |
| 16:03:46 | 7 | had asked him to rank the |
| 16:03:46 | 8 | quality of the muni bonds, |
| 16:03:46 | 9 | which ones to keep and which |
| 16:03:46 | 10 | ones to sell.  And I think |
| 16:03:46 | 11 | based on that, I sold.  And I |
| 16:03:46 | 12 | didn't sell any more, I |
| 16:03:46 | 13 | stopped.") |
| 16:03:49 | 14 | MR. LEIDERMAN:  Q.  Okay.  Did you tell |
| 16:03:51 | 15 | this broker what you were doing with the money? |
| 16:03:55 | 16 | A.   I don't recall.  I don't think so. |
| 16:04:08 | 17 | MR. LEIDERMAN:  Did -- let's look at 007. |
| 16:04:25 | 18 | Let's mark this next in order. |
| 16:04:35 | 19 | (Whereupon Exhibit 49 was |
| 16:04:35 | 20 | marked for identification.) |
| 16:04:35 | 21 | MR. LEIDERMAN:  Q.  Let me show you what |
| 16:04:36 | 22 | we've marked as Exhibit 49, a one-page document on |
| 16:04:40 | 23 | the letterhead of Charles Schwab addressed to |
| 16:04:44 | 24 | Elizabeth Eilert Trustee, Elizabeth Eilert Trust |
| 16:04:50 | 25 | regarding Account Number MP 30730366. |

206

ELIZABETH GREWAL    January 1, 2008

| | |
|---|---|
| 16:04:55 | 1 |
| 16:04:57 | 2 |
| 16:04:59 | 3 |
| 16:04:59 | 4 |
| 16:05:02 | 5 |
| 16:05:05 | 6 |
| 16:05:08 | 7 |
| 16:05:09 | 8 |
| 16:05:11 | 9 |
| 16:05:12 | 10 |
| 16:05:18 | 11 |
| 16:05:20 | 12 |
| 16:05:24 | 13 |
| 16:05:27 | 14 |
| 16:05:34 | 15 |
| 16:05:37 | 16 |
| 16:05:43 | 17 |
| 16:05:46 | 18 |
| 16:05:51 | 19 |
| 16:05:54 | 20 |
| 16:05:57 | 21 |
| 16:05:58 | 22 |
| 16:06:00 | 23 |
| 16:06:02 | 24 |
| 16:06:03 | 25 |

1        Do you recognize this document that was

2   produced to us by your counsel?

3        A.   Yes.

4        Q.   Was this a confirmation of the wire

5   transfer of the $880,000 that you've testified

6   about?

7        A.   Yes.

8        Q.   Was that the name on the account from

9   which these funds came from?

10       A.   Yes.

11       Q.   This was not in your married name, right?

12   Your trust, Elizabeth Eilert, it was not the

13   Elizabeth Eilert Grewal trust?

14       A.   Correct.

15       Q.   So this confirms that that money was wired

16   on December 13th, 2000.  So sometime between

17   September 1 where you allege in the complaint that

18   you had this dinner discussion, and December 13th

19   when you actually wired the money, did you have any

20   further discussions with Mr. Choudhury about the

21   transaction?

22       A.   I'm sure.

23       Q.   Do you recall or you're just guessing at

24   that?

25       A.   I worked with him nearly every day.  I saw

207

| | | |
|---|---|---|
| 16:06:07 | 1 | him frequently.  I don't recall what discussions |
| 16:06:13 | 2 | happened when. |
| 16:06:15 | 3 | Q.   Do you recall any discussion between |
| 16:06:17 | 4 | September 1 and December 13 with Mr. Choudhury about |
| 16:06:29 | 5 | this transaction? |
| 16:06:29 | 6 | MR. BANCHERO:  Let me ask a question:  Is |
| 16:06:30 | 7 | the question do you recall that discussions were |
| 16:06:34 | 8 | had, or are you asking her to testify to whatever |
| 16:06:38 | 9 | recollection she has of the substance of the words |
| 16:06:41 | 10 | of those? |
| 16:06:43 | 11 | MR. LEIDERMAN:  Q.  I'm asking you to -- |
| 16:06:43 | 12 | whether you recall whether there was, in fact, any |
| 16:06:47 | 13 | discussion with Mr. Choudhury between September 1 of |
| 16:06:51 | 14 | 2000 and December 13th of 2000 regarding this |
| 16:06:55 | 15 | transaction. |
| 16:06:59 | 16 | A.   I believe I asked him more questions. |
| 16:07:04 | 17 | Q.   You have a specific recollection of having |
| 16:07:07 | 18 | done that?  I mean to distinguish that from your |
| 16:07:14 | 19 | thinking, "Well, that would have been what I would |
| 16:07:16 | 20 | have done," or something like that. |
| 16:07:17 | 21 | A.   Oh, no, I remember telling him 880 is |
| 16:07:20 | 22 | coming over. |
| 16:07:22 | 23 | Q.   When did you tell him that? |
| 16:07:27 | 24 | A.   Probably not long before the money was |
| 16:07:30 | 25 | wired.  I said something to the effect that, "This |

