# Exhibit B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ELIZABETH GREWAL, an          **CERTIFIED COPY**

individual,

        Plaintiff,          No. C-07-4218 CRB

vs.

AMIT CHOUDHURY, an individual,

        Defendant.

_____/

Videotaped Deposition of

**AMIT CHOUDHURY**

Thursday, January 10, 2008

Reported by:
COLLEEN M. REDAMONTI
CRP, CSR No. 7012
Job No.:  782CMR



41 Aptos Avenue   San Francisco, CA 94127-2518
Ph: [415] 587-2000  Fx: [415] 587-2110
Email: Info@baycityreporting.com

1                         APPEARANCES

2

3    For the Plaintiff:

4          KASTNER BANCHERO LLP

5          By:  E. JEFFREY BANCHERO

6          Attorney at Law

7          20 California Street, Seventh Floor

8          San Francisco, California 94111

9          (415) 398-7000

10         E-mail: ejb@kastnerbanchero.com

11

12

13   For the Defendant:

14         REED SMITH LLP

15         By:  HARVEY L. LEIDERMAN

16         Attorney at Law

17         Two Embarcadero Center, Suite 2000

18         San Francisco, California 94111

19         (415) 543-8700

20         E-mail:  hleiderman@reedsmith.com

21

22   Also Present:

23         CYRIL SUSZCKIEWICZ, Video Operator

24         ELIZABETH GREWAL

25

09:35:59  1          Counsel, would you please identify yourselves

.9:36:02  2   for the record.

09:36:02  3          MR. BANCHERO:  My name is Jeffrey Banchero.

09:36:05  4   I'm at Kastner Banchero, LLP.  I represent the

09:36:09  5   plaintiff, Elizabeth Grewal.  I'm here with the

09:36:12  6   plaintiff, Ms. Grewal, who is sitting to my left.

09:36:16  7          MR. LEIDERMAN:  Good morning.  Harvey

09:36:19  8   Leiderman, Reed Smith, representing defendant Amit

09:36:23  9   Choudhury.  Mr. Choudhury is present as the deponent.

09:36:29  10          VIDEOTAPE OPERATOR:  The court reporter may

09:36:31  11   swear in the witness.

09:36:31  12          (Witness sworn.)

09:36:38  13              EXAMINATION BY MR. BANCHERO

09:36:38  14   Q.        Good morning, Mr. Choudhury.  My name is

09:36:43  15   Jeffrey Banchero.  I represent Elizabeth Grewal in the

09:36:49  16   case that she brought against you which you removed to

09:36:53  17   the United States District Court for the Northern

09:36:56  18   District of California.

09:36:58  19          You're here for your deposition.  I take it

09:37:03  20   that you've had an opportunity to meet with your counsel

09:37:05  21   prior to this morning to discuss the deposition process?

09:37:12  22   A.        Yes.

09:37:13  23   Q.        Okay.  Did you have dinner with Elizabeth and

09:37:20  24   Hardev Grewal at the Millennium restaurant on

9:37:25  25   September 1, 2000?

| | | |
|---|---|---|
| 09:37:26 | 1 | A.        I don't remember. |
| 9:37:27 | 2 | Q.        Did you have dinner with Elizabeth and Hardev |
| 09:37:31 | 3 | Grewal on September 1st, 2000? |
| 09:37:34 | 4 | A.        I don't remember. |
| 09:37:35 | 5 | Q.        During the fall of 2000, did you have dinner |
| 09:37:39 | 6 | with Elizabeth and Hardev Grewal? |
| 09:37:45 | 7 | A.        I don't remember. |
| 09:37:47 | 8 | Q.        In September 2000, did you have any discussions |
| 09:37:57 | 9 | with Elizabeth Grewal about the possibility of her |
| 09:38:02 | 10 | loaning money to you? |
| 09:38:05 | 11 | A.        No. |
| 09:38:06 | 12 | Q.        At any time during the month of August 2000, |
| 09:38:13 | 13 | did you have any discussions with Elizabeth Grewal about |
| 09:38:17 | 14 | the possibility of her loaning money to you? |
| 09:38:20 | 15 | A.        No. |
| 09:38:23 | 16 | Q.        At any time during October 2000, did you have |
| 09:38:29 | 17 | any discussions with Elizabeth Grewal about the |
| 09:38:32 | 18 | possibility of her loaning money to you? |
| 09:38:35 | 19 | A.        No. |
| 09:38:36 | 20 | Q.        During the period from August -- |
| 09:38:44 | 21 | MR. LEIDERMAN:  I'm sorry.  Excuse me.  It |
| 09:38:46 | 22 | won't show on the tape.  Ms. Grewal is staring intently |
| 09:38:51 | 23 | and leaning forward across the table at the deponent. |
| 09:38:55 | 24 | Would you kindly instruct your client on proper |
| 9:38:59 | 25 | decorum in the deposition room, Mr. Banchero? |

09:40:03   1          MR. LEIDERMAN:  If I did, I would.

9:40:05    2          MR. BANCHERO:  I just wanted to make sure you

09:40:07   3    had an opportunity to say whatever you had to say.

09:40:10   4          MR. LEIDERMAN:  I took the opportunity.

09:40:11   5          MR. BANCHERO:  Okay.

09:40:13   6          Could I have the last question and answer back

09:40:15   7    to Mr. Choudhury, please?

09:40:30   8          MS. GREWAL:  Could I have the record show that

09:40:32   9    he just glared at me.  This lawyer right here.

09:40:35  10          MR. BANCHERO:  I do think Mr. Leiderman's

09:40:37  11    tactics at this point are a little out of line.  But

09:40:43  12    he'll do what he'll do.  So let's just ignore him and

09:40:47  13    proceed with the deposition.

09:40:48  14          Could I have the last question and answer back?

09:41:12  15               (The following was read by the reporter:

09:38:26  16               QUESTION:  At any time during October

09:38:29  17               2000, did you have any discussions with

09:38:31  18               Elizabeth Grewal about the possibility of

09:38:33  19               her loaning money to you?

09:38:36  20               ANSWER:  No.

09:38:41  21               QUESTION:  During the period from

09:38:43  22               August --)

09:41:13  23    Q.       BY MR. BANCHERO:  During the period from August

09:41:14  24    to October 2000, did you have any discussions with

9:41:19   25    Ms. Grewal about the possibility of her transferring

09:41:23  1    money to you?

09:41:34  2    A.        What does -- I'm not sure what transferring

09:41:37  3    means here.

09:41:39  4    Q.        Um, taking money that is hers and transferring

09:41:45  5    it to you.  Transferring money to you.

09:41:51  6    A.        I'm not sure I understand the word "transfer,"

09:42:40  7    but, um, I'll say yes.

09:42:44  8    Q.        Okay.  What was the sum and substance of those

09:42:47  9    discussions?

09:42:49  10        MR. LEIDERMAN:  I object to the form of the

09:42:51  11   question.  Also calls for a narrative.

09:42:54  12        MR. BANCHERO:  I'll rephrase.

09:42:55  13   Q.        Did you have one or more than one such

09:42:58  14   discussion?

09:43:01  15   A.        More than one.

09:43:06  16   Q.        Did you have -- I'll rephrase.

09:43:12  17        How many such discussions did you have with

09:43:13  18   her?

09:43:13  19   A.        I don't remember.

09:43:15  20   Q.        Okay.  Were these discussions over the

09:43:19  21   telephone or face to face?

09:43:21  22   A.        I don't remember.

09:43:23  23   Q.        Okay.  What did you say to her and what did she

09:43:29  24   say to you?

09:43:32  25        MR. LEIDERMAN:  When?

```
09:43:33   1          MR. BANCHERO:  During this discussion about

 9:43:37   2   transferring money from herself to Mr. Choudhury.

09:43:42   3          MR. LEIDERMAN:  Well, you used the word

09:43:44   4   "discussion," singular.  He's testified that it was

09:43:46   5   plural.  So is there any particular one you want him to

09:43:49   6   answer?

09:43:52   7          MR. BANCHERO:  Yes.  Why don't I ask him about

09:43:55   8   the first of those discussions.

09:43:59   9          THE WITNESS:  I don't remember details.

09:44:02  10   Q.      BY MR. BANCHERO:  What about the second of

09:44:04  11   those discussions?

09:44:06  12   A.      I don't remember any of the specifics.

09:44:10  13   Q.      Okay.  Do you remember the sum and substance of

09:44:19  14   any of these discussions?

09:44:20  15          MR. LEIDERMAN:  Again, object to the form of

09:44:21  16   the question.

09:44:23  17   Q.      BY MR. BANCHERO:  You may answer.

09:44:26  18   A.      Ms. Grewal wanted to make an investment.

09:44:32  19   Q.      Do you remember anything that she said about

09:44:34  20   wanting to make an investment?

09:44:38  21   A.      "I would like to make an investment."

09:44:44  22   Q.      Do you remember anything further that she said?

09:44:50  23   A.      Nothing specific.

09:45:21  24   Q.      Anything nonspecific?

 9:45:23  25   A.      I don't remember.
```

09:45:48  1    Q.        What did you say to her when she said, "I would

9:45:53   2    like to make an investment"?

09:45:57  3    A.        I don't remember anything I said specific.

09:46:22  4    Q.        Did you say words to the effect that, "I could

09:46:56  5    help with that"?

09:46:57  6    A.        I'm sorry.  I don't remember.

09:47:04  7    Q.        You've testified that you had more than one

09:47:11  8    discussion with Ms. Grewal in which she said she would

09:47:18  9    like to make an investment during the period from August

09:47:21  10   to October 2000.  Are you able to testify as to when in

09:47:28  11   time these discussions took place?

09:47:30  12         MR. LEIDERMAN:  Objection to the

09:47:32  13   mischaracterization of his testimony.

09:47:33  14         But if you can answer the question that follows

09:47:38  15   the mischaracterization, please do.

09:47:41  16         THE WITNESS:  Could you repeat the question,

09:47:43  17   please?

09:47:43  18         MR. BANCHERO:  Go ahead.

09:48:04  19            (The following was read by the reporter:

09:47:07  20            QUESTION:  You've testified that you had

09:47:10  21            more than one discussion with Ms. Grewal

09:47:15  22            in which she said she would like to make

09:47:19  23            an investment during the period from

09:47:21  24            August to October 2000.  Are you able to

9:47:25   25            testify as to when in time these

09:47:28  1                 discussions took place?)

.9:48:05  2          THE WITNESS:  No.

09:48:07  3   Q.      BY MR. BANCHERO:  Okay.  Did -- did Ms. Grewal

09:48:42  4   make an investment with you during the fall of 2000?

09:48:46  5   A.      At the end of the year.

09:48:50  6   Q.      What did -- what sort of investment did she

09:48:53  7   make with you?

09:48:54  8   A.      Um, I'm not sure what you mean by "sort of."

09:49:01  9   Q.      Did Ms. Grewal send you funds that she wanted

09:49:09  10  you to invest on her behalf?

09:49:11  11  A.      Yes.

09:49:12  12  Q.      These were the funds represented by the wire

09:49:19  13  transfer on December 13, 2000 in the amount of $880,000?

09:49:25  14  A.      I'm not sure of the date, but I believe the

09:49:27  15  amount was 880,000.

09:49:31  16  Q.      These were funds of Elizabeth Grewal's that she

09:49:35  17  asked you to invest on her behalf?

09:49:37  18          MR. LEIDERMAN:  Objection to the form of the

09:49:38  19  question.  Assumes facts that have not been established.

09:49:43  20  Q.      BY MR. BANCHERO:  You may answer.

09:49:44  21  A.      Yes.

09:49:50  22  Q.      Did you have any discussions with Ms. Grewal

09:49:55  23  about this investment before your account received the

09:50:01  24  funds on December 13, 2000?

