# Exhibit D

# A Negotiable Instruments Primer

## Second Edition

ELLEN A. PETERS
Professor of Law
Yale Law School

Copyright © 1971, 1974 by THE BOBBS-MERRILL COMPANY, INC.
Library of Congress Catalog Card Number: 74-26392
ISBN 0-672-81994-5
Printed in the United States of America
All Rights Reserved

THE BOBBS-MERRILL COMPANY, INC.
PUBLISHERS
INDIANAPOLIS • NEW YORK

by the middle of the eighteenth century. Over the next century, case law and statutes proliferated on both sides of the Atlantic and furnished an incentive for codification of this area of the law. Although efforts at general codification in the mid-nineteenth century were unsuccessful, the needs of commerce were perceived as a special case. In England, 1882 saw the enactment of the Bills of Exchange Act; in the United States, the Negotiable Instruments Law was launched in 1896. The N.I.L. remains the only American uniform law ever to have been enacted in every single state and territory. Its success in the state legislatures was, to a considerable extent, mirrored in judicial deference as well; although its provisions might be misconstrued, they were seldom ignored. When the drafting of the Uniform Commercial Code came to be extended to include negotiable instruments, it was natural for Article 3 to be shaped in the image, albeit a modernized image, of its widely lauded progenitor. Article 4, based on the American Bankers Association's sparsely enacted Bank Collection Code, was predictably less firmly grounded and hence more controversial.

## C.  WHAT IS AN INSTRUMENT?

The law of commercial paper, or bills and notes as it used to be called, deals with a limited class of contracts, known as "instruments." The carving out of instruments from the general law of contracts was necessary, as a matter of history, to protect their free transferability and marketability. The special benefits which accrue from the negotiability of instruments will be described in the sections to come. But in actual litigation the two issues are often mixed: is this the kind of contract entitled to special attributes, and what are the special attributes to which this contract entitles the parties?

The first characteristic of an instrument is that it must be a contract in writing. There is no such thing as an oral instrument; an oral promise to give or make or draw an instrument is merely a contractual promise of the ordinary sort, enforceable or not according to the general law of contracts. The second characteristic of an instrument is that it must embody an obligation for the payment of money, rather than for the delivery of goods or services. The third characteristic of an instrument is that it must be a relatively simple short writing, a characteristic underscored by the Uniform Commercial Code's decision to relegate long-term corporate obligations to a separate article, Article 8, similar but not identical in terms to Article 3 on short-term commercial paper. Article 3 contains in § 3-104(2) a list illustrative of the kinds of commercial paper ordinarily thought of as instruments, principally drafts and notes.

It is important to pause for a moment, before these Article 3 instruments are examined in detail, to understand the jurisdiction of Article 3 and the technical meaning of the term "instruments." The Negotiable Instruments Law, in its opening section, had purported to be the sole source of law governing all potentially negotiable instruments. So ambitious an undertaking turned out to be misguided: other forms of paper with many of the commercial attributes of negotiability could not be fitted into the tight pattern of the N.I.L. and yet deserved recognition. A good example of an important maverick was the corporate bond. Bearing this history in mind, the draftsmen of Article 3 took a more limited line: to be a negotiable instrument *within Article 3,* an instrument must meet certain criteria. And, by the definition of § 3-102(1)(e), the term "instrument" presumptively, but only presumptively, means a negotiable instrument. *Cf.* § 3-805. Instruments which do not meet the Article 3 criteria may still be instruments, may even take on attributes of negotiability, but are not governed by Article 3 except perhaps as a source of analogous law.

This theme of nonexclusivity is reinforced by other sections of the Code which supplement, or even supplant, the rules of Article 3. Instruments which are issued or dealt in as media for investment—stocks and bonds, principally—are "securities," if they meet the formal criteria of § 8-102(1)(a). Securities, even if they might also be Article 3 instruments, are governed exclusively by Article 8. § 8-102(1)(b). Instruments which find their way into the process of bank collection are swallowed up within Article 4's definition of an "item" as "any instrument for the payment of money even though it is not negotiable." § 4-104(1)(g). Both Articles 3 and 4 stipulate that, in the event of conflict, Article 4's provisions govern. §§ 3-103(2) and 4-102(1). Instruments may also become involved in secured transactions, and then Article 9 provisions may become relevant or, in the case of conflict, controlling. § 3-103 (2). It is important to note that the Article 9 definition of "instruments," contained in § 9-105 (1)(g), and elaborated on by an extended comment in the 1966 Permanent Editorial Board Report includes, but is in no way limited to, Article 3 instruments. Article 9 instruments include "any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment."

Article 3's jurisdictional boundaries are not so clear in cases of conflict with statutory provisions arising outside of the Code. Of these, the most significant today are the regulations designed to

limit negotiability in the context of consumer transactions. Article 9, in §§ 9-203(4) and 9-206(1), expressly defers to relevant local law in its provisions defining valid security agreements. By contrast, Article 3 is, on the whole, silent about the effect of non-Code statutes on Article 3 instruments. The only exception is the language contained in two subsections, §§ 3-106(2) and 3-112 (2) which state, identically in each case, that "nothing in this section shall validate any term which is otherwise illegal." Since § 3-106 deals only with calculation of a "sum certain," and § 3-112 validates only a number of specific promises regularly involved in pre-Code litigation, neither reference is especially illuminating about the effect of statutes purporting to outlaw negotiability *in toto* without regard to the particular terms of particular instruments. Elsewhere in Article 3, illegality is not *per se* dispositive of the powers of holders of instruments: illegality does not necessarily make negotiation voidable under § 3-207, nor does it always create a real defense against a due course holder under § 3-305. Local law enacted after the effective date of the Code could of course expressly supersede inconsistent provisions in Article 3, but to date neither the Uniform Consumer Credit Code nor typical individual consumer statutes have in terms addressed the issue. Perhaps repealer is so regularly implied from subsequent legislation as to obviate direct intervention; but such generalizations are somewhat unreliable for the law of specialties such as negotiable instruments.