208

ELIZABETH GREWAL    January 1 2008

| | | |
|---|---|---|
| 16:07:37 | 1 | is how much I came up with.  This is what you're |
| 16:07:39 | 2 | getting and that's all." |
| 16:07:47 | 3 | Q.    Did he say anything in response to that? |
| 16:07:49 | 4 | A.    I don't recall. |
| 16:07:51 | 5 | Q.    And you don't recall when that |
| 16:07:53 | 6 | conversation took place?  Other than that it was |
| 16:07:57 | 7 | sometime -- was it shortly before December 13th of |
| 16:08:01 | 8 | 2000? |
| 16:08:04 | 9 | A.    I think so because there's a date on my |
| 16:08:08 | 10 | list of muni bonds with the person's name on it who |
| 16:08:12 | 11 | I called to discuss them, who ranked them for me. |
| 16:08:15 | 12 | And I believe that date is very early in December of |
| 16:08:21 | 13 | 2000. |
| 16:08:23 | 14 | MR. LEIDERMAN:  Counsel, many of the |
| 16:08:25 | 15 | documents, handwritten documents that were produced |
| 16:08:27 | 16 | to us were entirely illegible and we requested that |
| 16:08:30 | 17 | you bring those with you today.  Did you bring the |
| 16:08:33 | 18 | originals of those with you today so we could take a |
| 16:08:36 | 19 | look and see if perhaps what the witness is |
| 16:08:39 | 20 | testifying about is contained in those documents? |
| 16:09:00 | 21 | MR. BANCHERO:  Yes, we brought the |
| 16:09:02 | 22 | originals of those that your colleague, Mr. Reidy, |
| 16:09:06 | 23 | requested that we bring. |
| 16:09:08 | 24 | MR. LEIDERMAN:  May I see those at this |
| 16:09:09 | 25 | time? |

209

| | | |
|---|---|---|
| 16:37:57 | 1 | MR. LEIDERMAN:  Let's have marked, please, |
| 16:37:59 | 2 | as exhibit next in order, 50.  Two pages that are |
| 16:38:05 | 3 | stamped 100010 and -09. |
| 16:38:11 | 4 | (Whereupon Exhibit 50 was |
| 16:38:11 | 5 | marked for identification.) |
| 16:38:22 | 6 | MR. LEIDERMAN:  Q.  And I'll hand Exhibit |
| 16:38:24 | 7 | 50 to you and ask you if you're familiar with those |
| 16:38:28 | 8 | documents that were produced to us by your counsel |
| 16:38:31 | 9 | and numbers stamped in that fashion. |
| 16:38:39 | 10 | A.  Yes. |
| 16:38:39 | 11 | Q.  Does that appear to be true copies of |
| 16:38:42 | 12 | excerpts from the statement on the account from |
| 16:38:46 | 13 | which you transferred $880,000 in December of 2000? |
| 16:38:52 | 14 | A.  Yes. |
| 16:38:53 | 15 | Q.  Do you have the original in your |
| 16:38:55 | 16 | possession of at least these two pages? |
| 16:38:59 | 17 | A.  Yes. |
| 16:38:59 | 18 | Q.  Do you have the rest of the pages that |
| 16:39:01 | 19 | came with the statement? |
| 16:39:02 | 20 | A.  I believe so, yes. |
| 16:39:05 | 21 | Q.  Would you turn to the second page here, |
| 16:39:07 | 22 | 10009?  Do you see in the middle of that page, it |
| 16:39:12 | 23 | says, "Total investments and purchases sold"? |
| 16:39:16 | 24 | A.  Yes. |
| 16:39:17 | 25 | Q.  And this is the statement period of |