.9:50:04  25  A.      Um, I'm not sure what you mean by "discussions"

| | | |
|---|---|---|
| 09:50:09 | 1 | here. |
| 9:50:10 | 2 | Q.        Conversations. |
| 09:50:11 | 3 | A.        About? |
| 09:50:13 | 4 | Q.        About the investment before you received the |
| 09:50:15 | 5 | funds. |
| 09:50:16 | 6 | A.        Um, I don't remember. |
| 09:50:21 | 7 | Q.        You recall no discussions with Ms. Grewal about |
| 09:50:29 | 8 | the $880,000 that she invested with you that you |
| 09:50:35 | 9 | received on December 13, 2000, correct? |
| 09:50:38 | 10 | A.        I don't remember any details. |
| 09:50:41 | 11 | Q.        At some point you discovered that Ms. Grewal |
| 09:50:49 | 12 | had wired 880 -- I'll rephrase. |
| 09:50:52 | 13 | At some point you discovered that Ms. Grewal |
| 09:50:56 | 14 | had directed her financial institution to wire $880,000 |
| 09:51:05 | 15 | to your account at Golden Gate Bank, correct? |
| 09:51:10 | 16 | A.        Yes. |
| 09:51:17 | 17 | Q.        Did this wire come as a surprise to you? |
| 09:51:24 | 18 | A.        Yes. |
| 09:51:33 | 19 | MS. GREWAL: (Response of a brief laugh.) |
| 09:51:33 | 20 | MR. BANCHERO:  Let's -- |
| 09:51:34 | 21 | MR. LEIDERMAN:  Madam court reporter, can you |
| 09:51:37 | 22 | pick up the audible expression reaction from Ms. Grewal |
| 09:51:42 | 23 | on the transcript? |
| 09:51:45 | 24 | MS. GREWAL:  I'm sorry. |
| 9:51:45 | 25 | MR. BANCHERO:  All right.  We'll take a break. |

09:58:38  1    account took place on December 13, 2000.  Can you

09:58:42  2    testify as to how many days subsequent to December 13th,

09:58:47  3    2000 elapsed before this discussion took place?

09:58:52  4    A.       No.  I'm sorry.

09:58:54  5    Q.       Was it within a day or two of December 13,

09:58:57  6    2000?

09:58:58  7    A.       I -- I don't know.

09:59:00  8    Q.       Was it within a week or two?

09:59:03  9    A.       Probably.

09:59:05  10   Q.       Was it before you presented her with a

09:59:09  11   promissory note?

09:59:10  12   A.       I don't remember.

09:59:12  13   Q.       What did you do with the $880,000 that

09:59:42  14   Ms. Grewal wired to you?

09:59:43  15   A.       I invested it.

09:59:46  16   Q.       Did you invest it in Ms. Grewal's name?

09:59:51  17   A.       No.

09:59:52  18   Q.       Did you invest it in your name?

10:00:01  19   A.       Yes.

10:00:02  20   Q.       Where did you invest it?

10:00:06  21   A.       With the bank.

10:00:08  22   Q.       Which bank?

10:00:09  23   A.       Golden Gate Bank.

10:00:16  24   Q.       You purchased a certificate of deposit?

10:00:19  25   A.       Yes.

| | | |
|---|---|---|
| 10:00:20 | 1 | Q.        The certificate of deposit was in whose name? |
| 0:00:23 | 2 | A.        I believe it was in my name. |
| 10:00:29 | 3 | Q.        What were the terms of that certificate of |
| 10:00:32 | 4 | deposit? |
| 10:00:33 | 5 | A.        I don't remember, but I think you have the -- |
| 10:00:40 | 6 | you have the document. |
| 10:00:43 | 7 | Q.        Was the certificate of deposit in the amount of |
| 10:00:55 | 8 | $1 million? |
| 10:00:56 | 9 | A.        Yes. |
| 10:00:57 | 10 | Q.        What was the term of the certificate of |
| 10:01:01 | 11 | deposit? |
| 10:01:02 | 12 | A.        I don't remember. |
| 10:01:03 | 13 | Q.        Do you know what the interest rate was? |
| 10:01:05 | 14 | A.        I think it's on the document somewhere. |
| 10:01:09 | 15 | Q.        In any event, you don't remember what it was? |
| 10:01:12 | 16 | A.        I don't remember. |
| 10:01:12 | 17 | Q.        You purchased the $1 million CD in your name |
| 10:01:24 | 18 | with Golden Gate Bank using the $880,000 that Elizabeth |
| 10:01:33 | 19 | Grewal sent you on December 13, 2000; is that right? |
| 10:01:37 | 20 | A.        Yes. |
| 10:01:42 | 21 | Q.        When did you purchase the certificate of |
| 10:02:04 | 22 | deposit? |
| 10:02:06 | 23 | A.        I don't remember the exact date, but I think |
| 10:02:10 | 24 | it's on the document. |
| 0:02:13 | 25 | Q.        We do have some documents, and we will get to |

10:02:17   1   those.

0:02:17    2          Did you purchase the certificate of deposit

10:02:20   3   prior to presenting Ms. Grewal with the term promissory

10:02:26   4   note?

10:02:26   5   A.        I don't remember.

10:02:26   6   Q.        Did you tell Ms. Grewal that you were using the

10:02:32   7   $880,000 to purchase the certificate of deposit from

10:02:45   8   Golden Gate Bank?

10:02:47   9   A.        NO.  NO.

10:02:55  10          MR. BANCHERO:  Okay.  Let's mark as Exhibit 1 a

10:03:37  11   document numbered AC-001-2.

10:03:47  12          MR. LEIDERMAN:  I'm sorry.  What's that number

10:03:49  13   again?

10:03:49  14          MR. BANCHERO:  AC-001-002.

10:03:55  15          MR. LEIDERMAN:  Two pages?

10:03:57  16          MR. BANCHERO:  Yeah.

10:03:58  17          MR. LEIDERMAN:  Okay.

10:04:22  18              (Discussion.)

10:04:23  19          MR. BANCHERO:  I have a copy for you.  You

10:04:25  20   don't want a copy?

10:04:26  21          MR. LEIDERMAN:  I've got copies of those

10:04:28  22   documents.  That's fine.

10:04:29  23          In fact, if you want to speed things along, the

10:04:33  24   court reporter could just mark it in pencil or

0:04:35   25   something, not have to fill out the whole sticker, and

```
10:04:38   1   we could do that later.  Whatever you want to do.

0:04:40    2             (Plaintiff's Exhibit 1 was marked.)

10:04:40   3             MR. BANCHERO:  That's fine.

10:04:41   4   Q.        Mr. Choudhury, I'm showing you what's been

10:04:44   5   marked as Exhibit 1.  Could you please take a moment to

10:04:46   6   look at this?

10:04:46   7             (Pause in proceedings for document review.)

10:04:55   8   Q.        BY MR. BANCHERO:  Exhibit 1 is a copy of the

10:04:57   9   Golden Gate Bank statement for an account that you had

10:05:02  10   at the bank, number 2241161, yes?

10:05:08  11   A.        It appears to be that.

10:05:09  12   Q.        You'll see in the middle of the first page the

10:05:13  13   phrase, "Wire transfer credit, 12/13, $880,000."

10:05:19  14             That wire transfer credit reflects the $880,000

10:05:25  15   that Ms. Grewal transferred into this account on that

10:05:29  16   date, yes?

10:05:29  17   A.        I believe so.

10:05:32  18   Q.        You'll see two lines down it says, "Wire

10:05:38  19   transfer credit, $250,000," dated 12/22.

10:05:44  20             From what source did those funds come?

10:05:48  21   A.        I don't remember.

10:05:50  22   Q.        Turn, if you would, to page 2 of this exhibit.

10:06:10  23   In the middle of the page you'll see, "Transfer to CD

10:06:16  24   209593," December 27, amount $1 million.

0:06:21   25             Do you see that?
```

| | | |
|---|---|---|
| 10:06:22 | 1 | A.        Yes. |
| 0:06:22 | 2 | Q.        Is that the transfer of these monies for the |
| 10:06:28 | 3 | purpose of purchasing the certificate of deposit that |
| 10:06:32 | 4 | you referred to a few moments ago in your testimony? |
| 10:06:36 | 5 | MR. LEIDERMAN:  Object to the form of the |
| 10:06:37 | 6 | question.  The phrase "these monies," I don't know what |
| 10:06:40 | 7 | you're referring to, Counsel. |
| 10:06:42 | 8 | Q.        BY MR. BANCHERO:  You may answer. |
| 10:06:45 | 9 | MR. LEIDERMAN:  Do you know what he's talking |
| 10:06:47 | 10 | about? |
| 10:06:48 | 11 | THE WITNESS:  If you're saying was this |
| 10:06:50 | 12 | $1 million used to purchase the CD, the answer is yes. |
| 10:06:54 | 13 | MR. BANCHERO:  That is my question. |
| 10:06:56 | 14 | Q.        As far as you know, the CD was identified as |
| 10:07:00 | 15 | 209593? |
| 10:07:02 | 16 | A.        I believe so. |
| 10:07:45 | 17 | MR. BANCHERO:  Okay.  Let's go off the record |
| 10:07:46 | 18 | for a moment. |
| 10:07:47 | 19 | VIDEOTAPE OPERATOR:  Off the record at |
| 10:07:50 | 20 | 10:08 a.m. |
| 10:07:52 | 21 | (Discussion.) |
| 10:08:44 | 22 | VIDEOTAPE OPERATOR:  We're back on the record |
| 10:08:49 | 23 | at 10:09 a.m. |
| 10:08:52 | 24 | MR. BANCHERO:  Let's mark as the next exhibit |
| 10:08:55 | 25 | in order a three-page document -- pardon me, two-page |

| | | |
|---|---|---|
| 10:09:01 | 1 | document, AC-004 and AC-005, entitled, "Promissory |
| 0:09:11 | 2 | Note." |
| 10:09:46 | 3 | (Plaintiff's Exhibit 2 was marked.) |
| 10:09:47 | 4 | Q.      BY MR. BANCHERO:  Mr. Choudhury, is your |
| 10:09:50 | 5 | signature on page 2 of this exhibit? |
| 10:09:53 | 6 | A.      I believe so, yes. |
| 10:10:05 | 7 | Q.      This promissory note, by its terms, appears to |
| 10:10:14 | 8 | be evidence of a straight line of credit obtained by |
| 10:10:19 | 9 | Finexa, Inc. from Golden Gate Bank in the principal |
| 10:10:23 | 10 | amount of $1 million. |
| 10:10:26 | 11 | Is that what this is? |
| 10:10:28 | 12 | A.      It appears to be that. |
| 10:10:35 | 13 | Q.      You'll see at the top of the exhibit on page 1 |
| 10:10:50 | 14 | a notation that reads, "12/08/2000, 8:36, 703-6180, |
| 10:11:03 | 15 | Silverspoon." |
| 10:11:04 | 16 | Do you know what that is? |
| 10:11:05 | 17 | A.      It appears that's a fax stamp. |
| 10:11:12 | 18 | Q.      Do you know who Silverspoon is? |
| 10:11:13 | 19 | A.      Silverspoon is a company that my brother used |
| 10:11:18 | 20 | to own. |
| 10:11:19 | 21 | Q.      Where is that company located? |
| 10:11:23 | 22 | A.      At the time he was living in Dallas. |
| 10:11:28 | 23 | Q.      Did you or one of your employees fax this form |
| 10:11:37 | 24 | promissory note to Silverspoon on December 8, 2000? |
| '0:11:44 | 25 | A.      I'm sorry.  The question was? |

| | | |
|---|---|---|
| 10:13:04 | 1 | offices in Dallas so that you could look at it? |
| 0:13:07 | 2 | A.      No. |
| 10:13:11 | 3 | Q.      Was it done without your instruction? |
| 10:13:21 | 4 | A.      Yes. |
| 10:13:21 | 5 | Q.      David Hayford was the CFO of Finexa, Inc. at |
| 10:13:33 | 6 | this time, December 2000? |
| 10:13:34 | 7 | A.      Yes. |
| 10:13:36 | 8 | Q.      Did you or Mr. Hayford have any discussions |
| 10:13:59 | 9 | with Golden Gate Bank prior to December 13, 2000 on the |
| 10:14:05 | 10 | subject of a line of credit for Finexa, Inc.? |
| 10:14:12 | 11 | A.      I did not.  I don't know about him. |
| 10:14:19 | 12 | Q.      Did you have any communications with Golden |
| 10:14:29 | 13 | Gate Bank about a line of credit prior to December 13, |
| 10:14:35 | 14 | 2000? |
| 10:14:35 | 15 | A.      No. |
| 10:14:40 | 16 | Q.      Did any employee of Finexa, Inc. have |
| 10:14:49 | 17 | discussions with Golden Gate Bank about a line of |
| 10:14:54 | 18 | credit -- |
| 10:14:56 | 19 | A.      I don't -- |
| 10:14:56 | 20 | Q.      -- prior to December 13, 2000? |
| 10:14:59 | 21 | A.      I don't know. |
| 10:15:01 | 22 | Q.      Do you know how the line of credit with Golden |
| 10:15:04 | 23 | Gate Bank came about? |
| 10:15:05 | 24 | MR. LEIDERMAN:  Object to the question. |
| 0:15:07 | 25 | Assumes facts not testified to. |

10:16:51    1    there would need to be a million dollar, I guess,

0:16:59    2    collateral.