The special character of Article 3 is underlined by its attitude toward private variation. In contrast to the open invitation for contractual agreement contained in Article 4, § 4-103, Article 3's language is largely peremptory: "Any writing to be a negotiable instrument within this Article must . . ." is the opening and characteristic wording of § 3-104. Only rarely, as in § 3-411(2) or in § 3-802(1), does an Article 3 section contain the prefatory words "unless otherwise agreed" that are so commonplace in Article 2. Although Article 1, in § 1-102, suggests that the absence of such prefatory words is not to be taken as dispositive, the impact of Article 3 as a whole can hardly be ignored. Despite the favorable stance toward private agreement in the Code as a whole, its role in Article 3 is likely to be severely limited.

Whatever may be the range of these ambiguities of scope, Article 3 itself remains the principal source of law concerning commercial paper, and examination of the governing provisions of Article 3 can be postponed no longer. Section 3-104(2) describes the various "writings" central to Article 3, the draft, the check, the certificate of deposit and the note. Each of these is worthy of separate scrutiny, although not necessarily in the order listed.

The common criterion of all the § 3-104 instruments is that they must all meet the requirements of a writing. A writing requires not only a piece of paper, but also a signature. The signature must be genuine to be binding, although perforce principals may be bound by authorized agents. Hence the stricture of § 3-401 that no person can be liable on an instrument "unless his signature appears thereon" is modified by § 3-403 which gives effect to the signatures of agents or other representatives. Article 1 adds a time frame to the concept of signing: signing requires, under § 1-201(39), a present intention to authenticate a writing. Thus printed checks are not automatically signed; neither are photocopies automatically authenticated; although both may be, in particular cases, fully binding upon evidence of the appropriate intent.

The simplest of the various writings which qualify as instruments is a note, sometimes called a promissory note, defined in § 3-104(2)(d) as "a promise other than a certificate of deposit." A note must contain the promise to pay of the person who signs it, called the maker; it must identify the payee, and the sum of money to which the payee is to be entitled. Although notes regularly contain much more than this, they need not do so; an instrument in the form below is a note (whether or not it is negotiable).

> I hereby promise to pay $5,000
> to Dean Robert H. Smith.
> (signed)  Jane Student

On this note, Jane Student is the maker, Dean Smith the payee; two parties are all that a note requires. The note's obligation is in the form of a promise, a word of art defined in § 3-102(1)(c) as an "undertaking to pay." "Undertaking" itself is undefined, and in fact the word never again reappears significantly in the text of the Code; but its use must represent an intent to distinguish "promise" from the kind of commitments which are described as "agreement" and "contract" in the basic definitions of § 1-201. For the fact that a promise is put in the form of an instrument, even in the form of a negotiable instrument, does not in and of itself make the promise enforceable or conclusively establish sufficiency of consideration. The language above could as easily represent a loan from Dean Smith to Jane Student as a charitable contribution from Jane to the Dean. It was long thought essential to free transferability of instruments to say as little as possible about the transactions out of which they arose;

8                     A NEGOTIABLE INSTRUMENTS PRIMER

in the often quoted dictum of Gibson, C. J., in Overton v. Tyler, 3 Pa. 346 (1846), "a negotiable bill or note is a courier without luggage." This ambiguity about what a promise represents is an important counterpart to the rather categorical wording of § 3-413(1) which defines the contract of a maker as an engagement that he(she) "will pay the instrument according to its tenor at the time of his engagement. . . ." The maker's promise to pay is often described as unconditional, but that characterization means only that the law of negotiable instruments adds no conditions to the maker's undertaking; it does not deprive the maker of otherwise appropriate defenses except in the special case of negotiable paper in the hands of a holder in due course.

If the maker of what would otherwise be called a promissory note is a bank, the instrument is a certificate of deposit. Under § 3-104(2)(c), such a certificate is defined as "an acknowledgment by a bank of receipt of money with an engagement to repay it." Certificates of deposit differ from notes principally insofar as commercial understanding attaches stronger presumptions of collectibility to "bank" paper than it does to "private" paper. This understanding is reflected in rules concerning accrual of causes of action, § 3-122, and discharge of prior claims, § 3-802. But in terms of direct liability, the position of the obligor on a certificate of deposit is essentially similar to that of the maker of a promissory note.

The other basic Article 3 instrument is the draft (or bill of exchange), a writing which differs from a note in two significant respects. A draft is an order to pay, § 3-104(2)(a), rather than a promise to pay; and it involves, of necessity, three rather than two essential parties. A simplistic draft might look like this:

> To New Haven Corporation,
> Pay $5,000 to Dean Robert Smith.
> (signed) Jane Student

Although the payee, Dean Smith, is unchanged, Jane Student is now a drawer rather than a maker; and the New Haven Corporation has been added as the person to whom the instrument is addressed, called the drawee. If the drawee had been the New Haven Bank, rather than the New Haven Corporation, the instrument would have become a check, § 3-104(2)(b). Drafts and checks share an important characteristic: in terms, no one promises to pay anyone anything; Jane Student is only instructing some one else to pay Dean Smith whatever she may or may not owe him. What obligations does a draft impose? What happens if Dean Smith