218

**Merrill Legal Solutions**
**(800) 869-9132**

| | | |
|---|---|---|
| 16:47:44 | 1 | transfer. |
| 16:47:45 | 2 | Q.   Okay.   What evidence did you have in |
| 16:47:48 | 3 | writing -- |
| 16:47:49 | 4 | A.   I'm sorry, and my Schwab statement that we |
| 16:47:51 | 5 | just looked at. |
| 16:47:53 | 6 | Q.   Did you have -- up until the time that you |
| 16:47:55 | 7 | received Exhibit A, the Term Promissory Note, did |
| 16:47:58 | 8 | you have anything in writing to evidence whatever |
| 16:48:02 | 9 | the terms of the transaction was between you and |
| 16:48:07 | 10 | Mr. Choudhury? |
| 16:48:08 | 11 | A.   No. |
| 16:48:08 | 12 | Q.   Did you ask for anything in writing? |
| 16:48:11 | 13 | A.   Repeatedly. |
| 16:48:13 | 14 | Q.   But you had nothing? |
| 16:48:14 | 15 | A.   No. |
| 16:48:14 | 16 | Q.   And when you wired the money you had |
| 16:48:18 | 17 | nothing? |
| 16:48:18 | 18 | A.   I was given nothing. |
| 16:48:20 | 19 | Q.   Okay.   And you didn't create anything? |
| 16:48:22 | 20 | A.   I did not. |
| 16:48:26 | 21 | Q.   When you wired the money, what was your |
| 16:48:30 | 22 | understanding of what obligation Mr. Choudhury had |
| 16:48:36 | 23 | to you, if any? |
| 16:48:42 | 24 | A.   If any? |
| 16:48:43 | 25 | Q.   Yes. |

225

16:49:50    1        Q.    Other than what you've just told me, were

16:49:52    2    there any other terms of this transaction and

16:49:56    3    Mr. Choudhury's obligations to you, as you

16:49:59    4    understood them, when you transferred the money to

16:50:02    5    him on December 13th?

16:50:04    6        A.    Not that I can recall.

16:50:13    7        Q.    Well, do you have anything in writing to

16:50:13    8    indicate -- if you can't recall, anything to

16:50:13    9    indicate what the terms of that transaction were

16:50:21   10    when you wire-transferred the money?

16:50:23   11        A.    I repeatedly asked for a promissory note

16:50:26   12    and was not given one.

16:50:29   13        Q.    I understand.  I'm asking you now do you

16:50:31   14    have anything in writing, handwritten notes, for

16:50:31   15    example, or a confirmation from anyone else or a

16:50:39   16    representation written by somebody else or a letter

16:50:42   17    or any kind of writing, an e-mail, for example,

16:50:47   18    anything at the time you wire-transferred the money

16:50:53   19    to evidence the terms of Mr. Choudhury's obligations

16:50:57   20    to you?

16:50:59   21        A.    No, I don't think so.

16:51:11   22        Q.    Did you know at the time that you

16:51:15   23    wire-transferred the money that you were

16:51:17   24    wire-transferring the money to Mr. Choudhury's

16:51:20   25    account?

227

ELIZABETH GROWAL   January 4, 2008

16:51:22   1          A.    I believe I did, yes.

16:51:31   2          Q.    Was your understanding that 4 percent was

16:51:34   3    the minimum amount of interest or income that you

16:51:35   4    would receive from the wiring him this money?

16:51:44   5          A.    Yes.

16:51:52   6          Q.    And was that 4 percent simple interest?

16:51:55   7    Compounded?  What was your understanding?

16:51:59   8          A.    My understanding was compound because in

16:52:02   9    working with Amit, as I recall, I remember talking

16:52:06   10   about compound interest all the time.

16:52:10   11         Q.    And did you discuss that specific term

16:52:12   12   with him relative to this wire of money?

16:52:16   13         A.    I do not recall.

16:52:17   14         Q.    And you have nothing in writing to

16:52:20   15   indicate one way or the other?

16:52:21   16         A.    No, I do not.

16:52:29   17         Q.    You understood that you were not going to

16:52:31   18   receive anything for five years, that was the idea?

16:52:38   19         A.    Correct.

16:52:47   20         Q.    Now, I'm sorry, you said you received the

16:52:50   21   original of the Term Promissory Note that's Exhibit

16:52:53   22   A, to the first amended complaint sometime in

16:52:59   23   mid-January?

16:53:00   24         A.    Correct, that is my memory.