10:17:14    3            MR. BANCHERO:  Let's mark as the next exhibit

10:17:15    4    in order a document entitled, "Assignment of Deposit

10:17:25    5    Account."  AC-006 is the first page.

10:17:29    6            What exhibit is this?

10:17:38    7            MS. REPORTER:  3.

10:17:39    8               (Plaintiff's Exhibit 3 was marked.)

10:17:40    9            MR. LEIDERMAN:  Counsel, for the record, would

10:17:41   10    you identify all the pages of the exhibit that is being

10:17:44   11    marked as Exhibit 3?

10:17:48   12            MR. BANCHERO:  The pages are AC-006 through

10:17:54   13    009.

10:17:54   14            MR. LEIDERMAN:  Thank you.

10:18:03   15    Q.      BY MR. BANCHERO:  Mr. Choudhury, please review

10:18:05   16    Exhibit 3.

10:18:14   17            MR. LEIDERMAN:  When you ask the witness to

10:18:16   18    review it, do you want him to read the entire document?

10:18:19   19            MR. BANCHERO:  No, I don't.

10:18:25   20            MR. LEIDERMAN:  Why don't you tell him what

10:18:27   21    you'd like him to do about it.

10:18:31   22    Q.      BY MR. BANCHERO:  Mr. Choudhury, I'm going to

10:18:32   23    ask you some questions that are specific to certain

10:18:34   24    paragraphs.  I would like you to familiarize yourself

10:18:38   25    generally with the document.  And when I ask you a

10:18:43  1   question, if you need to read a specific sentence or

0:18:46  2   paragraph, please take the time to do so.

10:18:48  3          I realize that there is a lot of language in

10:19:51  4   this document that I will not be questioning you about.

10:19:04  5          (Pause in proceedings for document review.)

10:19:04  6   Q.      BY MR. BANCHERO:  Mr. Choudhury, you'll see by

10:19:06  7   the date stamp to Silverspoon, Exhibit 3, that this

10:19:10  8   document, the Assignment of Deposit Account, was sent to

10:19:15  9   Silverspoon along with the promissory note, Exhibit 2;

10:19:20  10  is that correct?

10:19:20  11  A.      Yes.

10:19:22  12  Q.      You received both the promissory note and the

10:19:27  13  Assignment of Deposit Account in form on December 8,

10:19:34  14  2000 when you were at your brother's office in Dallas?

10:19:37  15  A.      Um, I wasn't there on December 8th.

10:19:40  16  Q.      Did you arrive at the office sometime after

10:19:43  17  December 8th and read the documents then?

10:19:46  18  A.      It would be around Christmas.

10:19:50  19  Q.      Okay.  Had you seen the promissory note or

10:19:58  20  Assignment of Deposit Account prior to arriving at the

10:20:01  21  offices around Christmas in Dallas?

10:20:04  22  A.      No.

10:20:04  23  Q.      Turn to the last page of Exhibit 3, please.

10:20:54  24          Your signature appears on the lines there under

0:20:59  25  "Borrower" and "Grantor"?

| | | |
|---|---|---|
| 10:21:00 | 1 | A.        Yes. |
| 0:21:00 | 2 | Q.        Above the signature in all caps are the words |
| 10:21:06 | 3 | "Borrower and Grantor acknowledge having read all the |
| 10:21:09 | 4 | provisions of this Assignment of Deposit Account and |
| 10:21:13 | 5 | agree to its terms.  This agreement is dated |
| 10:21:17 | 6 | December 21, 2000." |
| 10:21:20 | 7 | Reading that sentence, does it refresh your |
| 10:21:30 | 8 | recollection as to when you signed Exhibit 3? |
| 10:21:34 | 9 | MR. LEIDERMAN:  Objection.  He did not say that |
| 10:21:36 | 10 | he couldn't recall when he signed Exhibit 3. |
| 10:21:43 | 11 | MR. BANCHERO:  All right.  I'll rephrase.  I'll |
| 10:21:46 | 12 | withdraw the question. |
| 10:21:47 | 13 | Q.        When did you sign Exhibit 3? |
| 10:21:48 | 14 | A.        Sometime after Christmas. |
| 10:21:50 | 15 | Q.        Would it be sometime after December 25, 2000 |
| 10:21:57 | 16 | and before December 31st, 2000? |
| 10:22:02 | 17 | A.        Yes. |
| 10:22:03 | 18 | Q.        Did you sign the documents when you were in |
| 10:22:04 | 19 | your brother's offices in Dallas? |
| 10:22:06 | 20 | A.        Yes. |
| 10:22:06 | 21 | Q.        After signing the deposit account and |
| 10:22:14 | 22 | promissory note at your brother's offices in Dallas, did |
| 10:22:18 | 23 | you then fax them to the bank? |
| 10:22:21 | 24 | A.        I believe so. |
| '0:22:24 | 25 | Let me take that back.  I'm not sure who I |

| | |
|---|---|
| 10:22:27 | 1 |
| 0:22:31 | 2 |
| 10:22:40 | 3 |
| 10:22:43 | 4 |

1 faxed it to. I know I faxed it, but I don't recall if I

2 faxed it to the bank or to -- to the company, who

3 then -- to Dave Hayford, who then may have walked it

4 over. I don't know.

5 Q.      Okay. Turning your attention to the first page

6 of Exhibit 3, you'll see under the words "Collateral"

7 about a third of the way down the page, the document

8 reads:

9        "The word 'Collateral' means the following

10 described deposit account:  Certificate of Deposit

11 205953 issued by Lender in an amount not less than

12 $1,000,000.00."

13        Is that the certificate of deposit that was in

14 your name that you purchased from Golden Gate Bank?

15 A.      I think 209593.  I believe so, yes.

16 Q.      Did Finexa, Inc. in fact open up a $1 million

17 line of credit with Golden Gate Bank in late December

18 2000 or early January, 2001?

19 A.      I don't know.

20 Q.      Do these exhibits, the promissory note and the

21 Assignment of Deposit Account, refresh any recollection

22 that you might have about whether Finexa in fact opened

23 up a million dollar line of credit at the end of 2000 or

24 in the early days of 2001?

25 A.      Um, the -- I don't know because I had -- I did

10:36:49  1    A.       Correct.

0:36:50   2    Q.       All right.  Is it accurate then that Finexa,

10:37:10  3    Inc. decided to obtain a line of credit from Golden Gate

10:37:16  4    Bank only after you received the $880,000 from Elizabeth

10:37:19  5    Grewal?

10:37:19  6    A.       I don't know.  You'll have to ask David

10:37:22  7    Hayford.

10:37:24  8    Q.       Do you have any recollection of speaking with

10:37:27  9    David Hayford about setting up a line of credit?

10:37:34  10   A.       No.  I don't have any recollection.

10:37:37  11   Q.       Did you tell David Hayford that Ms. Grewal had

10:37:44  12   transferred $880,000 to you on December 13, 2000?

10:37:50  13   A.       No.

10:37:51  14   Q.       You did not tell David that?

10:37:53  15   A.       That's correct.

10:37:54  16   Q.       Did you have any discussions with Mr. Hayford

10:38:03  17   about the source of the funds for the million dollar CD

10:38:08  18   that you put up as collateral for the line of credit

10:38:13  19   that Golden Gate Bank provided to Finexa, Inc.?

10:38:21  20   A.       If your question is did he know that some of

10:38:29  21   the money came from Ms. Grewal?

10:38:33  22   Q.       No.  My -- I may go there, but this question is

10:38:38  23   did you have any discussions with Mr. Hayford about the

10:38:44  24   source of the funds for the million dollar CD?

10:38:48  25   A.       The source, no.

10:38:51  1   Q.       Did you tell Mr. Hayford that you were willing

0:38:57   2   to put up the million dollar certificate of deposit to

10:39:05  3   provide collateral for the million dollar Finexa line of

10:39:08  4   credit?

10:39:09  5   A.       At some point he asked me if I could, and I

10:39:15  6   said that may be possible.

10:39:18  7   Q.       Okay.  In fact, you did?

10:39:24  8   A.       Yes.

10:39:26  9   Q.       You did not, however, tell Mr. Hayford that

10:39:33  10  Ms. Grewal had contributed some portion of the funds

10:39:36  11  that went into the certificate of deposit, correct?

10:39:39  12  A.       That is correct.

10:39:40  13  Q.       Ms. Grewal at this time, that is December 2000,

10:39:50  14  was an employee of Finexa, Inc.?

10:39:54  15  A.       Yes.

10:39:54  16  Q.       You worked with her, yes?

10:39:55  17  A.       Yes.

10:39:56  18  Q.       Did you tell her that Finexa, Inc. had obtained

10:40:04  19  a million dollar line of credit from Golden Gate Bank at

10:40:08  20  about the time that the line of credit was opened?

10:40:11  21  A.       I don't believe I did.

10:40:15  22  Q.       Did anyone else at your company tell her?

10:40:20  23  A.       I don't know.

10:40:21  24           MR. LEIDERMAN:  What do you mean by "your

0:40:23   25  company"?  I'm sorry.

10:42:18  1          THE WITNESS:  Exhibits 2 and 3.

0:42:21   2          MR. LEIDERMAN:  Thank you.

10:42:23  3   Q.      BY MR. BANCHERO:  The certificate of deposit

10:42:24  4   was not purchased in Ms. Grewal's name, correct?

10:42:28  5   A.      That is correct.

10:42:29  6   Q.      It was purchased in your name?

10:42:31  7   A.      Yes.

10:43:15  8          MR. BANCHERO:  Let's marked as Exhibit 4 a

10:43:18  9   two-page document numbered AC-10-11.

10:43:31  10         (Plaintiff's Exhibit 4 was marked.)

10:43:33  11  Q.      BY MR. BANCHERO:  Who is Brian Plotner?

10:43:54  12  A.      I think he works at Golden Gate Bank.

10:43:58  13  Q.      Did you send this facsimile and letter to

10:44:01  14  Mr. Plotner on March 30, 2001?

10:44:05  15  A.      I did not.

10:44:08  16  Q.      Do you recognize the handwriting on the first

10:44:11  17  page of Exhibit 4?

10:44:12  18  A.      Yes.

10:44:12  19  Q.      Whose handwriting is that?

10:44:14  20  A.      It belongs to Ana Ramirez.

10:44:18  21  Q.      Who is Ana Ramirez?

10:44:19  22  A.      She was the operations manager for Finexa.

10:44:37  23  Q.      Your signature appears on page 2 of Exhibit 4?

10:44:43  24  A.      That appears to be my signature, yes.

'0:44:47  25  Q.      Did you write this letter --

10:44:56  1    A.        No.

0:44:56   2    Q.        -- that is attached as the second page of

10:44:59  3    Exhibit 4?

10:44:59  4    A.        No.

10:45:00  5    Q.        Who wrote it?

10:45:02  6    A.        I don't know.

10:45:02  7    Q.        Did you read this letter before you signed it?

10:45:06  8    A.        I didn't sign it.  That's an electronic

10:45:09  9    signature.

10:45:10  10   Q.        Okay.  Explain how this document came to have

10:45:16  11   your electronic signature on it.

10:45:20  12   A.        Um, Ana has a copy of -- or used to have a copy

10:45:24  13   of my electronic signature so she could send

10:45:28  14   communications on. . .

10:45:36  15   Q.        Okay.  Is there something about this particular

10:45:38  16   signature that suggests to you that this is an

10:45:50  17   electronic signature as opposed to a signature that you

10:45:54  18   placed using your own hand?

10:45:57  19   A.        Um, there are a couple of electronic signatures

10:46:01  20   of mine, and that looks like one of them.

10:46:03  21   Q.        Okay.  Did you authorize Ana Ramirez to send

10:46:11  22   this letter to Mr. Plotner?

10:46:13  23   A.        No.

10:46:13  24   Q.        Do you know who did?