takes the draft to the New Haven Corporation and the drawee refused to cooperate: because New Haven thinks Student is bankrupt, because New Haven thinks New Haven is bankrupt, because New Haven has no assets of Student's out of which to pay Dean Smith, or because it prefers to ignore Student's wishes? If New Haven, despite due presentment, defined in §§ 3-505 and 3-506, refuses to pay, even out of sheer inadvertence or obstinacy, Dean Smith still has no recourse against New Haven. The drawee has not signed the instrument and therefore has undertaken no liability upon it. *Cf.* § 3-401(1). A draft, in and of itself, does not operate as an assignment to the payee despite the drawee's holding of identifiable funds belonging to the drawer. § 3-409(1). New Haven may be liable to Jane Student for failure to honor contractual obligations to her, but not to Dean Smith as mere payee of the draft. Drafts would not, however, be commercial instruments if they were no more than invitations to a runaround. Once the drawee, having been asked to pay, refuses, the drawer Jane Student must do so. The engagement of the drawer is precisely that, under § 3-413(2). In fact, although § 3-413(2) conditions the drawer's liability upon prompt dishonor and notice thereof, § 3-502(1)(b) discharges the drawer only if the holder's delay in presentment or notification actually prejudices the drawer's access to formerly available funds. Given the prevalence today of Federal Deposit Insurance, loss of relevant funds can only rarely be shown. Jane Student's ultimate liability is therefore virtually the same whether she signs as drawer of a draft or as maker of a note; in this respect the Code closes a gap which was marked under the N.I.L. Furthermore, the Code permits private agreement to provide for complete assimilation, as by having the drawer expressly waive all rights to demand, presentment and notice, or by having the drawer draw upon herself as drawee. *See* § 3-118(a). On the other hand, a drawer may, by appropriate disclaimer such as by adding "without recourse" totally eliminate any secondary liability. § 3-413(2).

It is important to note, in the foregoing discussion, the role of form in delineating the obligation of the parties to an instrument. Jane Student's characterization as maker derives from her signature on an instrument called a note; she could no more be the drawer of a note than she could be a maker of a check. To what extent is the face of the instrument conclusive evidence of the scope of the signer's obligation? How does the law of negotiable instruments deal with ambiguous undertakings?

One recurring source of ambiguity arises out of the law of principal and agent. Instruments are frequently signed by someone who intends no personal liability but rather means to bind

Case 3:07-cv-04218-CRB   Document 43-4   Filed 04/18/2008   Page 9 of 22

in the often quoted dictum of Gibson, C. J., in Overton v. Tyler, 3 Pa. 346 (1846), "a negotiable bill or note is a courier without luggage." This ambiguity about what a promise represents is an important counterpart to the rather categorical wording of § 3-413(1) which defines the contract of a maker as an engagement that he(she) "will pay the instrument according to its tenor at the time of his engagement. . . ." The maker's promise to pay is often described as unconditional, but that characterization means only that the law of negotiable instruments adds no conditions to the maker's undertaking; it does not deprive the maker of otherwise appropriate defenses except in the special case of negotiable paper in the hands of a holder in due course.

If the maker of what would otherwise be called a promissory note is a bank, the instrument is a certificate of deposit. Under § 3-104(2)(c), such a certificate is defined as "an acknowledgment by a bank of receipt of money with an engagement to repay it." Certificates of deposit differ from notes principally insofar as commercial understanding attaches stronger presumptions of collectibility to "bank" paper than it does to "private" paper. This understanding is reflected in rules concerning accrual of causes of action, § 3-122, and discharge of prior claims, § 3-802. But in terms of direct liability, the position of the obligor on a certificate of deposit is essentially similar to that of the maker of a promissory note.

The other basic Article 3 instrument is the draft (or bill of exchange), a writing which differs from a note in two significant respects. A draft is an order to pay, § 3-104(2)(a), rather than a promise to pay; and it involves, of necessity, three rather than two essential parties. A simplistic draft might look like this:

> To New Haven Corporation,
> Pay $5,000 to Dean Robert Smith.
>     (signed) Jane Student

Although the payee, Dean Smith, is unchanged, Jane Student is now a drawer rather than a maker; and the New Haven Corporation has been added as the person to whom the instrument is addressed, called the drawee. If the drawee had been the New Haven Bank, rather than the New Haven Corporation, the instrument would have become a check, § 3-104(2)(b). Drafts and checks share an important characteristic: in terms, no one promises to pay anyone anything; Jane Student is only instructing some one else to pay Dean Smith whatever she may or may not owe him. What obligations does a draft impose? What happens if Dean Smith

takes the draft to the New Haven Corporation and the drawee refused to cooperate: because New Haven thinks Student is bankrupt, because New Haven thinks New Haven is bankrupt, because New Haven has no assets of Student's out of which to pay Dean Smith, or because it prefers to ignore Student's wishes? If New Haven, despite due presentment, defined in §§ 3-505 and 3-506, refuses to pay, even out of sheer inadvertence or obstinacy, Dean Smith still has no recourse against New Haven. The drawee has not signed the instrument and therefore has undertaken no liability upon it. *Cf.* § 3-401(1). A draft, in and of itself, does not operate as an assignment to the payee despite the drawee's holding of identifiable funds belonging to the drawer. § 3-409(1). New Haven may be liable to Jane Student for failure to honor contractual obligations to her, but not to Dean Smith as mere payee of the draft. Drafts would not, however, be commercial instruments if they were no more than invitations to a runaround. Once the drawee, having been asked to pay, refuses, the drawer Jane Student must do so. The engagement of the drawer is precisely that, under § 3-413(2). In fact, although § 3-413(2) conditions the drawer's liability upon prompt dishonor and notice thereof, § 3-502(1)(b) discharges the drawer only if the holder's delay in presentment or notification actually prejudices the drawer's access to formerly available funds. Given the prevalence today of Federal Deposit Insurance, loss of relevant funds can only rarely be shown. Jane Student's ultimate liability is therefore virtually the same whether she signs as drawer of a draft or as maker of a note; in this respect the Code closes a gap which was marked under the N.I.L. Furthermore, the Code permits private agreement to provide for complete assimilation, as by having the drawer expressly waive all rights to demand, presentment and notice, or by having the drawer draw upon herself as drawee. *See* § 3-118(a). On the other hand, a drawer may, by appropriate disclaimer such as by adding "without recourse" totally eliminate any secondary liability. § 3-413(2).