16:53:02   25         Q.    Do you recall the circumstances at which

                                                                      228

ELIZABETH GREWAL    January 1, 2008

| | | |
|---|---|---|
| 16:53:03 | 1 | that came into your possession? |
| 16:53:05 | 2 | A.   Yes. |
| 16:53:05 | 3 | Q.   Tell me about that. |
| 16:53:06 | 4 | A.   I believe we were in Mr. Choudhury's |
| 16:53:09 | 5 | office, Amit's office on Van Ness.  I think he was |
| 16:53:15 | 6 | sitting behind his desk and I was over here on the |
| 16:53:19 | 7 | other side. |
| 16:53:19 | 8 | Q.   What did you discuss? |
| 16:53:21 | 9 | A.   I had been asking for a promissory note |
| 16:53:25 | 10 | for quite some time and this is what he gave me. |
| 16:53:33 | 11 | Q.   Okay.  Did you look at it then? |
| 16:53:35 | 12 | A.   Yes. |
| 16:53:35 | 13 | Q.   Did you read it? |
| 16:53:36 | 14 | A.   Yes. |
| 16:53:36 | 15 | Q.   Do you think you understood it? |
| 16:53:39 | 16 | A.   Yes. |
| 16:53:40 | 17 | Q.   Did you see it said -- it referred to the |
| 16:53:44 | 18 | sum of a million dollars? |
| 16:53:45 | 19 | A.   Yes. |
| 16:53:45 | 20 | Q.   Did you say anything about that? |
| 16:53:47 | 21 | A.   Yes. |
| 16:53:47 | 22 | Q.   What did you say? |
| 16:53:48 | 23 | A.   I asked him, "Why does it say a million?" |
| 16:53:51 | 24 | Q.   Yes.  What did he say? |
| 16:53:52 | 25 | A.   He said he prepared this before the money |

229

ELIZABETH GREWAL    January 7, 2008

| 17:24:56 | 1 | Q. How many such books are there? |
| 17:24:58 | 2 | A. That's the only one. |
| 17:24:59 | 3 | Q. Do you still have it? |
| 17:25:00 | 4 | A. Yes, it's not up-to-date. I stopped using |
| 17:25:03 | 5 | it except for this. |
| 17:25:04 | 6 | Q. Okay. And so you wrote this down last |
| 17:25:06 | 7 | summer for what purpose? |
| 17:25:09 | 8 | A. To track. |
| 17:25:11 | 9 | Q. To track? |
| 17:25:12 | 10 | A. To track the loan. |
| 17:25:17 | 11 | Q. All right. On either side of this page at |
| 17:25:20 | 12 | the top there's a "24" and a "25." What does that |
| 17:25:24 | 13 | mean? |
| 17:25:26 | 14 | A. I believe those are the page numbers in my |
| 17:25:29 | 15 | booklet. |
| 17:25:29 | 16 | Q. Okay. So would you explain to me what |
| 17:25:32 | 17 | this is recording? You said it's the loan, but what |
| 17:25:37 | 18 | are you showing here? |
| 17:25:39 | 19 | A. This tracks the principal that I wired |
| 17:25:44 | 20 | over -- |
| 17:25:44 | 21 | Q. Yes. |
| 17:25:45 | 22 | A. -- of the loan on December 13th, 2000. |
| 17:25:47 | 23 | And then it calculates 4 percent simple interest and |
| 17:25:54 | 24 | it calculates 5 percent daily compounding interest. |
| 17:26:03 | 25 | You look like you're waiting for more. Because -- |

251

Merrill Legal Solutions
(800) 869-9132

| | |
|---|---|
| 17:26:05 | 1 |
| 17:26:08 | 2 |
| 17:26:10 | 3 |
| 17:26:16 | 4 |
| 17:26:21 | 5 |
| 17:26:25 | 6 |
| 17:26:29 | 7 |
| 17:26:34 | 8 |
| 17:26:39 | 9 |
| 17:26:41 | 10 |
| 17:26:48 | 11 |
| 17:26:50 | 12 |
| 17:26:54 | 13 |
| 17:26:56 | 14 |
| 17:26:59 | 15 |
| 17:27:01 | 16 |
| 17:27:05 | 17 |
| 17:27:09 | 18 |
| 17:27:14 | 19 |
| 17:27:17 | 20 |
| 17:27:20 | 21 |
| 17:27:22 | 22 |
| 17:27:23 | 23 |
| 17:27:26 | 24 |
| 17:27:31 | 25 |

Q.   Well, I'm going to ask you why, so --

A.   Yes, I thought so.  Because for six out of
the last seven years, Amit told me that my money was
sitting in a family office account in HSBC in London
making 5 percent -- some product that was making 5
percent minimum with potentially more.  And I
remember I had to ask him what "HSBC" stood for, and
that's Hong Kong Shanghai Banking Corporation.

Q.   Okay.  Well, were you trying to reflect
what your agreement was, or something else?

A.   I was reflecting what was in writing on
the Term Promissory Note and what Amit was saying
verbally.  Those were two different things.

Q.   Which part reflects what was stated in the
Term Promissory Note?

A.   Again, I don't know if the promissory note
is for simple or for compound.  This calculation is
for simple, 4 percent simple.  And the 5 percent is
for daily compounded because that was my
understanding when Amit verbally said many, many
times in the last six years that that's what my
money was making.