'0:46:16  25   A.        Um, I would be speculating.

10:46:19  1   Q.        When is the first time you saw this March 30,

0:46:26   2   2001 letter to Brian Plotner?

10:46:29  3   A.        After the complaint was filed.

10:46:33  4   Q.        That is the complaint in this lawsuit?

10:46:35  5   A.        That is correct.

10:46:37  6   Q.        Was it customary at Finexa, Inc. in 2001 for

10:46:55  7   Mr. Hayford to draft letters for you that would be sent

10:47:02  8   out under your signature?

10:47:05  9   A.        It appears to be that way.

10:47:10  10          MR. BANCHERO:   Okay.   Let's mark as Exhibit 5 a

10:47:34  11  document labeled AC-003.

10:47:38  12          (Plaintiff's Exhibit 5 was marked.)

10:48:00  13  Q.        BY MR. BANCHERO:   Exhibit 5 is a copy of your

10:48:10  14  bank account statement from Golden Gate Bank for account

10:48:13  15  number 2241161, yes?

10:48:17  16  A.        Correct.

10:48:19  17  Q.        You'll see that halfway down the page there are

10:48:23  18  words that state, "Transfer from 209593."

10:48:30  19          That is the $1 million CD that was in your

10:48:33  20  name, correct?

10:48:34  21  A.        I believe so, yes.

10:48:37  22  Q.        Opposite those words there is the date

10:48:41  23  April 2nd, the amount $1,014,494.05.   This reflects a

10:48:51  24  transfer into account 2241161 in that amount on that

'0:48:56  25  date, yes?

| | | |
|---|---|---|
| 10:48:56 | 1 | A.          I believe so. |
| 0:49:00 | 2 | Q.          At the -- towards the bottom of the page under |
| 10:49:04 | 3 | the heading "Other Debits," you'll see the word "Loan |
| 10:49:07 | 4 | Payment," yes? |
| 10:49:08 | 5 | A.          Yes. |
| 10:49:08 | 6 | Q.          April 2nd, amount $1,666,066.  Do you see that, |
| 10:49:19 | 7 | yes? |
| 10:49:19 | 8 | A.          Yes. |
| 10:49:20 | 9 | MR. LEIDERMAN:  I'm sorry, I believe you |
| 10:49:21 | 10 | misstated the amount, Counsel.  Just so we get it clear |
| 10:49:24 | 11 | for the record. |
| 10:49:25 | 12 | MR. BANCHERO:  I'm sorry.  I'll state it again. |
| 10:49:27 | 13 | MR. LEIDERMAN:  Thank you. |
| 10:49:29 | 14 | Q.          BY MR. BANCHERO:  Under the heading "Other |
| 10:49:30 | 15 | Debits," you'll see the words "Loan Payment" April 2nd, |
| 10:49:36 | 16 | $1,000,666.66, yes? |
| 10:49:43 | 17 | A.          Yes. |
| 10:49:44 | 18 | Q.          That reflects the payment from this account to |
| 10:49:56 | 19 | Golden Gate Bank to pay the balance of the line of |
| 10:50:02 | 20 | credit that Finexa, Inc. had with Golden Gate Bank? |
| 10:50:07 | 21 | A.          It appears to be, yes. |
| 10:50:10 | 22 | Q.          Is it true then that prior to April 2nd, 2001, |
| 10:50:22 | 23 | Finexa, Inc. had drawn down on its line of credit with |
| 10:50:30 | 24 | Golden Gate Bank in an amount that was approximately |
| 0:50:40 | 25 | $1 million? |

10:50:41  1    A.        I don't know, but it appears that way.

0:50:44  2    Q.        Okay.  Looking at this document, Exhibit 5,

10:50:51  3    does it refresh any recollection of what Finexa, Inc.

10:50:55  4    used that million dollars for during the period from

10:51:01  5    late December 2000 to early April 2001?

10:51:09  6    A.        No.

10:51:10  7    Q.        Did you have any discussions with David Hayford

10:51:19  8    about paying off the line of credit prior to doing so?

10:51:24  9    A.        No.

10:51:24  10   Q.        Why did Finexa, Inc. pay off the line of credit

10:51:35  11   with Golden Gate Bank when it did so?

10:51:37  12   A.        I don't know.

10:51:38  13   Q.        Did you personally authorize Golden Gate Bank

10:51:46  14   to transfer over $1 million from your account 2241161 in

10:51:55  15   order to pay off the loan to Golden Gate Bank?

10:52:00  16   A.        Um, no.  I think -- if you're referring to this

10:52:05  17   letter, Exhibit 4?

10:52:08  18   Q.        Yes.

10:52:09  19   A.        No, I didn't send that.

10:52:12  20   Q.        Who sent it?

10:52:13  21   A.        Looking at the cover page, maybe it was Ana.

10:52:18  22   Or maybe it was David.  But I don't want to speculate.

10:52:20  23   You'll have to ask them.

10:52:23  24   Q.        Did either David or Ana have authority with

0:52:31  25   Golden Gate Bank to make deposits into or transfers out

10:55:25  1  the effect that the loan was paid off.

0:55:34  2  Q.      This was agreeable to you?

10:55:36  3  A.      Um, I trusted him with the finances.  I didn't

10:55:42  4  question him.

10:55:43  5  Q.      Okay.  You would agree with me that the loan

10:55:52  6  payoff left -- I'll rephrase the question.

10:56:01  7          Did you ever review the Finexa financial

10:56:21  8  statements during this period, that is the first quarter

10:56:24  9  of 2001?

10:56:26  10  A.      No.

10:56:26  11  Q.      Did you have any discussions with Ms. Grewal

10:56:47  12  about Finexa, Inc.'s decision to pay off the $1 million

10:56:57  13  line of credit with Golden Gate Bank at about the time

10:57:00  14  the loan was paid off, that is, in early April 2001?

10:57:06  15  A.      No.

10:57:06  16  Q.      Do you know if Mr. Hayford spoke to her on that

10:57:12  17  subject?

10:57:12  18  A.      I don't know.

10:57:13  19  Q.      Okay.  Would you agree with me that when the

10:57:45  20  million dollars represented by the certificate of

10:57:51  21  deposit was transferred from the certificate to your

10:58:02  22  account 2241161 on April 2nd, that at that moment that

10:58:08  23  would reflect the whereabouts of Ms. Grewal's $880,000

10:58:19  24  investment?

0:58:19  25          MR. LEIDERMAN:  Object to the form of the

10:58:23    1    question.  It's incomprehensible.

10:58:25    2    Q.      BY MR. BANCHERO:  Do you comprehend it?

10:58:26    3    A.      Not really.

10:58:27    4    Q.      Well, let me ask it more open ended then.

10:58:30    5        As of April 2nd, 2001, where was Ms. Grewal's

10:58:35    6    $880,000?

10:58:37    7    A.      Um, it was in the CD.  And I think what you --

10:58:43    8    I think I now understand.  You said was the CD then

10:58:48    9    deposited or cashed in, I guess.  I'm not sure what the

10:58:50    10    right term is.

10:58:51    11    Q.      Well, we'll take it question by question.

10:58:54    12        You would agree with me that the money was in

10:58:56    13    the certificate of deposit --

10:58:57    14    A.      Yes.

10:58:57    15    Q.      -- during the three months that the certificate

10:58:59    16    of deposit was in existence, correct?

10:59:01    17    A.      Yes.

10:59:01    18    Q.      All right.  Then when the certificate of

10:59:03    19    deposit was turned in on April 2nd, then those monies

10:59:08    20    would now reside in your account 2241161 at Golden Gate

10:59:15    21    Bank, correct?

10:59:16    22    A.      It appears that way, yes.

10:59:18    23    Q.      Okay.  Then would you also agree with me that

10:59:23    24    the $880,000 would have been transferred to Golden Gate

10:59:36    25    Bank to pay off a portion of the $1 million line of

| | | |
|---|---|---|
| 10:59:41 | 1 | credit that Finexa, Inc. had with the bank on April 2nd, |
| 0:59:48 | 2 | 2001? |
| 10:59:49 | 3 | A.        Um, I think it appears that way, yes. |
| 10:59:53 | 4 | Q.        Okay.  And in fact at that moment, Finexa, Inc. |
| 11:00:05 | 5 | was receiving a benefit by having its line of credit |
| 11:00:08 | 6 | paid off with these funds, yes? |
| 11:00:17 | 7 | A.        I guess. |
| 11:00:19 | 8 | Q.        Okay.  The letter that is marked as Exhibit 4, |
| 11:00:48 | 9 | page 2 states: |
| 11:00:50 | 10 | "It is my understanding that Finexa will pay |
| 11:00:54 | 11 | the interest for March, and that on Monday April 2nd, |
| 11:00:57 | 12 | 2001, I will have access to the residual interest from |
| 11:01:01 | 13 | my" certificate of deposit, "CD." |
| 11:01:05 | 14 | Did that happen? |
| 11:01:08 | 15 | MR. LEIDERMAN:  I'm sorry, which of those |
| 11:01:09 | 16 | things that you just read are you referring to as the |
| 11:01:13 | 17 | "it" that happened? |
| 11:01:14 | 18 | Q.        BY MR. BANCHERO:  Well, I think we've |
| 11:01:15 | 19 | established that -- well, I'll rephrase the question. |
| 11:01:32 | 20 | I'll withdraw it. |
| 11:01:36 | 21 | So as of April 2nd, 2001, where was |
| 11:02:00 | 22 | Ms. Grewal's investment? |
| 11:02:02 | 23 | A.        It appears that it went to pay the loan that |
| 11:02:12 | 24 | was between Finexa and Golden Gate Bank. |
| '1:02:16 | 25 | Q.        Okay.  Did you tell Ms. Grewal that? |

| | | |
|---|---|---|
| 11:02:19 | 1 | A.        No. |
| 1:02:20 | 2 | Q.        Why not? |
| 11:02:21 | 3 | A.        At that time I didn't know about it.  And later |
| 11:02:27 | 4 | on when I found out about it, I was very embarrassed |
| 11:02:32 | 5 | about it. |
| 11:02:33 | 6 | Q.        Why were you embarrassed? |
| 11:02:35 | 7 | A.        Because that's not what -- that's not what I |
| 11:02:40 | 8 | had planned to do with the investment. |
| 11:02:43 | 9 | Q.        If it was not what you planned to do with the |
| 11:02:47 | 10 | investment, how did it happen? |
| 11:02:49 | 11 | A.        Um, it just did.  It was meant to be in the CD |
| 11:03:04 | 12 | just for a short period of time. |
| 11:03:08 | 13 | Q.        Shorter than three months? |
| 11:03:11 | 14 | A.        Um, no specific.  It was meant to be sort of |
| 11:03:15 | 15 | parked there until I could take that money and invest it |
| 11:03:19 | 16 | differently. |
| 11:03:21 | 17 | Q.        Okay.  How long a time was it supposed to be in |
| 11:03:33 | 18 | the CD? |
| 11:03:35 | 19 | A.        Don't know.  Maybe a few months.  It was |
| 11:03:39 | 20 | nothing specific. |
| 11:03:41 | 21 | Q.        Is it your testimony that the certificate of |
| 11:03:45 | 22 | deposit, with Ms. Grewal's money as part of it, was not |
| 11:03:50 | 23 | supposed to be used to pay off the line of credit for |
| 11:03:54 | 24 | Finexa, Inc.? |
| 1:03:56 | 25 | A.        It was not the intention, if that's your |

11:19:26  1          MR. BANCHERO:  Well, I'm permitted to ask

.1:19:28  2    follow-up questions.

11:19:28  3          MR. LEIDERMAN:  You are.

11:19:31  4          MR. BANCHERO:  Go ahead and repeat it to the

11:19:33  5    witness.

11:19:39  6                (The following was read by the reporter:

11:19:12  7                QUESTION:  Okay.  Your testimony is that

11:19:17  8                you may have had those communications, but

11:19:19  9                if you did, you don't remember them,

11:19:21  10               correct?)

11:19:40  11         THE WITNÉSS:  Um, I spoke to her from time to

11:19:44  12   time on the phone.  And most of our communication was

11:19:51  13   about personal matters.

11:19:56  14   Q.      BY MR. BANCHERO:  Putting aside the

11:19:58  15   communications about personal matters, did you have any

11:20:02  16   communications with her about the investment?