It is important to note, in the foregoing discussion, the role of form in delineating the obligation of the parties to an instrument. Jane Student's characterization as maker derives from her signature on an instrument called a note; she could no more be the drawer of a note than she could be a maker of a check. To what extent is the face of the instrument conclusive evidence of the scope of the signer's obligation? How does the law of negotiable instruments deal with ambiguous undertakings?

One recurring source of ambiguity arises out of the law of principal and agent. Instruments are frequently signed by someone who intends no personal liability but rather means to bind

another. Leaving aside the case of the forger, whose motives are usually as clear as his unavailability for suit, there is the authorized agent or representative. Such an agent should, of course, indicate both his agency and his principal as part of his signature. Failure to do so may, between immediate parties, be remedied by parol evidence under § 3-403(2), but only if either the agency relationship or the identity of the principal is shown on the instrument itself. Perhaps the most typical source of difficulty arises out of borrowing by small corporations. If a promissory note is "signed" ABC Corporation, followed in the next line by the signature of David Jones, without further identification, has David Jones signed on behalf of the corporation, or personally as co-maker? Frequently lenders do require the individual commitment of a corporate officer before a loan is extended; still, a corporation can hardly sign all by itself. Does the name of the corporation sufficiently indicate "the person represented" so that relevant testimony may be heard? In several litigated instances, courts have disallowed such evidence and held the co-signer personally responsible. *See, e.g.,* Perez v. Janota, 107 Ill. App. 2d 90, 246 N.E. 2d 42 (1969). When it is easy to avoid ambiguity by identifying David Jones *ab initio* as a corporate officer, courts are perhaps justified in taking a hard line. It follows from the above that if David Jones, although widely known to be the president and chief executive of ABC Corporation, signs alone, without any reference to the corporation on the instrument, then without question Jones alone is liable on the instrument. *See, e.g.,* Bostwick Banking Co. v. Arnold, 227 Ga. 18, 178 S.E. 2d 890 (1970).

Ambiguities may arise also concerning the scope of the commitment which an instrument represents. Since instruments are purposely skeletonic, they are likely to be accompanied by a variety of parol understandings (or misunderstandings). When these understandings take the form of written contemporaneous agreements, § 3-119 allows the understandings to become operative between immediate parties and holders in due course with appropriate notice. The availability of oral extrinsic evidence is not generally codified in Article 3, although § 3-415 allows "oral proof" of suretyship status against a holder not in due course, and § 3-403 sometimes allows agency status to be "otherwise established." In describing the rights of ordinary holders not in due course, § 3-306 permits all defenses "which would be available in an action on a simple contract" without indicating any constraints on how such defenses may be proven; and under Article 2, § 2-202, parol evidence is rather readily admissible in the absence of a finding of intentional integration. Still, here as else-

where, extrapolation from general contracts to negotiable instruments is an unreliable predictor of judical response. Presumably, pre-Code case law under the N.I.L., which was often inhospitable to parol variation or amplification of negotiable instruments, will continue to be a relevant source of learning.

Furthermore, ambiguities may surround the issuance of negotiable instruments. The payee of an instrument, Dean Robert Smith in our earlier illustrations, is of course its designated beneficiary as soon as he is so identified on the instrument. But he has no operative rights to enforce the instrument until it has been issued, until, according to § 3-102(1)(a), there has been a "first delivery" of the instrument "to a holder or a remitter." Jane Student's drawing of an instrument does not impose any obligations upon her if she carefully locks the instrument in a burglary-proof drawer to which only she has a key. Only when the instrument escapes from her custody does it become viable. The term "delivery," defined in § 1-201(14) as "voluntary transfer of possession," suggests that ambiguities about entrusting of possession to unreliable agents as well as outright theft might leave Dean Smith's status as holder in jeopardy under § 1-201(20). In fact, such concerns are unfounded, since it is well understood that defective issuance, although possibly a personal defense, is no answer to a potential holder in due course. *See* §§ 3-305 and 3-306. The problem becomes more difficult if the instrument was misappropriated while still incomplete, missing characteristically the amount to be paid. Here the N.I.L. rule was that nondelivery of an incomplete instrument was a total defense, although neither theft nor improper completion alone would defeat a due course holder. Section 3-115 reverses this conclusion, labeling it illogical. The new logic imposes severe risks on those who unknowingly sign writings which may subsequently be embellished into instruments. The test of § 3-115(1), whether the "contents of the paper at the time of signing show that it is intended to become an instrument" is not easily applied after the fact of completion, since the subsection is explicit that the mere absence of essential terms is not sufficient to relieve the signer of liability.

Taken as a whole, Article 3 continues to reinforce the primacy of the actual wording of the instruments it regulates, reflecting well-understood commercial pressures for certainty and efficiency. Yet its own definitions create one final ambiguity about the kinds of instruments to which these regulations apply. What is the fate, under the Code, of writings which appear to meet the tests of negotiability under § 3-104(1) but are not in the form of notes or certificates of deposit, drafts or checks? Currently troublesome examples include traveler's checks and credit card

slips. Section 3-104's comment 4 is curiously ambivalent on this issue. On the one hand, it suggests that any writing meeting the requirements of subsection (1) for negotiability (and not excluded by § 3-103) *is* a negotiable instrument governed by Article 3. On the other hand, the next sentence suggests that such an instrument *is* a draft, check, certificate of deposit or note. Automatically? Always? No, for the comment follows this thought with the observation that traveler's checks are negotiable instruments (only) when completed by the purchaser's identifying signature. In light of Article 3's option for nonexclusivity, and of the N.I.L.'s unfortunate experience with overgeneralization, it would be preferable to read § 3-104 strictly and to exclude from it those instruments for which Article 3 was not drafted. That would still leave Article 3 as a fruitful source of analogy for the development of new and perhaps even negotiable forms of commercial paper, but it would focus attention on the continued need to decide explicitly where and how Article 3 could most appropriately be translated into new contexts.