Q.   Okay.  My question was which part of this
records what you thought the written Term Promissory
Note provided?

252

ELIZABETH GREWAL      January 1, 2008

| | | |
|---|---|---|
| 17:28:46 | 1 | what you thought the agreement was. |
| 17:28:50 | 2 | A.   I believe when I made this, I did the |
| 17:28:53 | 3 | spectrum of minimum, which would be 4 percent |
| 17:28:57 | 4 | simple, to the maximum, 5 percent daily compounded, |
| 17:29:00 | 5 | which is what Amit verbally -- let me turn that off, |
| 17:29:05 | 6 | I'm sorry. |
| 17:29:26 | 7 | Okay.  Back to this.  I believe I was |
| 17:29:28 | 8 | representing the spectrum from the lowest to the |
| 17:29:31 | 9 | highest based on 4 percent and 5 percent. |
| 17:29:40 | 10 | Q.   Okay. |
| 17:29:41 | 11 | A.   Now, the promissory note is not clear in |
| 17:29:44 | 12 | my mind.  I believe it means compound.  But there's |
| 17:29:47 | 13 | 4 percent, there's 5 percent that Amit said for the |
| 17:29:50 | 14 | last six out of seven years that my money was |
| 17:29:53 | 15 | making, and so I tracked that as well.  I tracked |
| 17:29:54 | 16 | both. |
| 17:29:55 | 17 | Q.   I see.  And the 5 percent was the maximum |
| 17:29:58 | 18 | then? |
| 17:29:58 | 19 | A.   No, he said my money was in some product |
| 17:30:01 | 20 | that was making a minimum of 5 percent and that it |
| 17:30:04 | 21 | might be more. |
| 17:30:06 | 22 | Q.   Did you calculate what "more" might be? |
| 17:30:13 | 23 | A.   That wasn't possible.  He didn't ever give |
| 17:30:16 | 24 | me that information except on one occasion. |
| 17:30:18 | 25 | Q.   So this wasn't the spectrum from high to |

254

ELIZABETH GREWAL    January 1, 2008

17:30:21  1    low, then, that's recorded on Exhibit 55?  This is

17:30:26  2    between two different numbers, I understand.  But

17:30:29  3    the 5 percent that he then told you for six years,

17:30:32  4    according to your testimony, that the money was at

17:30:35  5    HSBC in London earning 5 percent, was that part of

17:30:41  6    the deal?

17:30:43  7        A.    Approximately one year after I wired the

17:30:46  8    money to him, he said that that's where my money

17:30:50  9    was, in a family office account with some of his

17:30:54  10   family members and a very few select friends in some

17:30:58  11   sort of product that was making 5 percent minimum.

17:31:03  12   That is why I tracked that in here, because that's

17:31:08  13   what he told me.

17:31:12  14       Q.    What's the language "Debtor/Amisil

17:31:14  15   Holdings, Limited" on the top of Exhibit 55?

17:31:21  16       A.    The first time I heard of Amisil Holdings

17:31:23  17   was whenever Amit filed his lawsuit against Peter

17:31:33  18   Thiel, and he produced a press release that

17:31:36  19   mentioned Amisil Holdings in Cypress.  And I turned

17:31:39  20   to him and said, "Is that where my money is?"  And

17:31:42  21   he said "Yes."  "Is that the entity that my money is

17:31:47  22   in?"  And he said "Yes," so --

17:31:50  23       Q.    I'm sorry, go ahead.

17:31:52  24       A.    -- my understanding was my money was in

17:31:54  25   Amisil Holdings.

255

ELIZABETH GREWAL      January 1, 2008

| | |
|---|---|
| 17:31:56 | 1 |
| 17:32:00 | 2 |
| 17:32:04 | 3 |
| 17:32:07 | 4 |
| 17:32:12 | 5 |
| 17:32:16 | 6 |
| 17:32:20 | 7 |
| 17:32:23 | 8 |
| 17:32:26 | 9 |
| 17:32:29 | 10 |
| 17:32:31 | 11 |
| 17:32:32 | 12 |
| 17:32:35 | 13 |
| 17:32:40 | 14 |
| 17:32:42 | 15 |
| 17:32:43 | 16 |
| 17:32:46 | 17 |
| 17:32:49 | 18 |
| 17:32:53 | 19 |
| 17:32:57 | 20 |
| 17:32:59 | 21 |
| 17:33:02 | 22 |
| 17:33:03 | 23 |
| 17:33:06 | 24 |
| 17:33:09 | 25 |

1    Q.    I thought you said your money was at HSBC.

2    A.    Right.  Amisil Holdings is Amit's company,

3  as I understand, that's based in Cypress and

4  Bermuda.  And I don't know where else that he has his

5  offshore funds.  And he told me that that's where my

6  money was, presumably implying that Amisil Holdings

7  has an account at HSBC in London.