11:20:04  17         MR. LEIDERMAN:  This is in 2005?

11:20:06  18         MR. BANCHERO:  Yes.

11:20:07  19         THE WITNESS:  Um, I think in 2005 we might have

11:20:12  20   had some discussions.  I don't remember the content.

11:20:17  21   Q.      BY MR. BANCHERO:  January 2006 was

11:20:29  22   approximately five years after you received the $880,000

11:20:36  23   from Ms. Grewal.  Did you have any discussions with her

11:20:42  24   at that time about the investment?

11:20:44  25   A.      I believe I did at some point in that time

```
11:20:50   1   frame.

1:20:52    2   Q.        What do you recall?

11:20:53   3   A.        Um, I don't -- don't recall a lot.

11:21:01   4   Q.        Please testify as to what you do recall.

11:21:07   5   A.        Um, I was embarrassed by the fact of what had

11:21:19   6   happened earlier, and so I, um -- I would be vague

11:21:35   7   almost.   I would be vague in terms of what I would say.

11:21:40   8            I know at some -- at some point in there we

11:21:46   9   talked about my being able to get her the investment

11:21:54   10  money back.

11:22:27   11  Q.        Do you have any other recollections of what you

11:22:30   12  said to her during this period about the investment?

11:22:33   13  A.        I'm sorry, I don't.

11:22:39   14  Q.        Okay.  Did you ever tell Ms. Grewal that it was

11:22:49   15  too bad that she had decided against a more risk-averse

11:22:56   16  investment because she would have earned 14 percent on

11:23:00   17  her money, which is what the family monies had earned in

11:23:04   18  the London account?

11:23:08   19           MR. LEIDERMAN:  I'm sorry, Counsel.  That whole

11:23:10   20  question you're asking him if he said something like

11:23:13   21  that to her?

11:23:14   22           MR. BANCHERO:  Yes.

11:23:14   23           MR. LEIDERMAN:  Okay.

11:23:17   24           MR. BANCHERO:  Why don't we repeat the

11:23:19   25  question.
```

11:38:14  1  transferred to you?

1:38:15  2         MR. LEIDERMAN:  Object to the form of the

11:38:17  3  question.

11:38:18  4         THE WITNESS:  Um, it -- their passing away

11:38:25  5  affected me personally in that it affected what I could

11:38:32  6  do personally in terms of work or anything else.

11:38:36  7  Q.       BY MR. BANCHERO:  Okay.  Did it affect your

11:38:40  8  ability to raise the monies necessary to repay

11:38:44  9  Ms. Grewal?

11:38:44  10        MR. LEIDERMAN:  Object to the form of the

11:38:46  11 question.

11:38:47  12        THE WITNESS:  Yes.

11:38:48  13 Q.       BY MR. BANCHERO:  Okay.  This was because their

11:38:57  14 passing was -- I'll rephrase.

11:39:06  15        In response to one of my earlier questions,

11:39:18  16 Mr. Choudhury, you stated that you did talk to

11:39:22  17 Ms. Grewal about getting the investment money back.  Do

11:39:29  18 you remember with any more specificity what you said to

11:39:33  19 her on this subject?

11:39:34  20 A.       Just that I was trying to pull the money

11:39:40  21 together.

11:39:43  22 Q.       Okay.  You were trying to pull the money

11:39:48  23 together to repay her?

11:39:49  24 A.       Yes.

1:39:50  25 Q.       Okay.  Did you tell her that this was made

12:06:35  1    individual's money individually, the answer is no.  And

2:06:40   2    it's Capital LP, sorry, not LLP.

12:06:43  3    Q.        Okay.  Okay.  At this time in December of 2000,

12:06:58  4    did you maintain any licenses from the State of

12:07:07  5    California with respect to the investing of securities?

12:07:14  6    A.        Yes.

12:07:15  7    Q.        What did you maintain?

12:07:16  8    A.        I had a Series 65.

12:07:20  9    Q.        What is that?

12:07:21  10   A.        It's a registered investment advisor license.

12:07:38  11   Q.        Who issues that?

12:07:40  12   A.        Used to be the NASD, and they're now called

12:07:45  13   FINRA, F-I-N-R-A.

12:07:49  14   Q.        Okay.  Any other licenses at that time?

12:07:53  15   A.        No.

12:07:53  16   Q.        When you received Ms. Grewal's money to invest

12:08:06  17   in December 2000, were you acting as an investment

12:08:11  18   advisor under the rules of FINRA?

12:08:15  19             MR. LEIDERMAN:  As to that money?

12:08:17  20             MR. BANCHERO:  Yes.

12:08:18  21             THE WITNESS:  Um, there was no requirement for

12:08:20  22   me to do that.

12:08:24  23   Q.        BY MR. BANCHERO:  Were you?

12:08:25  24   A.        No.

2:08:27   25   Q.        Why not?

12:08:33  1    A.        Just wasn't.

.2:08:39  2    Q.        At any point in your career -- well, let me

12:08:50  3    rephrase.

12:08:51  4              Were you a registered investment advisor

12:08:53  5    Series 65 under FINRA because of the work you did with

12:08:56  6    the two hedge funds?

12:08:58  7    A.        There wasn't a requirement.  And over the

12:09:02  8    years, sometimes there has been a requirement, sometimes

12:09:05  9    there hasn't been a requirement.  So I became a

12:09:07  10   registered investment advisor just so I wouldn't have to

12:09:10  11   deal with any issues.

12:09:13  12   Q.        When did you become a registered investment

12:09:17  13   advisor?

12:09:17  14   A.        In the middle of 2000.

12:09:20  15   Q.        Did you maintain that registration throughout

12:09:26  16   2001?

12:09:26  17   A.        Yes.

12:09:27  18   Q.        Do you maintain it today?

12:09:29  19   A.        Yes.

12:09:30  20   Q.        Has it been maintained throughout the period

12:09:32  21   from 2000 to the present?

12:09:34  22   A.        Yes.

12:09:35  23   Q.        Apart from the Series 65 FINRA registration, do

12:09:43  24   you have any other licenses regarding investments for

2:09:47  25    other people?

12:09:48  1    A.        No.

.2:09:59  2              I no longer manage assets for other people, by

12:10:02  3    the way.

12:10:02  4    Q.        When did you stop doing that?

12:10:04  5    A.        Um, when the -- when the fund was dissolved.

12:10:18  6    Q.        which fund?

12:10:19  7    A.        Pinnacle Partners Capital, LP.

12:10:24  8    Q.        When was that dissolved?

12:10:27  9    A.        2002, I think, maybe.

12:10:33  10   Q.        Okay.  To summarize, then, you were not acting

12:10:43  11   as a registered investment advisor under the FINRA rules

12:10:54  12   when you agreed to provide investment services to

12:11:04  13   Ms. Grewal, correct?

12:11:05  14   A.        I agreed to invest the money.

12:11:12  15   Q.        Did you make a conscious decision at the time

12:11:26  16   to invest the money without following requirements of

12:11:44  17   FINRA?

12:11:45  18   A.        If you mean -- is your question -- when you say

12:11:54  19   "at the time," you mean end of 2000?

12:11:56  20   Q.        Yes.

12:11:57  21   A.        Um, did I make a conscious decision to invest

12:12:02  22   it without following the rules?

12:12:03  23   Q.        Yes.

12:12:04  24   A.        Um, the money was sent to my personal account,

'2:12:08  25   so I was investing it as if I was investing it.

12:14:35  1    Q.        You don't actually make the decisions about the

.2:14:41  2    investments?

12:14:41  3    A.        That's correct.

12:14:42  4    Q.        The businesses that you work with today are

12:14:48  5    free to follow your advice and free to ignore it?

12:14:51  6    A.        Precisely.

12:14:53  7    Q.        Okay.  In 2000 then, there were no other

12:15:06  8    individuals that provided you money to invest as persons

12:15:10  9    other than Ms. Grewal?

12:15:11  10   A.        Outside of the funds?

12:15:14  11   Q.        Yes.

12:15:14  12   A.        No.

12:15:15  13   Q.        Same question with respect to the period from

12:15:19  14   2001 to the present:  Outside of the funds, no

12:15:23  15   individuals have asked you to invest money on their

12:15:27  16   behalf, other than Ms. Grewal, correct?

12:15:30  17   A.        That's correct.  Outside of the items we just

12:15:33  18   covered, companies or -- I was not managing funds or

12:15:35  19   acting as an investment manager for anybody else.

12:15:39  20   Q.        Okay.  Finexa, Inc. hired Ms. Grewal in June of

12:15:58  21   2000, correct?

12:15:59  22   A.        In that time frame.  I don't remember the exact

12:16:02  23   date.

12:16:02  24   Q.        Okay.  At that time what position did you hold

2:16:05   25   with Finexa?

| | | |
|---|---|---|
| 12:16:06 | 1 | A.       I was one of the two co-founders. |
| 2:16:09 | 2 | Q.       The other co-founder was who? |
| 12:16:11 | 3 | A.       Was David Hayford. |
| 12:16:12 | 4 | Q.       Ms. Grewal was hired as director of marketing? |
| 12:16:19 | 5 | A.       I believe so. |
| 12:16:20 | 6 | Q.       Did you and Mr. Hayford jointly decide to hire |
| 12:16:24 | 7 | Ms. Grewal? |
| 12:16:25 | 8 | A.       I had input into it, but I believe David made |
| 12:16:31 | 9 | the offer. |
| 12:16:33 | 10 | Q.       Why did Finexa decide to hire Ms. Grewal? |
| 12:16:38 | 11 | A.       To help us start a business. |
| 12:16:45 | 12 | Q.       What qualities did she possess that Finexa |
| 12:16:51 | 13 | thought would help in the starting of this business? |
| 12:16:56 | 14 | A.       An interest in marketing. |
| 12:17:00 | 15 | Q.       Anything else? |
| 12:17:01 | 16 | A.       She spoke French. |
| 12:17:04 | 17 | Q.       What business was Finexa in? |
| 12:17:08 | 18 | A.       Financial planning software. |
| 12:17:11 | 19 | Q.       That is, the development of financial planning |
| 12:17:18 | 20 | software? |
| 12:17:18 | 21 | A.       The development and sales. |
| 12:17:22 | 22 | Q.       In June 2000, how many employees did Finexa |
| 12:17:28 | 23 | have? |
| 12:17:28 | 24 | A.       Just David and myself.  Before Ms. Grewal was |
| 2:17:33 | 25 | hired. |

| | | |
|---|---|---|
| 12:17:33 | 1 | Q.       Ms. Grewal was the third person hired? |
| 2:17:36 | 2 | A.       That's correct. |
| 12:17:36 | 3 | Q.       Was Ms. Grewal full time at Finexa? |
| 12:17:48 | 4 | A.       I believe so. |
| 12:17:49 | 5 | Q.       Was Ana Ramirez working for you at the time? |
| 12:18:05 | 6 | A.       Yes. |
| 12:18:05 | 7 | Q.       Whom was she employed by? |
| 12:18:07 | 8 | A.       Pinnacle Partners, Inc. |
| 12:18:13 | 9 | Q.       Pinnacle Partners, Inc. was different than |
| 12:18:21 | 10 | Pinnacle Partners Capital, LP? |
| 12:18:23 | 11 | A.       Yes. |
| 12:18:23 | 12 | Q.       What was the relationship? |
| 12:18:25 | 13 | A.       Pinnacle Partners, Inc. was the -- is where I |
| 12:18:31 | 14 | work.  It's what employs me. |
| 12:18:42 | 15 | Q.       Was Mr. Hayford employed by Pinnacle Partners, |
| 12:18:46 | 16 | Inc.? |
| 12:18:47 | 17 | A.       At some point, yes.  I don't know the exact |
| 12:18:51 | 18 | dates. |
| 12:18:52 | 19 | Q.       In 2000, did Pinnacle Partners, Inc., Pinnacle |
| 12:19:04 | 20 | Partners Capital, LP, and Finexa all have offices at the |
| 12:19:06 | 21 | same location? |
| 12:19:07 | 22 | A.       Um, initially.  Finexa had an office in Foster |
| 12:19:13 | 23 | City later on. |
| 12:19:14 | 24 | Q.       When? |
| 2:19:15 | 25 | A.       I think like September, October, in -- |

| | | |
|---|---|---|
| 12:19:19 | 1 | somewhere in that time frame. |
| .2:19:22 | 2 | Q.      2000? |
| 12:19:23 | 3 | A.      2000. |
| 12:19:25 | 4 | Q.      Okay.  Were there other employees of these |
| 12:19:30 | 5 | entities at the time besides Ana Ramirez, yourself, |
| 12:19:34 | 6 | Mr. Hayford and Ms. Grewal? |
| 12:19:35 | 7 | A.      Yes.  Finexa grew to over 40 people. |
| 12:19:41 | 8 | Q.      When was that? |
| 12:19:43 | 9 | A.      Between sometime that September, October time |
| 12:19:48 | 10 | frame to the end of the year, early January.  I don't |
| 12:19:52 | 11 | know -- I don't know which month we peaked. |
| 12:19:56 | 12 | Q.      Okay.  Do you recall what Finexa's monthly |
| 12:20:09 | 13 | expenses were? |
| 12:20:10 | 14 | A.      No. |
| 12:20:10 | 15 | Q.      Can you give me an order of magnitude? |
| 12:20:16 | 16 | A.      Maybe 70,000, 100,000.  I don't know.  I'd be |
| 12:20:23 | 17 | guessing.  I'm speculating.  David was responsible for |
| 12:20:25 | 18 | all financials. |
| 12:20:29 | 19 | Q.      Do you have a life insurance policy? |
| 12:20:41 | 20 | A.      I do. |
| 12:20:42 | 21 | Q.      Did you ever tell Elizabeth Grewal that she was |
| 12:20:46 | 22 | a beneficiary of your life insurance policy? |
| 12:20:51 | 23 | A.      A beneficiary?  I'm not sure I said that. |
| 12:20:57 | 24 | Q.      Did you say anything about your life insurance |
| 2:21:00 | 25 | policy with respect to Ms. Grewal? |

12:21:03  1    A.        I did, yes.