## D.  NEGOTIABILITY

Instruments which fall within the terms of Article 3 may or may not qualify as negotiable. What does negotiability mean? Professor Grant Gilmore, in unpublished lectures which he gave at the Yale Law School in the late 1950's, offered this capsule comment:

> The word negotiability is never defined and is perhaps, in essence, undefinable. It is possible, however, to isolate the principal aspects of commercial paper, both when it is approaching negotiable status and when it has become fully negotiable. There are three major attributes of negotiability. The first is that the claim must be completely alienable, freely transferable. Historically, this concept had been fully developed in English case law by the end of the seventeenth century. Secondly, a good faith purchaser must be allowed to take the instrument free of defenses available between prior parties. This was the focus of English case law in the eighteenth century. Thirdly, there is the concept often referred to as merger: the intangible claim becomes, so to say, reified in the piece of paper which evidences it and can be dealt with, for most purposes, as if it were a chattel. The application of merger theory is typically the last stage in the progress of any type of paper toward negotiability.

In deciding whether any particular instrument has reached negotiability, courts might well have emphasized the intent of

the parties, with appropriate reference to the language of the instrument and to attendant commercial custom and trade usage. That, in fact, is how investment securities (stocks and bonds) are characterized under the Code in Article 8, § 8-102(1)(a). And *cf.* § 7-104 concerning the negotiability of documents of title. But Article 3 instruments, like instruments covered by the Negotiable Instruments Law, are negotiable only if they meet elaborate criteria of form: intent, even intent manifest on the face of the instrument, unless memorialized in form, is irrelevant. While commercial practice has forced the steady enlargement of the category of negotiable instruments, that enlargement has come by way of statutory amendment of permissible forms rather than by common law recognition of manifest private agreement.

There is no reported history about why this preoccupation with form has continued to dominate the negotiability of commercial paper. Perhaps too many cases have been litigated, and too many words written, on so beautifully technical and lawyer-like a subject, for its abandonment to be conceivable. Perhaps the existence of formal requisites, like the concept of title in the law of sales, gives to the judge a manipulative device by which he can, case by case, choose between protection of commercial expectations and protection of unwary signers of written obligations. Yet there is no evidence that the formal requisites have been so imaginatively used, or that a more straight-forward approach would not more clearly identify those interests which are, or should be, safeguarded. The most likely explanation derives from the fact that Article 3 is not and was not designed to be a radical revision of the Negotiable Instruments Law. If its mission was merely to modernize and to update an essentially accepted framework, then, understandably, formal requisites would be seen as a subject for amendment rather than for excision. The end product of these amendments is to be found today in Article 3's dominant section, § 3-104(1)(a), and the eight succeeding sections, §§ 3-105—3-112, which elaborate on the criteria of § 3-104 (1)(a). The mandates of these sections are detailed, boring, illogical, manipulatable—but of continuing importance.

The first requirement for negotiability according to § 3-104 is that the instrument must be signed by the maker or drawer. Although no written instrument of any kind can be issued validly in the absence of at least one authorized signature, negotiability demands, in addition, that the validating signature be on the instrument itself.

The second requirement is more complicated. Section 3-104 (1)(b) describes the necessary characteristics of the undertaking

itself, so that it may qualify for negotiability. The promise (or order, in the case of a draft or check) must be unconditional, a limitation whose severity is substantially undercut by the long list of permissible conditions contained in §§ 3-105 and 3-112. As long as the promise is not expressly made conditional by making it "subject to" another agreement, words of cross-reference to the source of obligation are perfectly consistent with negotiability. A check does not lose its negotiability by reference to the revolving credit account from which the payment obligation arises; a promissory note is still negotiable even though it stipulates the contract, as yet executory, from which payment is expected. The only important substantive limitation denies negotiability to private paper which restricts repayment to a particular fund, such as an expected testamentary bequest or other third-party payment. Even this limitation is not fully applicable to borrowers who are government agencies or unincorporated associations of specified kinds.

A negotiable undertaking, besides being unconditional, must also have an appropriate subject: it must promise or order the payment of "a sum certain in money." Here §§ 3-106 and 3-107 validate the more common commercial variants: the sum remains certain although the amount due may be affected by interest calculations, and money is any official currency including that of a foreign government. *Cf.* § 1-201(24). Of particular comfort to lawyers is the stipulation that negotiability is not adversely affected by a promise to pay attorney's fees and collection costs, whether or not the instrument states a measure for their calculation. *See, e.g.,* Warner-Lambert Pharmaceutical Co. v. Sylk, 471 F.2d 1137 (3d Cir. 1972).

Finally, the instrument's unconditional promise or order cannot be compromised by supplemental promises not expressly authorized by Article 3. While the ideal of a negotiable instrument which is crisp and uncluttered, "a courier without luggage," is preserved in the text of § 3-104(1), its impact is certainly diminished by the extensive list of authorized terms in § 3-112. As always with a list, its inclusions and exclusions are odd. Why, for example, validate a promise to maintain collateral without validating a promise to pay taxes? Why permit a term authorizing confession of judgment depending upon when it may be exercised, which creates artificial distinctions between instruments which are payable on demand and instruments payable at a stated time in the future?

An instrument sufficiently unconditional by these various criteria still must meet a related but independent requirement con-

# Exhibit E

Westlaw.

MILCALRE § 21:19                                                                         Page 1
8 Cal. Real Est. § 21:19 (3d ed.)