8    Q.    Presumably implying that or saying that?

9    A.    No, he said that's where my money is.  I

10  said, "Is this where my money is?"

11    Q.    When did you say that?

12    A.    August of -- Amit will know if it's August

13  2006 or, no, August 2007?  When was the lawsuit?

14    Q.    You have to testify from your own memory

15  as best you can.

16    A.    No, there's a lawsuit he's filed against

17  Peter Thiel.  And just prior to filing the lawsuit

18  he issued one or two press releases.  And he can

19  tell you the dates to those precisely better than I.

20    Q.    Okay.  Anyway sometime in '06, we're

21  talking about, is when you had this conversation

22  with him?

23    A.    You're the one who represents him on the

24  Peter Thiel lawsuit as I've been told by Amit, so

25  you would know.

256

**Merrill Legal Solutions**
**(800) 869-9132**

LIZABETH GREWAL    January 11, 2008

17:33:11  1        Q.   No, I want to know when you wrote this and

17:33:13  2    referred to Amisil Holdings and why.  And I think

17:33:19  3    you said because he told you something about Amisil

17:33:22  4    Holdings.  I'm asking you when he told you.  If you

17:33:24  5    can't recall, tell me you can't recall.

17:33:26  6        A.   I recall exactly that I read the press

17:33:33  7    release that he issued, he e-mailed it to me, I

17:33:33  8    remember.  And when I saw him and I read the Amisil

17:33:36  9    Holdings I said, "Is this where my money is?"  And

17:33:39  10   he said, "Yes."  I think I said, "Is this the entity

17:33:46  11   in London where my money is?"  And he said, "Yes."

17:33:49  12       Q.   So you believe that there was a -- some

17:33:53  13   account that had your money in it; is that right?

17:33:56  14       A.   That's what he told me.

17:33:57  15       Q.   And it was earning interest?

17:33:59  16       A.   That's what he told me.

17:34:00  17       Q.   And that would have been consistent with

17:34:03  18   what the transaction was; is that correct?

17:34:05  19            MR. BANCHERO:  Objection.  Vague.

17:34:06  20            THE WITNESS:  I don't know what

17:34:06  21   "consistent" is.  He told me my money, for six out

17:34:10  22   of the last seven years, was making 5 percent.  And

17:34:14  23   it sat in a family office account in London at Hong

17:34:18  24   Kong Shanghai Banking Corp.

17:34:21  25            MR. LEIDERMAN:  Q.  And your money was the

257

LIZABETH GREWAL      January 1, 2008

| | | |
|---|---|---|
| 17:34:24 | 1 | money that you had wire-transferred to him; is that |
| 17:34:27 | 2 | what you're referring to? |
| 17:34:30 | 3 | A.   Yes. |
| 17:34:30 | 4 | Q.   I just want to make sure we're talking |
| 17:34:32 | 5 | about the same money here.  When he refers to your |
| 17:34:35 | 6 | money as being held in an account, you understand |
| 17:34:37 | 7 | that to refer to the $880,000 that you had |
| 17:34:40 | 8 | wire-transferred to him in December of 2000, |
| 17:34:43 | 9 | correct? |
| 17:34:44 | 10 | A.   Plus the accumulated interest, yes. |
| 17:34:46 | 11 | Q.   Okay.  Fine.  And that interest could have |
| 17:34:48 | 12 | been 4 percent simple, 5 percent compounded, 4 |
| 17:34:51 | 13 | percent compounded or more? |
| 17:34:53 | 14 | A.   He told me many, many times it was 5 |
| 17:34:55 | 15 | percent. |
| 17:34:55 | 16 | Q.   Yeah, but under your understanding of your |
| 17:34:58 | 17 | agreement, it could have been 4 percent simple or |
| 17:35:03 | 18 | more? |
| 17:35:05 | 19 | A.   Remember his verbal agreement said 4 |
| 17:35:09 | 20 | percent or more.  Then he maintained for six out of |
| 17:35:14 | 21 | the last seven years that it was 5 percent or more. |
| 17:35:18 | 22 | Q.   That wasn't in the agreement though? |
| 17:35:20 | 23 | MR. BANCHERO:  Objection. |
| 17:35:23 | 24 | MR. LEIDERMAN:  Q.  Was it? |
| 17:35:24 | 25 | MR. BANCHERO:  Argumentative. |

258

ELIZABETH GREWAL    January 4, 2008

18:10:19    1    minimum, a million dollars plus 4 percent.  And he

18:10:27    2    came up and hugged me when I was crying.

18:10:47    3        Q.    Did Mr. Choudhury ever tell you that he

18:10:52    4    had some family office?

18:11:00    5        A.    Yes, many times.  A family office account.