.2:21:04  2    Q.        What did you say?

12:21:05  3    A.        That if I was to die, she needed a way to have

12:21:11  4    a claim against my estate if something was to happen to

12:21:14  5    me after she made the investment.

12:21:18  6    Q.        This was advice you gave to her?

12:21:27  7    A.        I'm not sure I would call it advice.

12:21:29  8    Q.        Information?

12:21:30  9    A.        Just a statement.

12:21:31  10   Q.        What did you mean by it?

12:21:33  11   A.        Um, she was making an investment with me.  If I

12:21:38  12   got hit by a truck, I didn't want her to be out the next

12:21:41  13   day and have no way of getting that money back.

12:21:48  14   Q.        Referring to the $880,000?

12:21:51  15   A.        Yes.

12:21:52  16   Q.        Did you tell her what she should do in this

12:22:04  17   regard?

12:22:04  18   A.        I'm not sure if I specified anything.  Like I

12:22:15  19   don't know if I gave an instruction sheet or anything

12:22:18  20   like that.  I just said, "You'll have a claim against my

12:22:22  21   estate."

12:22:25  22   Q.        Okay.  Did you ever tell her that she was a

12:22:29  23   beneficiary of your life insurance policy?

12:22:31  24   A.        I don't remember.  I don't even know who the

2:22:35   25   beneficiaries of my policy are right now, quite frankly.

12:22:38 1    Q.        You don't remember one way or the other, or you

.2:22:41 2    recall specifically that you did not tell her that she

12:22:43 3    was a beneficiary of your life insurance?

12:22:45 4    A.        I don't recall one way or the other.

12:22:49 5    Q.        Is Ms. Grewal a beneficiary on your life

12:22:53 6    insurance policy?

12:22:54 7    A.        I don't know.  Like I said, I don't know who is

12:22:57 8    right now.  I haven't looked at it in a long time.

12:22:59 9    Q.        With whom do you have this policy?

12:23:03 10   A.        I was afraid you'd ask that question.  I don't

12:23:05 11   recall.  Met Life, maybe.  They would be life insurance.

12:23:10 12   Q.        Did you have a life insurance policy in 2000?

12:23:14 13   A.        I know I started it sometime in that time

12:23:16 14   frame.  I don't know if it was 2000 or 2001 or 2002.

12:23:21 15   But sometime in that time frame.

12:23:22 16   Q.        Do you have one policy or more than one policy?

12:23:25 17   A.        I have two policies.

12:23:27 18   Q.        Do you have a broker that you deal with on

12:23:29 19   these policies?

12:23:30 20   A.        Um, yes.  I believe so.

12:23:32 21   Q.        Who is that?

12:23:33 22   A.        I'm sorry.  I don't know the answer.

12:23:37 23   Ana Ramirez arranged the policy.

12:23:39 24   Q.        What city is the broker resident in?

2:23:44 25    A.        I don't think it's -- I think it's one of these

| | | |
|---|---|---|
| 12:23:48 | 1 | Internet type, 800 number types of things. |
| .2:23:51 | 2 | Q.        Did Ms. Grewal ever ask you to see a copy of |
| 12:23:56 | 3 | the policies that you have? |
| 12:23:58 | 4 | A.        I don't believe so.  Maybe.  I don't know. |
| 12:24:02 | 5 | Q.        You don't know one way or the other? |
| 12:24:04 | 6 | A.        I don't know one way or the other, no.  Don't |
| 12:24:06 | 7 | recall. |
| 12:24:06 | 8 | Q.        It's true, though, that you did not show her a |
| 12:24:10 | 9 | copy of any of your life insurance policies, correct? |
| 12:24:12 | 10 | A.        I don't believe I showed her anything, no. |
| 12:24:14 | 11 | Q.        Do you know whether Ana Ramirez did? |
| 12:24:16 | 12 | A.        I have no idea. |
| 12:24:20 | 13 | MR. BANCHERO:  All right.  It's a little after |
| 12:24:21 | 14 | 12:20.  This would be a good time to take a lunch break. |
| 12:24:26 | 15 | VIDEOTAPE OPERATOR:  We're going off the record |
| 12:24:27 | 16 | at 12:24 p.m. |
| 13:21:28 | 17 | (Break.) |
| 13:27:52 | 18 | (Plaintiff's Exhibit 7 was marked.) |
| 13:27:52 | 19 | VIDEOTAPE OPERATOR:  Okay.  We're back on the |
| 13:28:01 | 20 | record.  The time is 1:28 p.m. |
| 13:28:07 | 21 | Q.        BY MR. BANCHERO:  Mr. Choudhury, I'm showing |
| 13:28:08 | 22 | you what we have marked as Exhibit 7.  It is a document |
| 13:28:13 | 23 | entitled, "Term Promissory Note," numbered AC-018. |
| 13:28:20 | 24 | Would you take a moment and look at that, |
| 3:28:22 | 25 | please. |

| | | |
|---|---|---|
| 13:28:22 | 1 | (Pause in proceedings for document review.) |
| 13:28:25 | 2 | Q.      BY MR. BANCHERO:  Is that your signature on |
| 13:28:26 | 3 | Exhibit 7? |
| 13:28:27 | 4 | A.      It appears to be, yes. |
| 13:28:29 | 5 | Q.      Is that your signature by hand?  Did you place |
| 13:28:33 | 6 | it on this document? |
| 13:28:34 | 7 | A.      Yes. |
| 13:28:34 | 8 | Q.      Okay.  Did you prepare the term promissory |
| 13:28:41 | 9 | note? |
| 13:28:42 | 10 | A.      Yes. |
| 13:28:43 | 11 | Q.      Did you physically input the words into a word |
| 13:28:48 | 12 | processor? |
| 13:28:50 | 13 | A.      I don't remember if I typed it or cut and |
| 13:28:55 | 14 | pasted from somewhere else. |
| 13:28:58 | 15 | Q.      Okay.  Do you remember where you got the form |
| 13:29:08 | 16 | of the term promissory note? |
| 13:29:10 | 17 | A.      No.  Sorry. |
| 13:29:13 | 18 | Q.      Did you do this on a word processor that you |
| 13:29:18 | 19 | had in your offices at Finexa? |
| 13:29:20 | 20 | A.      Um, I'm not sure if it was at -- where I was |
| 13:29:23 | 21 | when I typed this. |
| 13:29:26 | 22 | Q.      During this period of 2000, early 2001, did you |
| 13:29:30 | 23 | have one or more than one computer that you used? |
| 13:29:32 | 24 | A.      At that time I had one. |
| 3:29:34 | 25 | Q.      Where was that computer? |

| | | |
|---|---|---|
| 13:29:36 | 1 | A.        It was a laptop. |
| 13:29:39 | 2 | Q.        When physically did you print the form note |
| 13:29:44 | 3 | that you signed? |
| 13:29:44 | 4 | A.        I don't remember. |
| 13:29:46 | 5 | Q.        The note says: |
| 13:29:48 | 6 |          "Made at San Francisco, California, this 2nd |
| 13:29:50 | 7 | day of January, 2001." |
| 13:29:53 | 8 |          Did you print the note from your word processor |
| 13:29:56 | 9 | on that date? |
| 13:29:57 | 10 | A.        I don't know.  I don't recall. |
| 13:29:58 | 11 | Q.        Did you create this term promissory note before |
| 13:30:07 | 12 | or after you received the $880,000 from Elizabeth |
| 13:30:13 | 13 | Grewal? |
| 13:30:13 | 14 | A.        I don't remember. |
| 13:30:17 | 15 | Q.        Did you sign the term promissory note before or |
| 13:30:23 | 16 | after you received the $880,000 from Elizabeth Grewal? |
| 13:30:28 | 17 | A.        I don't remember. |
| 13:30:29 | 18 | Q.        Did you present this note to Elizabeth Grewal |
| 13:30:43 | 19 | to sign? |
| 13:30:44 | 20 | A.        I believe so, yes. |
| 13:30:46 | 21 | Q.        Did you hand it to her? |
| 13:30:48 | 22 | A.        I think so. |
| 13:30:50 | 23 | Q.        Did she sign it in your presence? |
| 13:30:52 | 24 | A.        I don't remember. |
| 3:30:53 | 25 | Q.        Did she sign it and hand it back to you? |

13:43:40  1   your expectation, but did Ms. Grewal make that promise

13:43:43  2   to you?

13:43:43  3   A.        I don't know if she said the words "I promise."

13:43:47  4   But my expectation was that she was going to be sending

13:43:51  5   it because the agreement was one million.

13:43:54  6   Q.        When did you reach that agreement?

13:43:56  7   A.        Before she sent the first -- before she sent

13:44:02  8   the wire.  At some point before that.

13:44:04  9   Q.        Was the agreement in writing or oral?

13:44:10  10  A.        Verbal.

13:44:15  11  Q.        Okay.  Putting that aside for a moment, your

13:44:21  12  testimony is that sometime between December 13th and

13:44:24  13  December 31st, 2000, Ms. Grewal led you to believe that

13:44:27  14  she was going to send you an additional $120,000?

13:44:30  15  A.        Yes.

13:44:31  16  Q.        Can you testify with any more specificity

13:44:33  17  precisely what she said?

13:44:35  18  A.        I'm sorry.  I don't remember.

13:44:38  19  Q.        Okay.  Was this conversation or conversations

13:44:53  20  that you had with Ms. Grewal during the period from

13:44:57  21  December 13 to December 31st, 2000 before you handed her

13:45:05  22  the signed term promissory note, Exhibit 7?

13:45:08  23  A.        I don't remember.

13:45:10  24  Q.        At any point after the date in which you handed

3:45:25   25  her the term promissory note, did you request that she

13:45:28  1    send you the additional $120,000?

13:45:31  2    A.        I don't remember that either.

13:45:34  3    Q.        Do you remember that you did not do that or do

13:45:38  4    you not remember one way or the other?

13:45:40  5    A.        I don't remember one way or the other.

13:45:42  6    Q.        Is there any writing or E-mail message that you

13:45:45  7    found in which you request of Ms. Grewal that she send

13:45:54  8    an additional $120,000 to you?

13:45:57  9    A.        Yes.

13:45:57  10   Q.        What is that?

13:45:57  11   A.        There's an E-mail that we produced that, if you

13:46:03  12   produce it, I can read it out to you.  It talks about an

13:46:07  13   ultimate solution of how to -- or an option of how to

13:46:15  14   pay 120,000 or give -- transfer $120,000.

13:46:22  15   Q.        Does it say the words "$120,000"?

13:46:25  16   A.        I don't recall if -- it's probably part of your

13:46:29  17   exhibit somewhere.