Miller and Starr California Real Estate 3D
Database updated October 2007

Harry D. Miller and Marvin B. Starr

Chapter 21. Elements of Usury
By Harry D. Miller

A. Elements of Usury

References

§ 21:19.Term of loan; prepayment—Bonus for making a loan

West's Key Number Digest

West's Key Number Digest, Banks and Banking—National Banks ☞270

**A bonus is considered as interest.** A lender often seeks to receive a yield in excess of the statutory maximum by requiring a bonus from the borrower. A bonus is additional consideration for the loan and is treated as the payment of additional interest.[FN1] Every "fee, bonus, commission, discount or other compensation" or other value received by the lender, directly or indirectly, in any manner whatsoever, is considered as interest, and when added to other interest paid by the borrower, cannot exceed the statutory maximum.[FN2]

**A bonus to a lender is not illegal.** There is no law against a lender taking a bonus as additional consideration for a loan, as long as the amount of the bonus when added to the interest charged does not exceed the legal maximum.[FN3] If the lender requires the borrower to pay or deliver some bonus as additional consideration for the loan, the amount of the bonus (and, if it is in the form of an asset, its value) is added to the interest charged by the terms of the loan and amortized over the term of the loan. If the total amount of the bonus and the other interest charged exceeds the statutory maximum permissible rate when calculated over the term of the loan, it is usurious.[FN4]

**Form of bonus.** The bonus usually takes the form of money, but it also can include anything else of value. For example, the lender may require the borrower to transfer an additional secured note,[FN5] sacks of potatoes,[FN6] or stock or some other asset to the lender as additional consideration for the loan.

**The *value* of the bonus is interest.** Although any additional property received is considered as interest, whether or not the loan is thereby rendered usurious depends upon the value of the property received. The *value* of any other "goods or things in action" received by the lender as compensation for the loan is considered as interest and included within the computations of the interest charged to the borrower when calculating whether the transaction was usurious.[FN7]

**Case Example:**

A lender agreed to make a loan at 9 1/2% interest, but he also wanted "points" in order to increase his yield. The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MILCALRE § 21:19                                                                                          Page 2
8 Cal. Real Est. § 21:19 (3d ed.)

loan was to be secured by a golf course, and the land surrounding the course had a value of $6,000 per acre. The lender was given an option to purchase the adjacent land for $3,000 an acre, and the lender gave the borrower an option to repurchase the option during its term for a price which would provide an additional 10% return per annum to the lender. The court held that the value of the option was in fact a bonus designed to circumvent the Usury Law and, therefore, it was invalid and unenforceable.[FN8]

**A bonus that has no value is not additional interest.** The lender's receipt of property, or some asset or right, as consideration for the loan, which has no market value at the time it is given to the lender,[FN9] or its value is speculative,[FN10] does not render the loan usurious even though it might become valuable in the future.[FN11]

Case Example:

The lender was given an option to purchase certain shares of the borrower's stock for $10.50 per share as additional consideration for the loan. The court found that the option was a bonus, but since the stock only had a value of $10.50 per share at the time the loan was made and the option given, it had no real value which could be considered as interest and, therefore, did not render the loan usurious even though it may become valuable in the future.[FN12]

Case Example:

A lender made a loan which provided for interest at 6% per annum which was secured by a royalty interest, but he also received an option to purchase one fourth of the royalty interest for $100 upon the payoff of the loan. Although the value of the one fourth royalty interest was subject to contingencies regarding the paying quantities of oil, the uncertainty of oil production, the development of alternative energy sources, and the price of oil on the international market, each of these factors merely affected the *value of the option.*

The court held that whether or not the loan was usurious would depend on the value of the option at the time the loan was made, considering all the contingencies, as a question of fact. The value thus calculated, when added to the interest charged and amortized over the term of the loan, would determine whether the interest received by the lender was usurious.[FN13]

Case Example:

A land owner intending to subdivide his property needed an agreement from the holder of a note secured by the property to sign the subdivision map and give partial releases when the subdivided lots were sold. The holder of the note refused to cooperate, so a third person agreed to purchase the note for the unpaid balance, and to assist in the subdivision in consideration for a bonus in the form of a junior secured note on the property. Since the transaction involved the bona fide sale of a note and not a loan,[FN14] the court held that the bonus did not make the transaction usurious.[FN15]

**Payment for services as a bonus.** It is not uncommon for a lender to seek additional compensation for a loan by requiring the borrower to pay the lender for some purported services performed, or to be performed, by the lender. If the services actually are performed, payments for the services are not interest and do not render the transaction usurious.[FN16] However, if the lender has not and does not perform the services, the charge that is merely a device to avoid the Usury Law is treated as interest in determining whether the loan is usurious.[FN17]

Case Example:

At a time when the maximum rate under the Usury Law was 10% per annum, a creditor factored the debtor's receivables. The creditor charged the debtor 10% interest plus a 0.25% "factoring fee." The court held that the fee was in fact interest and the loans were usurious.[FN18]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MILCALRE § 21:19                                                                                          Page 3
8 Cal. Real Est. § 21:19 (3d ed.)

**Cash bonus deducted from loan proceeds.** A lender may make a loan but charge a fee or bonus in cash which is deducted from the loan proceeds disbursed to the borrower.

The lender may deduct those costs and charges which are properly imposed on the borrower,[FN19] and the net loan proceeds for determining whether the loan is usurious includes all proper costs and charges actually incurred.[FN20] When determining whether the note is usurious, the maximum interest that can be charged is calculated on the *net* amount of the loan proceeds disbursed to the borrower after the deduction of improper costs and charges.[FN21]

**Example:**

A lender charges the borrower $100 for a loan of $1,000 and only disburses $900 to the borrower. The note provides for 10% interest on the $1,000 face amount of the note, and payments of interest only for a term of one year. The maximum legal rate is 10%. If the $100 represents proper costs and charges actually incurred, the usury calculation is based upon the $1,000 loan and it would not be usurious. If the charge was not proper, but merely additional consideration for the loan, the maximum legal rate that can be charged is based upon the $900 net loan and therefore the maximum legal interest would be $90 per annum. The receipt by the lender of $100 interest plus the $100 bonus would be usurious.[FN22]

**Addition of the bonus to the principal of the note.** A lender may charge a bonus and add it to the amount of the note. For example, a lender may lend the sum of $1,000 and charge the borrower a bonus of $100 by having the borrower execute a note in the face amount of $1,100. The note then provides for the payment of interest on the full amount of the note.