18:11:06    6        Q.    A family office account.  And what did you

18:11:07    7    understand that to mean?

18:11:10    8        A.    As I understand, a family office can be

18:11:13    9    many things to many people.  They provide -- a

18:11:15    10   family office can provide a service where they pay

18:11:18    11   your bills, where they invest your money.  It has a

18:11:25    12   big range, as I understand, of what the people you

18:11:28    13   hire can do for you.

18:11:29    14       Q.    Where did you get your understanding from

18:11:31    15   about family offices?

18:11:35    16       A.    Some of them were our potential clients of

18:11:38    17   the Finexa product.

18:11:41    18       Q.    So at some time, Mr. Choudhury told you he

18:11:44    19   had a family office account?

18:11:47    20       A.    Approximately one year after I

18:11:49    21   wire-transferred my money to Amit, he said my money

18:11:54    22   was sitting in a family office account in HSBC in

18:11:59    23   London making 5 percent minimum.

18:12:06    24       Q.    So your money was earning interest in some

18:12:09    25   account according to him, that's what he told you?

278

| 18:12:13 | 1 | A. Yes. |
| 18:12:14 | 2 | Q. And did he tell you something about some |
| 18:12:16 | 3 | life insurance product? |
| 18:12:18 | 4 | A. Yes. A year or two or three, perhaps, |
| 18:12:22 | 5 | after I wire-transferred the money over, I don't |
| 13:12:25 | 6 | remember exactly when, in his apartment, he showed |
| 18:12:29 | 7 | me a piece of paper that he said I could not keep |
| 18:12:33 | 8 | because I am a US citizen, and I guess -- I don't |
| 18:12:39 | 9 | know why I would not be able to see that, but that's |
| 18:12:42 | 10 | what he said, or keep it. I'm guessing he meant |
| 18:12:48 | 11 | it's because I could not invest in that or something |
| 18:12:51 | 12 | because I was a US citizen, I don't know. |
| 18:12:54 | 13 | But as I understand, it was a product. I |
| 18:12:58 | 14 | thought that he had created -- with a man named |
| 18:13:01 | 15 | Jonathan Heller who was on the advisory board of |
| 18:13:07 | 16 | Finexa, and I believe the two of them created |
| 18:13:09 | 17 | financial products. And the name of that particular |
| 18:13:13 | 18 | product ended in the letters p-o-l-i-s. And it was |
| 18:13:17 | 19 | sort of a grid document, lines down and across. And |
| 18:13:21 | 20 | then one of the boxes said it was insured by Lloyd's |
| 18:13:26 | 21 | of London. |
| 18:13:28 | 22 | Q. Okay. |
| 18:13:32 | 23 | A. And I'm not sure, but I think he might |
| 18:13:34 | 24 | have said that that was the product my money was in. |
| 18:13:37 | 25 | It was a life insurance product. I'm not positive |

279

ELIZABETH GREWAL    January 1, 2008

| | | |
|---|---|---|
| 18:13:39 | 1 | if he said my money was there.  I think so. |
| 18:13:44 | 2 | Q.   You think he said your money was no longer |
| 18:13:46 | 3 | in a family office account at HSBC in London, it was |
| 18:13:51 | 4 | in some life insurance product? |
| 18:13:54 | 5 | A.   No, that's not what I said at all.  A |
| 18:13:57 | 6 | family office account could comprise many, many |
| 18:14:03 | 7 | investments for the family and people who hold the |
| 18:14:06 | 8 | money there.  One of which was this document he |
| 18:14:13 | 9 | showed me, the product. |
| 18:14:16 | 10 | Q.   Okay.  Prior to that, I think you |
| 18:14:18 | 11 | testified that he told you that the money was in an |
| 18:14:21 | 12 | account at HSBC earning interest, right?  So was |
| 18:14:27 | 13 | this something different than that, this life |
| 18:14:30 | 14 | insurance product? |
| 18:14:31 | 15 | A.   No, it may have been the same thing.  I |
| 18:14:33 | 16 | don't know for sure.  But I believe it may have been |
| 18:14:35 | 17 | the same thing, I don't know.  He said many things. |
| 18:14:39 | 18 | Q.   And you believed them all? |
| 18:14:41 | 19 | A.   I did.  He was a very good friend, I |
| 18:14:45 | 20 | thought, who I trusted.  And we talked repeatedly |
| 18:14:48 | 21 | about this family office account and the products. |
| 18:14:51 | 22 | In fact, in March of 2006 when he was |
| 18:15:05 | 23 | three months in default, he gave me a value of my |
| 18:15:09 | 24 | money at the time.  He said he owed me $1,165,000, |
| 18:15:12 | 25 | and I don't remember the last three numbers. |