13:46:31  18   Q.        Was this an E-mail message that you sent to

13:46:35  19   her?

13:46:35  20   A.        Yes.

13:46:36  21   Q.        Did she reply?

13:46:38  22   A.        Um, I don't know.  I'd have to look at that

13:46:42  23   E-mail.

13:46:44  24   Q.        Did you make any oral requests of Ms. Choudhury

3:46:47   25   that she pay the additional $120,000 during the period

```
13:46:53   1   from the date that you handed her the promissory note

13:46:56   2   and April 1st, 2001?

13:47:00   3   A.        I think you said make an oral request of

13:47:03   4   Mrs. Choudhury.

13:47:03   5   Q.        I'm sorry.  Did you -- I'll rephrase the

13:47:06   6   question.

13:47:07   7             At any time from -- during the period from the

13:47:09   8   date that you handed Ms. Grewal the promissory note and

13:47:14   9   April 1st, 2001, did you request of her that she pay an

13:47:19  10   additional $120,000?

13:47:22  11   A.        I don't know.  Because I don't know what date I

13:47:25  12   gave her the note.

13:47:30  13   Q.        Put aside that date, whatever date it was, do

13:47:34  14   you recall any conversations between the date that you

13:47:37  15   gave the note to her and April 1st, 2001 in which you

13:47:42  16   requested that she invest an additional $120,000?

13:47:47  17   A.        If the note was given before the E-mail was

13:47:49  18   sent, then the answer would be yes because the E-mail

13:47:52  19   talks about it.  If the note was given after, then I

13:47:55  20   don't know if we had any face-to-face discussions or we

13:47:59  21   talked about it.

13:48:07  22   Q.        Did you have any discussions with Ms. Grewal

13:48:32  23   about the term promissory note when you handed it to

13:48:35  24   her?

3:48:36   25   A.        I don't remember.
```

13:48:37  1    Q.        Do you remember anything that she said or you

13:48:40  2    said when you handed her the promissory note?

13:48:43  3    A.        No.

13:49:44  4    Q.        You've had some discussions with Ms. Grewal in

13:49:22  5    the last couple of years about the monies that she sent

13:49:30  6    to you in December of 2000, correct?

13:49:32  7    A.        Yes.

13:49:34  8    Q.        Okay.  During any of those discussions, did you

13:49:38  9    tell her that you had expected to receive more than the

13:49:46 10    monies that you did and that was one of the reasons that

13:49:50 11    you weren't repaying the money?

13:49:55 12              MR. LEIDERMAN:  The question is did you say

13:49:58 13    such a thing to her.  Do you understand the question?

13:50:00 14              THE WITNESS:  I don't remember.

13:50:02 15              MR. BANCHERO:  Okay.  Let's mark as the next

13:50:20 16    exhibit in order a document labeled AC-020.

13:50:26 17              MR. LEIDERMAN:  AC-020.

13:50:32 18              (Plaintiff's Exhibit 8 was marked.)

13:50:40 19    Q.        BY MR. BANCHERO:  Do you recognize Exhibit 8?

13:50:54 20    A.        Um, yes, we produced it, I believe.

13:50:56 21    Q.        You did.  What is Exhibit 8?

13:50:59 22    A.        Um, I'm not sure.

13:51:02 23    Q.        Where did you find it?

13:51:03 24    A.        It was just a sheet in -- in a manila folder.

3:51:11 25    And it starts with 880, that's why I thought it was

14:03:01  1    Q.       Okay.  Why did you sign the note in the amount

4:03:19  2    of $1 million rather than simply sign a note in the

14:03:23  3    amount of $880,000?

14:03:25  4             MR. LEIDERMAN:  Objection.  Argumentative.

14:03:30  5    Q.       BY MR. BANCHERO:  You may answer.

14:03:32  6    A.       I was expecting one million.

14:03:35  7    Q.       Fair enough.  You didn't get it.  So the fact

14:03:38  8    that you didn't get it, why does the note say $1 million

14:03:42  9    instead of $880,000?

14:03:44  10   A.       Because I was expecting one million, there's

14:03:48  11   nothing that stops -- stopped Ms. Grewal from sending it

14:03:52  12   in two lots, 880,000 plus 120,000.  She could have sent

14:03:53  13   the $120,000 at any time.

14:04:06  14   Q.       Did you ever write to Ms. Grewal and say that

14:04:10  15   you wanted to rescind the promissory note because she

14:04:16  16   hadn't given the additional $120,000?

14:04:20  17   A.       No.

14:04:23  18   Q.       Did there come a point in 2000 when you

14:04:39  19   realized you were not going to receive the additional

14:04:42  20   $120,000 from Ms. Grewal?

14:04:45  21   A.       In 2000?

14:04:46  22   Q.       Yes.  Pardon me.  2001.

14:04:47  23            I'll rephrase.

14:04:48  24            Did there come a time in 2001 when you realized

4:04:50  25   that you were not going to receive the additional

14:04:52  1    $120,000 from Ms. Grewal?

4:04:57   2    A.       I guess I did.  I mean, it's not something I

14:05:02  3    gave active thought to at that time.

14:05:04  4    Q.       Okay.  Did you discuss that with Ms. Grewal?

14:05:11  5             MR. LEIDERMAN:  When?

14:05:12  6             MR. BANCHERO:  In 2001.

14:05:14  7             THE WITNESS:  I know I asked for the additional

14:05:16  8    120,000.  I don't know what the dates were, if it was

14:05:23  9    the end of 2000, early 2001.  I don't remember.

14:05:26  10   Q.       BY MR. BANCHERO:  Did there come a time when

14:05:28  11   Ms. Grewal refused to provide the additional $120,000 to

14:05:33  12   you?

14:05:33  13   A.       I think the topic just sort of disappeared.  It

14:05:36  14   just wasn't discussed.

14:05:37  15   Q.       Was there ever a point when she told you that

14:05:39  16   she would refuse to give you an additional $120,000 in

14:05:45  17   investment capital?

14:05:46  18   A.       No.

14:05:47  19   Q.       Okay.  Did you ever demand that she give you

14:05:54  20   the term promissory note that you signed back to her?

14:05:58  21   A.       No.

14:06:10  22   Q.       Paragraph 18 states:

14:06:11  23            "Choudhury is informed and" believed --

14:06:13  24   "believes, and based thereon alleges, that Grewal acted

4:06:17   25   with malicious intent when she took advantage of

14:46:19 1    about what she meant in the message dated January 16,

4:46:27 2    2001 that she sent to you that reads:

14:46:29 3              "Looking for info/receipt for the other stuff"?

14:46:36 4    A.        I don't know what that refers to.  I was just

14:46:39 5    reading it right now, and I still don't know what it

14:46:42 6    refers to.

14:46:48 7              MR. LEIDERMAN:  Are we taking a break?

14:46:50 8              MR. BANCHERO:  No.

14:46:51 9              MR. LEIDERMAN:  Okay.

14:46:52 10             MR. BANCHERO:  No.  We're adjusting the

14:46:54 11   thermostat in the conference room.

14:47:16 12   Q.        At some point, Mr. Choudhury, the Pinnacle

14:47:22 13   Partners Capital, LP hedge fund did pay monies to

14:47:30 14   Ms. Grewal, correct?

14:47:30 15   A.        Yes.

14:47:31 16   Q.        So that at some point the investment that she

14:47:35 17   had in the hedge fund was completely liquidated?

14:47:38 18   A.        Yes.  When the hedge fund was dissolved.

14:47:41 19   Q.        Okay.  Putting aside Ms. Grewal's investment in

14:47:53 20   the hedge fund, did she receive any other monies from

14:47:59 21   you since December of 2000 when you received the

14:48:08 22   $880,000 from her?

14:48:09 23   A.        No.

14:48:12 24   Q.        Okay.  Why hasn't she received any monies from

4:48:23 25    you?

14:48:23   1   A.        I haven't sent her any money.

.4:48:30   2   Q.        And why have you not sent her any money?

14:48:33   3   A.        I have -- after the investment was made, and

14:48:47   4   since that time, I have been trying or have tried to

14:48:53   5   earn the money to be able to send her some money.

14:48:59   6   Q.        Have you not been able to do that?

14:49:01   7   A.        Not with a lot of success.

14:49:05   8   Q.        Okay.  Have you been attempting to earn the

14:49:17   9   $880,000 plus some amount of interest in order to pay

14:49:23  10   her?

14:49:24  11   A.        I have been trying to just earn money.  Hasn't

14:49:27  12   been -- it's not related to anything specific, just --

14:49:34  13   you know, an investment was made.  There was a loss in

14:49:39  14   the investment.  I felt like the correct thing morally

14:49:44  15   was to try and get some of this money, and I've been

14:49:48  16   working at it ever since.

14:49:53  17   Q.        Let me turn your attention to December 2006,

14:50:17  18   which was a little more than 12 months ago.  Is it true

14:50:27  19   that you had a face-to-face meeting with Ms. Grewal in

14:50:33  20   December 2006 during which you discussed the investment

14:50:38  21   that she had made with you?

14:50:40  22   A.        I had a face-to-face meeting with her in

14:50:43  23   December of 2006.  We discussed the investment.  Um, we

14:50:50  24   spent more time discussing personal matters.  And I did

4:50:58   25   say that I was trying to get the money together so I

14:51:01  1    could get her some money.

.4:51:04  2    Q.        Okay.  This meeting took place at your offices

14:51:13  3    on Van Ness Avenue here in San Francisco?

14:51:16  4    A.        Yes.

14:51:16  5    Q.        During this meeting, did Ms. Grewal state to

14:51:30  6    you that she would send you a written demand for

14:51:34  7    payment?

14:51:34  8    A.        No.

14:51:36  9    Q.        Did you tell her during this meeting that you

14:51:45  10   needed a few more months in order to raise the money to

14:51:49  11   return to her?

14:51:50  12   A.        I said I needed more time.

14:51:53  13   Q.        Did you make any promise to her as to when she

14:51:58  14   would be paid?

14:52:00  15   A.        Not by a specific date.  I just said I was

14:52:05  16   trying everything I could.

14:52:07  17   Q.        Did you ask her to give you until March 30,

14:52:13  18   2007?

14:52:14  19   A.        No.

14:52:15  20   Q.        Did you discuss with her the possibility of

14:52:24  21   opening accounts in Austria with Ms. Grewal's name on

14:52:31  22   them so that she might obtain ATM cards that would allow

14:52:39  23   her to withdraw $500 a day in cash so no one would know

14:52:46  24   about the withdrawals?

4:52:56  25    A.        No.

14:52:56  1    Q.        Okay.  Now, moving forward a few months to

4:53:02   2    March of 2006.  At this point did Ms. Grewal ask you for

14:53:08  3    a valuation of the investment?

14:53:10  4    A.        I'm sorry.  Did you mean March of 2007?

14:53:13  5    Q.        I'm sorry.  Yes, I did mean March of 2007.

14:53:18  6    A.        And, sorry, and the question was?

14:53:20  7    Q.        Let me rephrase it.  Thank you.

14:53:22  8              In March of 2007, some few months after the

14:53:26  9    meeting in December 2006, did Ms. Grewal ask you for a

14:53:31  10   valuation of the investment?

14:53:34  11   A.        I don't recall.

14:53:36  12   Q.        Did you tell her in March of 2007 that the

14:53:40  13   investment was worth nearly $1.2 million?

14:53:44  14   A.        No.

14:53:48  15   Q.        In May of 2007, did you state to Ms. Grewal

14:53:56  16   that she would be paid by the end of June 2007 or in

14:54:01  17   early July?

14:54:03  18   A.        I said that I was trying to raise the money.

14:54:06  19   And as soon as I could raise the money, because I felt

14:54:09  20   it was morally the correct thing to do, I would get her

14:54:13  21   as much of the money as I could.

14:54:18  22              MR. BANCHERO:  Okay.  Let's mark as Exhibit 11

14:54:47  23   a one-page document, AC-019, Demand For Payment.

14:55:15  24              (Plaintiff's Exhibit 11 was marked.)

4:55:15   25              MR. LEIDERMAN:  Jeff, what's the number on

14:55:17  1    that?

4:55:18   2              MR. BANCHERO:  19.  1-9.

14:55:25  3              MR. LEIDERMAN:  Okay.

14:55:26  4    Q.       BY MR. BANCHERO:  Did you receive this demand

14:55:28  5    for payment from Ms. Grewal?