As in the case of the cash bonus, where the bonus is not for proper costs and charges, the additional consideration for the loan is interest and the maximum permissible interest is calculated upon the *net* amount of the loan disbursed to the borrower. If the note in the above example provided for payments of interest only and the maximum legal rate was 10%, the maximum interest that could be charged would be $100 per year. If the note provides for the payment of 10% interest on the full face amount of the note, it would require the payment of $110 of interest each year, which would be usurious.[FN23]

**Requirement of a compensating balance.** When the lender requires the borrower to maintain a minimum "compensating balance" with the lender during the term of the loan, the effect is a reduction in the principal amount of the loan, but the loan interest is charged on the full balance of the loan. The effective interest rate is calculated on the net amount of the loan after deducting the amount of the compensating balance, with credit for the interest received, if any, on the borrower's funds held by the lender.[FN24]

**Cash bonus for renewal or forbearance.** A cash bonus charged for the renewal or forbearance of a loan is treated in the same manner.[FN25] Calculation of the maximum interest for an installment payment loan. When the loan provides for periodic installment payments of principal and interest, and the loan includes a bonus as a part of the face amount of the note, it is necessary to compare the amortization schedule as provided by the terms of the loan and the schedule as if the borrower paid the maximum interest as permitted by law on the net amount of the loan. In other words, it is necessary to calculate the interest as provided on the face of the note for its entire term and then add the amount of the bonus to determine the total interest being charged. Then a second calculation must be made starting with the net proceeds of the loan as the principal, and applying the same installments as required by the note, but using the maximum legal rate as applied to the unpaid principal balance for each installment, thus arriving at the same unpaid principal balance on the maturity date of the note. The two figures are then compared to determine whether the actual interest charged exceeds the permissible statutory maximum.[FN26]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MILCALRE § 21:19
8 Cal. Real Est. § 21:19 (3d ed.)

[FN1]Forte v. Nolfi, 25 Cal. App. 3d 656, 678-679, 102 Cal. Rptr. 455 (1st Dist. 1972); Wheeler v. Superior Mortg. Co., 196 Cal. App. 2d 822, 828, 17 Cal. Rptr. 291 (2d Dist. 1961); Smith v. G. Cavaglieri Mortgage Co., 111 Cal. App. 136, 143-144, 295 P. 366 (3d Dist. 1931).

[FN2] Cal. Const. (Art. XV) § 1; Uncodified Laws § 1919(2).

[FN3]Lewis v. Pacific States Savings & Loan Co., 1 Cal. 2d 691, 694-696, 37 P.2d 439 (1934); Haines v. Commercial Mortgage Co., 200 Cal. 609, 254 P. 956, 53 A.L.R. 725 (1927), reh'g denied, 200 Cal. 609, 255 P. 805, 53 A.L.R. 725 (1927) and (disapproved of by, Heald v. Friis-Hansen, 52 Cal. 2d 834, 345 P.2d 457 (1959)); Pacific Finance Corp. of Cal. v. Crane, 131 Cal. App. 2d 399, 405-406, 280 P.2d 502 (4th Dist. 1955); Ricord v. Aragon, 115 Cal. App. 2d 176, 177-178, 251 P.2d 759 (2d Dist. 1952); Otis v. I. Eisner Co., 7 Cal. App. 2d 496, 499-500, 46 P.2d 235 (3d Dist. 1935); Grall v. San Diego Bldg. & Loan Ass'n, 127 Cal. App. 250, 253, 15 P.2d 797 (4th Dist. 1932); David v. Frost, 122 Cal. App. 750, 752, 10 P.2d 504 (2d Dist. 1932); Finley v. Wyatt, 113 Cal. App. 233, 298 P. 80 (3d Dist. 1931).

[FN4]Haines v. Commercial Mortgage Co., 200 Cal. 609, 254 P. 956, 53 A.L.R. 725 (1927), reh'g denied, 200 Cal. 609, 255 P. 805, 53 A.L.R. 725 (1927) and (disapproved of by, Heald v. Friis-Hansen, 52 Cal. 2d 834, 345 P.2d 457 (1959)); Murphy v. Wilson, 153 Cal. App. 2d 132, 137, 314 P.2d 507 (2d Dist. 1957); Calimpco, Inc. v. Warden, 100 Cal. App. 2d 429, 439-440, 224 P.2d 421 (1st Dist. 1950) (disapproved of on other grounds by, Fazzi v. Peters, 68 Cal. 2d 590, 68 Cal. Rptr. 170, 440 P.2d 242 (1968)) and (overruling on other grounds recognized by, O'Connor v. Televideo System, Inc., 218 Cal. App. 3d 709, 267 Cal. Rptr. 237 (6th Dist. 1990)).

See § 21:17 (interest in excess of maximum rate; term of loan; prepayment).

[FN5]Williams v. Reed, 48 Cal. 2d 57, 60, 307 P.2d 353 (1957).

[FN6]Goodwin v. Alston, 130 Cal. App. 2d 664, 670, 280 P.2d 34 (4th Dist. 1955).

[FN7]Regents of University of California v. Superior Court, 17 Cal. 3d 533, 537-538, 131 Cal. Rptr. 228, 551 P.2d 844 (1976).