280

ELIZABETH GREWAL    January    2008

| | | |
|---|---|---|
| 18:57:25 | 1 | can.  Otherwise you can ask her generally, but she |
| 18:57:28 | 2 | had more than one conversation. |
| 18:57:30 | 3 | MR. LEIDERMAN:  Thank you for that. |
| 18:57:32 | 4 | Q.  So how many conversations did you have |
| 18:57:34 | 5 | after the filing of your lawsuit with David Hayford? |
| 18:57:38 | 6 | A.  Several. |
| 18:57:39 | 7 | Q.  And were you alone with Mr. Hayford when |
| 18:57:42 | 8 | you had these conversations? |
| 18:57:44 | 9 | A.  No, I've never seen him, so I was never |
| 18:57:47 | 10 | alone with him. |
| 18:57:48 | 11 | Q.  All right.  These were conversations by |
| 18:57:50 | 12 | what media? |
| 18:57:52 | 13 | A.  Telephone and e-mail. |
| 18:57:53 | 14 | Q.  Okay.  And several such communications? |
| 18:57:58 | 15 | A.  Yes. |
| 18:57:58 | 16 | Q.  Have you produced any of those e-mail |
| 18:58:01 | 17 | communications in the documents that you made |
| 18:58:05 | 18 | available to us? |
| 18:58:06 | 19 | A.  No. |
| 18:58:07 | 20 | Q.  Was there a reason why not? |
| 18:58:14 | 21 | MR. BANCHERO:  What is the -- in other |
| 18:58:16 | 22 | words, do you believe that she had an obligation to |
| 18:58:20 | 23 | produce these to me? |
| 18:58:22 | 24 | MR. LEIDERMAN:  I'm asking her if there |
| 18:58:23 | 25 | was a reason why she had documents relating to these |

301

**Merrill Legal Solutions**
**(800) 869-9132**

ZABETH GREWAL    January    2008

| | | |
|---|---|---|
| 18:58:27 | 1 | conversations, someone made a decision not to |
| 18:58:30 | 2 | produce them, and I want to know what the reason |
| 18:58:31 | 3 | was. |
| 18:58:32 | 4 | THE WITNESS:  No. |
| 18:58:34 | 5 | MR. LEIDERMAN:  Q.  No, you won't tell me |
| 18:58:35 | 6 | the reason or -- |
| 18:58:37 | 7 | A.  No, to my knowledge, there was no reason. |
| 18:58:40 | 8 | Q.  Okay.  So tell me the content of these |
| 18:58:44 | 9 | communications between yourself and Mr. Hayford |
| 18:58:49 | 10 | relating to the first item that you talked about, |
| 18:58:52 | 11 | Mr. Choudhury's financial obligations to you. |
| 18:59:00 | 12 | A.  I can't tell you the detail. |
| 18:59:02 | 13 | Q.  Okay. |
| 18:59:03 | 14 | A.  I don't recall exactly the words. |
| 18:59:06 | 15 | Q.  All right.  Do the best you can to recall |
| 18:59:09 | 16 | what you communicated to Mr. Hayford. |
| 18:59:14 | 17 | A.  I asked him if he knew about my loan to |
| 18:59:16 | 18 | Amit. |
| 18:59:19 | 19 | Q.  Did he respond? |
| 18:59:21 | 20 | A.  Yes. |
| 18:59:21 | 21 | Q.  How did he respond? |
| 18:59:23 | 22 | A.  He said no, he did not know of my loan to |
| 18:59:26 | 23 | Amit. |
| 18:59:27 | 24 | Q.  All right.  What else did you communicate |
| 18:59:28 | 25 | to him? |

302

1               CERTIFICATE OF REPORTER

2             I, SHERRI STARR, a Certified Shorthand

3  Reporter, hereby certify that the witness in the

4  foregoing deposition was by me duly sworn to tell

5  the truth, the whole truth, and nothing but the

6  truth in the within-entitled cause;

7             That said deposition was taken in

8  shorthand by me, a disinterested person, at the time

9  and place therein stated, and that the testimony of

10  the said witness was thereafter reduced to

11  typewriting, by computer, under my direction and

12  supervision;

13           That before completion of the deposition,

14  review of the transcript [X] was [ ] was not

15  requested.  If requested, any changes made by the

16  deponent (and provided to the reporter) during the

17  period allowed are appended hereto.

18           I further certify that I am not of counsel

19  or attorney for either or any of the parties to the

20  said deposition, nor in any way interested in the

21  event of this cause, and that I am not related to

22  any of the parties thereto.  1/18/08

23      DATED:

24

25            SHERRI STARR, CSR No. 10245