14:55:31  6    A.       It was received at the office.

14:55:32  7    Q.       Did you see it when the office received it?

14:55:34  8    A.       No.

14:55:35  9    Q.       You produced a copy of it in this litigation.

14:55:40  10   Did you find it in a file that you maintained?

14:55:42  11   A.       After we received the complaint, when I was

14:55:44  12   going through documents, I found the unopened envelope.

14:55:49  13   Q.       Okay.  So it's fair to say that you did not see

14:55:52  14   this demand for payment until after the lawsuit was

14:55:55  15   filed?

14:56:00  16   A.       That's exactly right.

14:56:03  17   Q.       I take it then that you had no discussions --

14:56:13  18   well, let me rephrase.

14:56:14  19            Did you have any discussions with Ms. Grewal

14:56:16  20   about this formal demand for payment --

14:56:19  21   A.       I don't remember.

14:56:20  22   Q.       -- between January 2nd, 2007 and July 1st,

14:56:24  23   2007?

14:56:24  24   A.       I don't recall.

4:58:12   25            MR. BANCHERO:  Okay.  Let's mark as the next

14:58:17  1  exhibit in order a document marked 100003 through 6.

4:58:28  2  (Plaintiff's Exhibit 12 was marked.)

14:58:47  3  Q.    BY MR. BANCHERO:  Did you sit down with

14:59:23  4  Ms. Grewal and go over this Charles Schwab investment

14:59:27  5  statement with her?

14:59:28  6  A.    I believe I did.

14:59:33  7  Q.    On page 2 of this exhibit, you'll see the words

14:59:44  8  "Apple Computer Inc" in typewriting, and then the words

14:59:48  9  "as long as Steve Jobs."  That's your handwriting,

14:59:51  10  correct?

14:59:51  11  A.    Yes.

14:59:52  12  Q.    The -- some of the check marks, at least, in

15:00:08  13  the left-hand margin of page 2 were also made by you?

15:00:12  14  A.    No.

15:00:13  15  Q.    No?

15:00:13  16  A.    No.

15:00:14  17  Q.    Okay.  Turn to page 5 -- pardon me, it's page 3

15:00:23  18  of the exhibit.  It's 100005 of the Bates numbering.

15:00:28  19  Is that in your handwriting?

15:00:30  20  A.    Not the words in here, if you mean the "sold

15:00:33  21  at" something.  I think this "KO," the arrow to "KO."

15:00:40  22  Q.    Opposite Pepsico, that's your writing?

15:00:42  23  A.    That's correct.  KO is the symbol for

15:00:47  24  Coca-Cola.

5:00:48  25  Q.    And what about the writing down at the bottom

| | | |
|--|--|--|
| 15:00:52 | 1 | right-hand corner? |
| .5:00:52 | 2 | A.         On the lower side where you see it says |
| 15:00:54 | 3 | approximately 2 million, think of it as eight to 12, |
| 15:00:57 | 4 | sort of in the 150 to 250K range.  Generically, that |
| 15:01:03 | 5 | would be a standard asset allocation model.  If you like |
| 15:01:06 | 6 | tech, seven to eight.  International, maybe two. |
| 15:01:10 | 7 | Q.         Those are your written words? |
| 15:01:14 | 8 | A.         Those are my written words, and it would be -- |
| 15:01:18 | 9 | that's what I would do from an investment processing |
| 15:01:22 | 10 | point of view.  I mentioned earlier I -- when I worked |
| 15:01:24 | 11 | with pension funds, for example, of clients, that's what |
| 15:01:27 | 12 | I would tell them, for example. |
| 15:01:28 | 13 | Q.         Okay.  The date of the statement is April 30, |
| 15:01:34 | 14 | 2000.  Does that suggest to you when you sat down with |
| 15:01:43 | 15 | Ms. Grewal to talk about this statement? |
| 15:01:46 | 16 | A.         Only that it was after April 30th. |
| 15:01:49 | 17 | Q.         Can you testify how soon after April 30th it |
| 15:01:52 | 18 | was? |
| 15:01:52 | 19 | A.         I have no idea. |
| 15:01:53 | 20 | Q.         Do you know whether it was before or after |
| 15:01:56 | 21 | Ms. Grewal started working for Finexa? |
| 15:01:59 | 22 | A.         Um, no, I don't know for sure. |
| 15:02:02 | 23 | Q.         Okay.  What was the purpose of your sitting |
| 15:02:05 | 24 | down with Ms. Grewal to discuss this statement? |
| .5:02:09 | 25 | A.         She approached me and asked me if I would |

| | | |
|---|---|---|
| 15:02:15 | 1 | consider just giving her some advice on her portfolio. |
| 15:02:21 | 2 | And I stated that I don't usually give buy and sell type |
| 15:02:26 | 3 | recommendations to anybody, but if you're interested in |
| 15:02:29 | 4 | a generic investment process and basic rules to |
| 15:02:33 | 5 | consider, then I can share some of my thoughts with you |
| 15:02:36 | 6 | on how I go about doing it. |
| 15:02:43 | 7 | Q.    Okay.  Did you do that with her? |
| 15:02:44 | 8 | A.    Yes. |
| 15:02:45 | 9 | Q.    Can you summarize what advice you gave to her? |
| 15:02:50 | 10 | A.    Just what I told you earlier.  If you have |
| 15:02:52 | 11 | about $2 million, you want to be allocated to between |
| 15:02:56 | 12 | eight and 12 stocks, each of which are between 150 to |
| 15:03:01 | 13 | 250.  If you like tech, then you've got to have seven to |
| 15:03:01 | 14 | eight of the eight to 12 in tech -- |
| 15:03:01 | 15 | MS. REPORTER:  I'm sorry, if you what? |
| 15:03:07 | 16 | THE WITNESS:  If you like technology stocks, |
| 15:03:09 | 17 | then you want seven to eight of them in technology; you |
| 15:03:12 | 18 | want at least two in international, if possible; and |
| 15:03:15 | 19 | then two you can do something else with. |
| 15:03:23 | 20 | Q.    BY MR. BANCHERO:  Did Ms. Grewal discuss with |
| 15:03:27 | 21 | you how she obtained the stocks in this investment |
| 15:03:33 | 22 | portfolio? |
| 15:03:34 | 23 | A.    I believe she told me she inherited a fair bit |
| 15:03:38 | 24 | of it. |
| 15:03:39 | 25 | Q.    Okay.  Inherited from her mother? |

15:39:22  1    question.

5:39:22   2    Q.        Okay.  That is, you've provided consulting

15:39:25  3    services under the name of Pinnacle Partners but not

15:39:30  4    been employed by companies to which you provide

15:39:33  5    consulting advice?

15:39:33  6    A.        That's correct.

15:40:14  7              MR. BANCHERO:  Okay.  Exhibit 14 is document

15:40:18  8    AC-101.

15:40:21  9              (Plaintiff's Exhibit 14 was marked.)

15:40:31  10   Q.        BY MR. BANCHERO:  Exhibit 14 refers to a

15:40:53  11   voicemail that you received from Ms. Grewal.  Do you

15:41:00  12   recall the contents of that voicemail?

15:41:02  13   A.        I'm sorry.  I don't.  This was right when my --

15:41:06  14   this was in the last month of my aunt's life.

15:41:10  15   Q.        Did you send Exhibit 14 to Ms. Grewal?

15:41:14  16   A.        I think so, yes.

15:41:20  17              MR. BANCHERO:  Exhibit 15 is pages 51 through

15:41:25  18   53.  AC-51 through 53.

15:41:30  19              (Plaintiff's Exhibit 15 was marked.)

15:42:27  20   Q.        BY MR. BANCHERO:  Turning your attention,

15:42:28  21   Mr. Choudhury, to the voicemail -- pardon me, the E-mail

15:42:31  22   message on the second page of Exhibit 14, did you send

15:42:36  23   that to Ms. Grewal?

15:42:38  24   A.        Yes.

5:42:39   25   Q.        You write, "Got your v-mail."

| | | |
|---|---|---|
| 15:44:28 | 1 | MR. LEIDERMAN:  That was 15. |
| 5:44:30 | 2 | MR. BANCHERO:  That was 15.  Thank you. |
| 15:44:34 | 3 | Exhibit 16 is AC-56, 57. |
| 15:44:43 | 4 | (Plaintiff's Exhibit 16 was marked.) |
| 15:45:01 | 5 | Q.      BY MR. BANCHERO:  The first page of Exhibit 16 |
| 15:45:32 | 6 | includes an E-mail message that appears to have been |
| 15:45:35 | 7 | sent by you to Ms. Grewal on April 24, 2006. |
| 15:45:38 | 8 | Did you send that to her on that date? |
| 15:45:41 | 9 | A.      Um, I believe so, yes. |
| 15:45:43 | 10 | Q.      You write: |
| 15:45:45 | 11 | "Am pursuing every avenue possible -- and have |
| 15:45:49 | 12 | racked up substantial expenses trying to accelerate each |
| 15:45:52 | 13 | one of them, (extra processing fees, lawyers, etc.) but |
| 15:45:57 | 14 | have not been able to complete any one process, even |
| 15:46:00 | 15 | though we are making a little progress every day or |
| 15:46:04 | 16 | two." |
| 15:46:04 | 17 | What did you mean by that? |
| 15:46:07 | 18 | A.      As I mentioned earlier, I felt some form of the |
| 15:46:13 | 19 | right thing to do morally was to try and get some money |
| 15:46:17 | 20 | back to Ms. Grewal.  So I was trying to, as I again |
| 15:46:24 | 21 | mentioned earlier, raise the money through whatever |
| 15:46:26 | 22 | legitimate mean possible. |
| 15:46:29 | 23 | Q.      That's what that sentence refers to? |
| 15:46:31 | 24 | A.      Correct. |
| 5:46:31 | 25 | Q.      Okay.  At any point in 2006, did you tell |

| | | |
|---|---|---|
| 15:47:06 | 1 | Ms. Grewal that the money that she had invested with you |
| .5:47:10 | 2 | had been lost? |
| 15:47:11 | 3 | A.        No. |
| 15:47:13 | 4 | Q.        At any point in 2005, did you tell Ms. Grewal |
| 15:47:28 | 5 | that the money that she had invested with you had been |
| 15:47:31 | 6 | lost? |
| 15:47:31 | 7 | A.        No. |
| 15:47:32 | 8 | Q.        What about in 2004? |
| 15:47:34 | 9 | A.        No. |
| 15:47:35 | 10 | Q.        2003? |
| 15:47:36 | 11 | A.        No. |
| 15:47:37 | 12 | Q.        2002? |
| 15:47:39 | 13 | A.        No. |
| 15:47:41 | 14 | Q.        2001? |
| 15:47:43 | 15 | A.        No. |
| 15:47:53 | 16 | MR. BANCHERO:  Exhibit 17 is AC-58. |
| 15:48:10 | 17 | (Plaintiff's Exhibit 17 was marked.) |
| 15:48:27 | 18 | Q.        BY MR. BANCHERO:  Did you receive this E-mail |
| 15:48:29 | 19 | message from Ms. Grewal on April 27, 2006? |
| 15:48:32 | 20 | A.        I received the E-mail from her.  I don't know |
| 15:48:34 | 21 | what day I received it or read it. |
| 15:48:37 | 22 | Q.        You recall receiving it from her? |
| 15:48:40 | 23 | A.        Well, only because I printed it out, so I must |
| 15:48:43 | 24 | have received it. |
| 5:48:44 | 25 | Q.        When you produced this E-mail message and |

REPORTER'S CERTIFICATE

1

2      I certify that the foregoing proceedings in the

3  within-entitled cause were reported at the time and

4  place therein named; that said proceedings were reported

5  by me, a duly Certified Shorthand Reporter of the State

6  of California, and were thereafter transcribed into

7  typewriting

8          I further certify that I am not of counsel

9  or attorney for either or any of the parties to said

10  cause of action, nor in any way interested in the

11  outcome of the cause named in said cause of action.

12      IN WITNESS WHEREOF, I have hereunto set my

13  hand this _24th_ day of _January_, 2008.

14

15          _Colleen M. Redamonti_
            COLLEEN M. REDAMONTI, CRP, CSR
16          Certified Shorthand Reporter
            Certificate No. 7012

17

18

19

20

21

22

23

24

25