In Calimpco, Inc. v. Warden, 100 Cal. App. 2d 429, 439-440, 224 P.2d 421 (1st Dist. 1950) (disapproved of on other grounds by, Fazzi v. Peters, 68 Cal. 2d 590, 68 Cal. Rptr. 170, 440 P.2d 242 (1968)) and (overruling on other grounds recognized by, O'Connor v. Televideo System, Inc., 218 Cal. App. 3d 709, 267 Cal. Rptr. 237 (6th Dist. 1990)), a group of mechanic's lien claimants agreed to discount their claims and to delay collection of the discounted sums if the subdivider would convey the subdivision into a holding agreement for the disbursement of the lot sales proceeds to the claimants. In addition, 20 lots were to be given to the claimants. The court held that the value of the lots was a bonus to the creditors. The lots had a value of $45,000, but the creditors accepted an offer of $20,000 cash from a third person. The court applied the $45,000 bonus to the discounted amounts the creditors agreed to accept for their claims and held that the transaction was usurious.

[FN8]Mission Hills Development Corp. v. Western Small Business Inv. Co., 260 Cal. App. 2d 923, 926-927, 67 Cal. Rptr. 505 (1st Dist. 1968).

[FN9]Sandell, Inc. v. Bailey, 212 Cal. App. 2d 920, 933, 28 Cal. Rptr. 413 (5th Dist. 1963); Ambrose v. Alioto, 65 Cal. App. 2d 362, 367, 150 P.2d 502 (4th Dist. 1944).

[FN10]Martyn v. Leslie, 137 Cal. App. 2d 41, 53-56, 290 P.2d 58 (2d Dist. 1955).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN11] See Kent v. Lampman, 59 Cal. App. 2d 407, 410-411, 139 P.2d 57 (2d Dist. 1943).

[FN12]Sandell, Inc. v. Bailey, 212 Cal. App. 2d 920, 932, 28 Cal. Rptr. 413 (5th Dist. 1963).

[FN13]Regents of University of California v. Superior Court, 17 Cal. 3d 533, 537-538, 131 Cal. Rptr. 228, 551 P.2d 844 (1976).

[FN14] See § 21:9 (loan or forbearance of money—sale of a note).

[FN15]O.A. Graybeal Co. v. Cook, 111 Cal. App. 518, 535-536, 295 P. 1088 (3d Dist. 1931).

[FN16] See § 21:22 (interest in excess of maximum rate; commissions).

[FN17] See § 21:22 (interest in excess of maximum rate; commissions).

[FN18]In re Vehm Engineering Corp., 521 F.2d 186, 189-190 (9th Cir. 1975).

[FN19] See § 21:24 (interest in excess of maximum rate; miscellaneous costs and charges).

[FN20] See § 21:15 (interest in excess of maximum rate; interest defined; method of calculation).

[FN21]Haines v. Commercial Mortgage Co., 200 Cal. 609, 254 P. 956, 53 A.L.R. 725 (1927), reh'g denied, 200 Cal. 609, 255 P. 805, 53 A.L.R. 725 (1927) and (disapproved of by, Heald v. Friis-Hansen, 52 Cal. 2d 834, 345 P.2d 457 (1959)); Forte v. Nolfi, 25 Cal. App. 3d 656, 678-679, 102 Cal. Rptr. 455 (1st Dist. 1972); Devers v. Greenwood, 139 Cal. App. 2d 345, 350-351, 293 P.2d 834 (2d Dist. 1956); Murphy v. Ablow, 123 Cal. App. 2d 853, 855-858, 268 P.2d 80 (2d Dist. 1954); Otis v. I. Eisner Co., 7 Cal. App. 2d 496, 499-500, 46 P.2d 235 (3d Dist. 1935); Courtney v. Tufeld, 128 Cal. App. 504, 507, 17 P.2d 1035 (3d Dist. 1932).

[FN22]Haines v. Commercial Mortgage Co., 200 Cal. 609, 254 P. 956, 53 A.L.R. 725 (1927), reh'g denied, 200 Cal. 609, 255 P. 805, 53 A.L.R. 725 (1927) and (disapproved of by, Heald v. Friis-Hansen, 52 Cal. 2d 834, 345 P.2d 457 (1959)).

[FN23]Community Lumber Co. of Baldwin Park v. Chute, 215 Cal. 268, 272, 10 P.2d 57 (1932); Forte v. Nolfi, 25 Cal. App. 3d 656, 678-679, 102 Cal. Rptr. 455 (1st Dist. 1972); Harris v. Gallant, 183 Cal. App. 2d 94, 97-99, 6 Cal. Rptr. 630 (1st Dist. 1960); Janisse v. Winston Inv. Co., 154 Cal. App. 2d 580, 584-587, 317 P.2d 48, 67 A.L.R.2d 225 (1st Dist. 1957); Richlin v. Schleimer, 120 Cal. App. 40, 42-43, 7 P.2d 711 (1st Dist. 1932); Jones v. Dickerman, 114 Cal. App. 357, 360-361, 300 P. 135 (3d Dist. 1931); Moore v. Russell, 114 Cal. App. 634, 641, 300 P. 479 (1st Dist. 1931); Smith v. G. Cavalieri Mortgage Co., 111 Cal. App. 136, 140-148, 295 P. 366 (3d Dist. 1931); Babcock v. Olhasso, 109 Cal. App. 534, 537, 293 P. 141 (3d Dist. 1930); Henning v. Akin, 91 Cal. App. 246, 257, 266 P. 981 (2d Dist. 1928); Coulter v. Collins, 71 Cal. App. 381, 385, 235 P. 465 (2d Dist. 1925).

[FN24]American Timber & Trading Co. v. First Nat. Bank of Oregon, 690 F.2d 781, 787-788 (9th Cir. 1982).

[FN25] See § 21:2 (essential elements of usury). § 21:4 (forbearance; extension and renewal).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN26]Lewis v. Pacific States Savings & Loan Co., 1 Cal. 2d 691, 695-696, 37 P.2d 439 (1934); Otis v. I. Eisner Co., 7 Cal. App. 2d 496, 499-501, 46 P.2d 235 (3d Dist. 1935).

See § 21:15 (interest in excess of maximum rate; interest defined; method of calculation).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works

MILCALRE § 21:19

END OF DOCUMENT