# Excerpts of A.Choudhury

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

--oOo--

ELIZABETH GREWAL, an

individual,

        Plaintiff,

vs.

AMIT CHOUDHURY, an individual,

        Defendant.

_____/

**CERTIFIED COPY**

No. C-07-4218 CRB

Videotaped Deposition of

**AMIT CHOUDHURY**

Thursday, January 10, 2008

Reported by:
COLLEEN M. REDAMONTI
CRP, CSR No. 7012
Job No.:  782CMR



41 Aptos Avenue  San Francisco, CA 94127-2518
Ph: [415] 587-2000  Fx: [415] 587-2110
Email: Info@baycityreporting.com

1                          APPEARANCES

2

3    For the Plaintiff:

4          KASTNER BANCHERO LLP

5          By:  E. JEFFREY BANCHERO

6          Attorney at Law

7          20 California Street, Seventh Floor

8          San Francisco, California 94111

9          (415) 398-7000

10         E-mail: ejb@kastnerbanchero.com

11

12

13   For the Defendant:

14         REED SMITH LLP

15         By:  HARVEY L. LEIDERMAN

16         Attorney at Law

17         Two Embarcadero Center, Suite 2000

18         San Francisco, California 94111

19         (415) 543-8700

20         E-mail:  hleiderman@reedsmith.com

21

22   Also Present:

23         CYRIL SUSZCKIEWICZ, Video Operator

24         ELIZABETH GREWAL

25

| | | |
|---|---|---|
| 09:58:38 | 1 | account took place on December 13, 2000.  Can you |
| 09:58:42 | 2 | testify as to how many days subsequent to December 13th, |
| 09:58:47 | 3 | 2000 elapsed before this discussion took place? |
| 09:58:52 | 4 | A.      No.  I'm sorry. |
| 09:58:54 | 5 | Q.      Was it within a day or two of December 13, |
| 09:58:57 | 6 | 2000? |
| 09:58:58 | 7 | A.      I -- I don't know. |
| 09:59:00 | 8 | Q.      Was it within a week or two? |
| 09:59:03 | 9 | A.      Probably. |
| 09:59:05 | 10 | Q.      Was it before you presented her with a |
| 09:59:09 | 11 | promissory note? |
| 09:59:10 | 12 | A.      I don't remember. |
| 09:59:12 | 13 | Q.      What did you do with the $880,000 that |
| 09:59:42 | 14 | Ms. Grewal wired to you? |
| 09:59:43 | 15 | A.      I invested it. |
| 09:59:46 | 16 | Q.      Did you invest it in Ms. Grewal's name? |
| 09:59:51 | 17 | A.      No. |
| 09:59:52 | 18 | Q.      Did you invest it in your name? |
| 10:00:01 | 19 | A.      Yes. |
| 10:00:02 | 20 | Q.      Where did you invest it? |
| 10:00:06 | 21 | A.      With the bank. |
| 10:00:08 | 22 | Q.      Which bank? |
| 10:00:09 | 23 | A.      Golden Gate Bank. |
| 10:00:16 | 24 | Q.      You purchased a certificate of deposit? |
| 10:00:19 | 25 | A.      Yes. |

10:00:20  1    Q.        The certificate of deposit was in whose name?

0:00:23  2    A.        I believe it was in my name.

10:00:29  3    Q.        What were the terms of that certificate of

10:00:32  4    deposit?

10:00:33  5    A.        I don't remember, but I think you have the --

10:00:40  6    you have the document.

10:00:43  7    Q.        Was the certificate of deposit in the amount of

10:00:55  8    $1 million?

10:00:56  9    A.        Yes.

10:00:57  10   Q.        What was the term of the certificate of

10:01:01  11   deposit?

10:01:02  12   A.        I don't remember.

10:01:03  13   Q.        Do you know what the interest rate was?

10:01:05  14   A.        I think it's on the document somewhere.

10:01:09  15   Q.        In any event, you don't remember what it was?

10:01:12  16   A.        I don't remember.

10:01:12  17   Q.        You purchased the $1 million CD in your name

10:01:24  18   with Golden Gate Bank using the $880,000 that Elizabeth

10:01:33  19   Grewal sent you on December 13, 2000; is that right?

10:01:37  20   A.        Yes.

10:01:42  21   Q.        When did you purchase the certificate of

10:02:04  22   deposit?

10:02:06  23   A.        I don't remember the exact date, but I think

10:02:10  24   it's on the document.

0:02:13  25   Q.        We do have some documents, and we will get to

| | | |
|---|---|---|
| 10:04:38 | 1 | we could do that later.  Whatever you want to do. |
| 0:04:40 | 2 | (Plaintiff's Exhibit 1 was marked.) |
| 10:04:40 | 3 | MR. BANCHERO:  That's fine. |
| 10:04:41 | 4 | Q.    Mr. Choudhury, I'm showing you what's been |
| 10:04:44 | 5 | marked as Exhibit 1.  Could you please take a moment to |
| 10:04:46 | 6 | look at this? |
| 10:04:46 | 7 | (Pause in proceedings for document review.) |
| 10:04:55 | 8 | Q.    BY MR. BANCHERO:  Exhibit 1 is a copy of the |
| 10:04:57 | 9 | Golden Gate Bank statement for an account that you had |
| 10:05:02 | 10 | at the bank, number 2241161, yes? |
| 10:05:08 | 11 | A.    It appears to be that. |
| 10:05:09 | 12 | Q.    You'll see in the middle of the first page the |
| 10:05:13 | 13 | phrase, "Wire transfer credit, 12/13, $880,000." |
| 10:05:19 | 14 | That wire transfer credit reflects the $880,000 |
| 10:05:25 | 15 | that Ms. Grewal transferred into this account on that |
| 10:05:29 | 16 | date, yes? |
| 10:05:29 | 17 | A.    I believe so. |
| 10:05:32 | 18 | Q.    You'll see two lines down it says, "Wire |
| 10:05:38 | 19 | transfer credit, $250,000," dated 12/22. |
| 10:05:44 | 20 | From what source did those funds come? |
| 10:05:48 | 21 | A.    I don't remember. |
| 10:05:50 | 22 | Q.    Turn, if you would, to page 2 of this exhibit. |
| 10:06:10 | 23 | In the middle of the page you'll see, "Transfer to CD |
| 10:06:16 | 24 | 209593," December 27, amount $1 million. |
| 0:06:21 | 25 | Do you see that? |

10:21:00  1    A.        Yes.

0:21:00   2    Q.        Above the signature in all caps are the words

10:21:06  3    "Borrower and Grantor acknowledge having read all the

10:21:09  4    provisions of this Assignment of Deposit Account and

10:21:13  5    agree to its terms.  This agreement is dated

10:21:17  6    December 21, 2000."

10:21:20  7              Reading that sentence, does it refresh your

10:21:30  8    recollection as to when you signed Exhibit 3?

10:21:34  9              MR. LEIDERMAN:  Objection.  He did not say that

10:21:36  10   he couldn't recall when he signed Exhibit 3.

10:21:43  11             MR. BANCHERO:  All right.  I'll rephrase.  I'll

10:21:46  12   withdraw the question.

10:21:47  13   Q.        When did you sign Exhibit 3?

10:21:48  14   A.        Sometime after Christmas.

10:21:50  15   Q.        Would it be sometime after December 25, 2000

10:21:57  16   and before December 31st, 2000?

10:22:02  17   A.        Yes.

10:22:03  18   Q.        Did you sign the documents when you were in

10:22:04  19   your brother's offices in Dallas?

10:22:06  20   A.        Yes.

10:22:06  21   Q.        After signing the deposit account and

10:22:14  22   promissory note at your brother's offices in Dallas, did

10:22:18  23   you then fax them to the bank?

10:22:21  24   A.        I believe so.

'0:22:24  25             Let me take that back.  I'm not sure who I

10:22:27  1    faxed it to.  I know I faxed it, but I don't recall if I

0:22:31  2    faxed it to the bank or to -- to the company, who

10:22:40  3    then -- to Dave Hayford, who then may have walked it

10:22:43  4    over.  I don't know.

10:22:44  5    Q.        Okay.  Turning your attention to the first page

10:22:56  6    of Exhibit 3, you'll see under the words "Collateral"

10:23:01  7    about a third of the way down the page, the document

10:23:05  8    reads:

10:23:06  9         "The word 'Collateral' means the following

10:23:11  10   described deposit account:  Certificate of Deposit

10:23:19  11   205953 issued by Lender in an amount not less than

10:23:24  12   $1,000,000.00."

10:23:25  13        Is that the certificate of deposit that was in

10:23:28  14   your name that you purchased from Golden Gate Bank?

10:23:32  15   A.        I think 209593.  I believe so, yes.

10:23:48  16   Q.        Did Finexa, Inc. in fact open up a $1 million

10:24:43  17   line of credit with Golden Gate Bank in late December

10:24:52  18   2000 or early January, 2001?

10:24:54  19   A.        I don't know.

10:24:57  20   Q.        Do these exhibits, the promissory note and the

10:25:03  21   Assignment of Deposit Account, refresh any recollection

10:25:08  22   that you might have about whether Finexa in fact opened

10:25:12  23   up a million dollar line of credit at the end of 2000 or

10:25:16  24   in the early days of 2001?

'0:25:19  25   A.        Um, the -- I don't know because I had -- I did

| | | |
|---|---|---|
| 10:42:18 | 1 | THE WITNESS: Exhibits 2 and 3. |
| 0:42:21 | 2 | MR. LEIDERMAN: Thank you. |
| 10:42:23 | 3 | Q.    BY MR. BANCHERO:  The certificate of deposit |
| 10:42:24 | 4 | was not purchased in Ms. Grewal's name, correct? |
| 10:42:28 | 5 | A.    That is correct. |
| 10:42:29 | 6 | Q.    It was purchased in your name? |
| 10:42:31 | 7 | A.    Yes. |
| 10:43:15 | 8 | MR. BANCHERO:  Let's marked as Exhibit 4 a |
| 10:43:18 | 9 | two-page document numbered AC-10-11. |
| 10:43:31 | 10 | (Plaintiff's Exhibit 4 was marked.) |
| 10:43:33 | 11 | Q.    BY MR. BANCHERO:  Who is Brian Plotner? |
| 10:43:54 | 12 | A.    I think he works at Golden Gate Bank. |
| 10:43:58 | 13 | Q.    Did you send this facsimile and letter to |
| 10:44:01 | 14 | Mr. Plotner on March 30, 2001? |
| 10:44:05 | 15 | A.    I did not. |
| 10:44:08 | 16 | Q.    Do you recognize the handwriting on the first |
| 10:44:11 | 17 | page of Exhibit 4? |
| 10:44:12 | 18 | A.    Yes. |
| 10:44:12 | 19 | Q.    Whose handwriting is that? |
| 10:44:14 | 20 | A.    It belongs to Ana Ramirez. |
| 10:44:18 | 21 | Q.    Who is Ana Ramirez? |
| 10:44:19 | 22 | A.    She was the operations manager for Finexa. |
| 10:44:37 | 23 | Q.    Your signature appears on page 2 of Exhibit 4? |
| 10:44:43 | 24 | A.    That appears to be my signature, yes. |
| 0:44:47 | 25 | Q.    Did you write this letter -- |

| 10:44:56 | 1 | A.        No. |
|---|---|---|
| 0:44:56 | 2 | Q.        -- that is attached as the second page of |
| 10:44:59 | 3 | Exhibit 4? |
| 10:44:59 | 4 | A.        No. |
| 10:45:00 | 5 | Q.        Who wrote it? |
| 10:45:02 | 6 | A.        I don't know. |
| 10:45:02 | 7 | Q.        Did you read this letter before you signed it? |
| 10:45:06 | 8 | A.        I didn't sign it.  That's an electronic |
| 10:45:09 | 9 | signature. |
| 10:45:10 | 10 | Q.        Okay.  Explain how this document came to have |
| 10:45:16 | 11 | your electronic signature on it. |
| 10:45:20 | 12 | A.        Um, Ana has a copy of -- or used to have a copy |
| 10:45:24 | 13 | of my electronic signature so she could send |
| 10:45:28 | 14 | communications on. . . |
| 10:45:36 | 15 | Q.        Okay.  Is there something about this particular |
| 10:45:38 | 16 | signature that suggests to you that this is an |
| 10:45:50 | 17 | electronic signature as opposed to a signature that you |
| 10:45:54 | 18 | placed using your own hand? |
| 10:45:57 | 19 | A.        Um, there are a couple of electronic signatures |
| 10:46:01 | 20 | of mine, and that looks like one of them. |
| 10:46:03 | 21 | Q.        Okay.  Did you authorize Ana Ramirez to send |
| 10:46:11 | 22 | this letter to Mr. Plotner? |
| 10:46:13 | 23 | A.        No. |
| 10:46:13 | 24 | Q.        Do you know who did? |
| '0:46:16 | 25 | A.        Um, I would be speculating. |

| | |
|---|---|
| 10:46:19 | 1 |
| 0:46:26 | 2 |
| 10:46:29 | 3 |
| 10:46:33 | 4 |
| 10:46:35 | 5 |
| 10:46:37 | 6 |
| 10:46:55 | 7 |
| 10:47:02 | 8 |
| 10:47:05 | 9 |
| 10:47:10 | 10 |
| 10:47:34 | 11 |
| 10:47:38 | 12 |
| 10:48:00 | 13 |
| 10:48:10 | 14 |
| 10:48:13 | 15 |
| 10:48:17 | 16 |
| 10:48:19 | 17 |
| 10:48:23 | 18 |
| 10:48:30 | 19 |
| 10:48:33 | 20 |
| 10:48:34 | 21 |
| 10:48:37 | 22 |
| 10:48:41 | 23 |
| 10:48:51 | 24 |
| 0:48:56 | 25 |

1    Q.    When is the first time you saw this March 30,

2    2001 letter to Brian Plotner?

3    A.    After the complaint was filed.

4    Q.    That is the complaint in this lawsuit?

5    A.    That is correct.

6    Q.    Was it customary at Finexa, Inc. in 2001 for

7    Mr. Hayford to draft letters for you that would be sent

8    out under your signature?

9    A.    It appears to be that way.

10         MR. BANCHERO:  Okay.  Let's mark as Exhibit 5 a

11    document labeled AC-003.

12         (Plaintiff's Exhibit 5 was marked.)

13    Q.    BY MR. BANCHERO:  Exhibit 5 is a copy of your

14    bank account statement from Golden Gate Bank for account

15    number 2241161, yes?

16    A.    Correct.

17    Q.    You'll see that halfway down the page there are

18    words that state, "Transfer from 209593."

19         That is the $1 million CD that was in your

20    name, correct?

21    A.    I believe so, yes.

22    Q.    Opposite those words there is the date

23    April 2nd, the amount $1,014,494.05.  This reflects a

24    transfer into account 2241161 in that amount on that

25    date, yes?

10:48:56  1    A.        I believe so.

0:49:00   2    Q.        At the -- towards the bottom of the page under

10:49:04  3    the heading "Other Debits," you'll see the word "Loan

10:49:07  4    Payment," yes?

10:49:08  5    A.        Yes.

10:49:08  6    Q.        April 2nd, amount $1,666,066.  Do you see that,

10:49:19  7    yes?

10:49:19  8    A.        Yes.

10:49:20  9              MR. LEIDERMAN:  I'm sorry, I believe you

10:49:21  10   misstated the amount, Counsel.  Just so we get it clear

10:49:24  11   for the record.

10:49:25  12             MR. BANCHERO:  I'm sorry.  I'll state it again.

10:49:27  13             MR. LEIDERMAN:  Thank you.

10:49:29  14   Q.        BY MR. BANCHERO:  Under the heading "Other

10:49:30  15   Debits," you'll see the words "Loan Payment" April 2nd,

10:49:36  16   $1,000,666.66, yes?

10:49:43  17   A.        Yes.

10:49:44  18   Q.        That reflects the payment from this account to

10:49:56  19   Golden Gate Bank to pay the balance of the line of

10:50:02  20   credit that Finexa, Inc. had with Golden Gate Bank?

10:50:07  21   A.        It appears to be, yes.

10:50:10  22   Q.        Is it true then that prior to April 2nd, 2001,

10:50:22  23   Finexa, Inc. had drawn down on its line of credit with

10:50:30  24   Golden Gate Bank in an amount that was approximately

0:50:40  25   $1 million?

| | | |
|---|---|---|
| 10:55:25 | 1 | the effect that the loan was paid off. |
| 0:55:34 | 2 | Q.      This was agreeable to you? |
| 10:55:36 | 3 | A.      Um, I trusted him with the finances.  I didn't |
| 10:55:42 | 4 | question him. |
| 10:55:43 | 5 | Q.      Okay.  You would agree with me that the loan |
| 10:55:52 | 6 | payoff left -- I'll rephrase the question. |
| 10:56:01 | 7 | Did you ever review the Finexa financial |
| 10:56:21 | 8 | statements during this period, that is the first quarter |
| 10:56:24 | 9 | of 2001? |
| 10:56:26 | 10 | A.      No. |
| 10:56:26 | 11 | Q.      Did you have any discussions with Ms. Grewal |
| 10:56:47 | 12 | about Finexa, Inc.'s decision to pay off the $1 million |
| 10:56:57 | 13 | line of credit with Golden Gate Bank at about the time |
| 10:57:00 | 14 | the loan was paid off, that is, in early April 2001? |
| 10:57:06 | 15 | A.      No. |
| 10:57:06 | 16 | Q.      Do you know if Mr. Hayford spoke to her on that |
| 10:57:12 | 17 | subject? |
| 10:57:12 | 18 | A.      I don't know. |
| 10:57:13 | 19 | Q.      Okay.  Would you agree with me that when the |
| 10:57:45 | 20 | million dollars represented by the certificate of |
| 10:57:51 | 21 | deposit was transferred from the certificate to your |
| 10:58:02 | 22 | account 2241161 on April 2nd, that at that moment that |
| 10:58:08 | 23 | would reflect the whereabouts of Ms. Grewal's $880,000 |
| 10:58:19 | 24 | investment? |
| 10:58:19 | 25 | MR. LEIDERMAN:  Object to the form of the |

| | |
|---|---|
| 10:58:23 | 1 |
| .0:58:25 | 2 |
| 10:58:26 | 3 |
| 10:58:27 | 4 |
| 10:58:30 | 5 |
| 10:58:35 | 6 |
| 10:58:37 | 7 |
| 10:58:43 | 8 |
| 10:58:48 | 9 |
| 10:58:50 | 10 |
| 10:58:51 | 11 |
| 10:58:54 | 12 |
| 10:58:56 | 13 |
| 10:58:57 | 14 |
| 10:58:57 | 15 |
| 10:58:59 | 16 |
| 10:59:01 | 17 |
| 10:59:01 | 18 |
| 10:59:03 | 19 |
| 10:59:08 | 20 |
| 10:59:15 | 21 |
| 10:59:16 | 22 |
| 10:59:18 | 23 |
| 10:59:23 | 24 |
| '0:59:36 | 25 |

1  question.  It's incomprehensible.

2  Q.      BY MR. BANCHERO:  Do you comprehend it?

3  A.      Not really.

4  Q.      Well, let me ask it more open ended then.

5         As of April 2nd, 2001, where was Ms. Grewal's

6  $880,000?

7  A.      Um, it was in the CD.  And I think what you --

8  I think I now understand.  You said was the CD then

9  deposited or cashed in, I guess.  I'm not sure what the

10  right term is.

11  Q.      Well, we'll take it question by question.

12         You would agree with me that the money was in

13  the certificate of deposit --

14  A.      Yes.

15  Q.      -- during the three months that the certificate

16  of deposit was in existence, correct?

17  A.      Yes.

18  Q.      All right.  Then when the certificate of

19  deposit was turned in on April 2nd, then those monies

20  would now reside in your account 2241161 at Golden Gate

21  Bank, correct?

22  A.      It appears that way, yes.

23  Q.      Okay.  Then would you also agree with me that

24  the $880,000 would have been transferred to Golden Gate

25  Bank to pay off a portion of the $1 million line of

10:59:41   1    credit that Finexa, Inc. had with the bank on April 2nd,

0:59:48   2    2001?

10:59:49   3    A.        Um, I think it appears that way, yes.

10:59:53   4    Q.        Okay.  And in fact at that moment, Finexa, Inc.

11:00:05   5    was receiving a benefit by having its line of credit

11:00:08   6    paid off with these funds, yes?

11:00:17   7    A.        I guess.

11:00:19   8    Q.        Okay.  The letter that is marked as Exhibit 4,

11:00:48   9    page 2 states:

11:00:50   10            "It is my understanding that Finexa will pay

11:00:54   11   the interest for March, and that on Monday April 2nd,

11:00:57   12   2001, I will have access to the residual interest from

11:01:01   13   my" certificate of deposit, "CD."

11:01:05   14            Did that happen?

11:01:08   15            MR. LEIDERMAN:  I'm sorry, which of those

11:01:09   16   things that you just read are you referring to as the

11:01:13   17   "it" that happened?

11:01:14   18   Q.        BY MR. BANCHERO:  Well, I think we've

11:01:15   19   established that -- well, I'll rephrase the question.

11:01:32   20            I'll withdraw it.

11:01:36   21            So as of April 2nd, 2001, where was

11:02:00   22   Ms. Grewal's investment?

11:02:02   23   A.        It appears that it went to pay the loan that

11:02:12   24   was between Finexa and Golden Gate Bank.

11:02:16   25   Q.        Okay.  Did you tell Ms. Grewal that?

| | | |
|---|---|---|
| 11:02:19 | 1 | A.        No. |
| 1:02:20 | 2 | Q.        Why not? |
| 11:02:21 | 3 | A.        At that time I didn't know about it.  And later |
| 11:02:27 | 4 | on when I found out about it, I was very embarrassed |
| 11:02:32 | 5 | about it. |
| 11:02:33 | 6 | Q.        Why were you embarrassed? |
| 11:02:35 | 7 | A.        Because that's not what -- that's not what I |
| 11:02:40 | 8 | had planned to do with the investment. |
| 11:02:43 | 9 | Q.        If it was not what you planned to do with the |
| 11:02:47 | 10 | investment, how did it happen? |
| 11:02:49 | 11 | A.        Um, it just did.  It was meant to be in the CD |
| 11:03:04 | 12 | just for a short period of time. |
| 11:03:08 | 13 | Q.        Shorter than three months? |
| 11:03:11 | 14 | A.        Um, no specific.  It was meant to be sort of |
| 11:03:15 | 15 | parked there until I could take that money and invest it |
| 11:03:19 | 16 | differently. |
| 11:03:21 | 17 | Q.        Okay.  How long a time was it supposed to be in |
| 11:03:33 | 18 | the CD? |
| 11:03:35 | 19 | A.        Don't know.  Maybe a few months.  It was |
| 11:03:39 | 20 | nothing specific. |
| 11:03:41 | 21 | Q.        Is it your testimony that the certificate of |
| 11:03:45 | 22 | deposit, with Ms. Grewal's money as part of it, was not |
| 11:03:50 | 23 | supposed to be used to pay off the line of credit for |
| 11:03:54 | 24 | Finexa, Inc.? |
| 11:03:56 | 25 | A.        It was not the intention, if that's your |

11:04:01  1    question.

1:04:02  2    Q.        Not your intention?

11:04:04  3    A.        That's correct.

11:04:05  4    Q.        Your intention was to purchase the certificate

11:04:09  5    of deposit and then roll the certificate of deposit over

11:04:16  6    into some other investment for Ms. Grewal?

11:04:19  7    A.        Correct.

11:04:21  8    Q.        You did, however, sign a document agreeing that

11:04:34  9    the certificate of deposit would be used as collateral

11:04:37  10   for the million dollar Finexa line of credit, correct?

11:04:44  11   A.        Yes, I believe so.  One of these documents

11:04:47  12   here.  One of the exhibits.

11:04:51  13   Q.        When you signed that document, was it your

11:04:57  14   intention that Finexa would pay off the line of credit

11:05:04  15   using a source of funds other than the certificate of

11:05:07  16   deposit?

11:05:08  17   A.        Yes.

11:05:10  18   Q.        Why wasn't that done?

11:05:15  19   A.        Um, everything changed in the first quarter of

11:05:20  20   2001 with the worldwide market.

11:05:23  21   Q.        What changed?

11:05:24  22   A.        Um, the -- a series of events.  The stock

11:05:30  23   market started to collapse.  Investors who were going to

11:05:36  24   invest or had committed to invest backed off.  Potential

1:05:43  25   sales fell through.

| | | |
|---|---|---|
| 13:43:40 | 1 | your expectation, but did Ms. Grewal make that promise |
| 13:43:43 | 2 | to you? |
| 13:43:43 | 3 | A.    I don't know if she said the words "I promise." |
| 13:43:47 | 4 | But my expectation was that she was going to be sending |
| 13:43:51 | 5 | it because the agreement was one million. |
| 13:43:54 | 6 | Q.    When did you reach that agreement? |
| 13:43:56 | 7 | A.    Before she sent the first -- before she sent |
| 13:44:02 | 8 | the wire.  At some point before that. |
| 13:44:04 | 9 | Q.    Was the agreement in writing or oral? |
| 13:44:10 | 10 | A.    Verbal. |
| 13:44:15 | 11 | Q.    Okay.  Putting that aside for a moment, your |
| 13:44:21 | 12 | testimony is that sometime between December 13th and |
| 13:44:24 | 13 | December 31st, 2000, Ms. Grewal led you to believe that |
| 13:44:27 | 14 | she was going to send you an additional $120,000? |
| 13:44:30 | 15 | A.    Yes. |
| 13:44:31 | 16 | Q.    Can you testify with any more specificity |
| 13:44:33 | 17 | precisely what she said? |
| 13:44:35 | 18 | A.    I'm sorry.  I don't remember. |
| 13:44:38 | 19 | Q.    Okay.  Was this conversation or conversations |
| 13:44:53 | 20 | that you had with Ms. Grewal during the period from |
| 13:44:57 | 21 | December 13 to December 31st, 2000 before you handed her |
| 13:45:05 | 22 | the signed term promissory note, Exhibit 7? |
| 13:45:08 | 23 | A.    I don't remember. |
| 13:45:10 | 24 | Q.    At any point after the date in which you handed |
| 3:45:25 | 25 | her the term promissory note, did you request that she |

| | | |
|---|---|---|
| 13:45:28 | 1 | send you the additional $120,000? |
| 13:45:31 | 2 | A.        I don't remember that either. |
| 13:45:34 | 3 | Q.        Do you remember that you did not do that or do |
| 13:45:38 | 4 | you not remember one way or the other? |
| 13:45:40 | 5 | A.        I don't remember one way or the other. |
| 13:45:42 | 6 | Q.        Is there any writing or E-mail message that you |
| 13:45:45 | 7 | found in which you request of Ms. Grewal that she send |
| 13:45:54 | 8 | an additional $120,000 to you? |
| 13:45:57 | 9 | A.        Yes. |
| 13:45:57 | 10 | Q.        What is that? |
| 13:45:57 | 11 | A.        There's an E-mail that we produced that, if you |
| 13:46:03 | 12 | produce it, I can read it out to you.  It talks about an |
| 13:46:07 | 13 | ultimate solution of how to -- or an option of how to |
| 13:46:15 | 14 | pay 120,000 or give -- transfer $120,000. |
| 13:46:22 | 15 | Q.        Does it say the words "$120,000"? |
| 13:46:25 | 16 | A.        I don't recall if -- it's probably part of your |
| 13:46:29 | 17 | exhibit somewhere. |
| 13:46:31 | 18 | Q.        Was this an E-mail message that you sent to |
| 13:46:35 | 19 | her? |
| 13:46:35 | 20 | A.        Yes. |
| 13:46:36 | 21 | Q.        Did she reply? |
| 13:46:38 | 22 | A.        Um, I don't know.  I'd have to look at that |
| 13:46:42 | 23 | E-mail. |
| 13:46:44 | 24 | Q.        Did you make any oral requests of Ms. Choudhury |
| 3:46:47 | 25 | that she pay the additional $120,000 during the period |

13:46:53  1    from the date that you handed her the promissory note

13:46:56  2    and April 1st, 2001?

13:47:00  3    A.        I think you said make an oral request of

13:47:03  4    Mrs. Choudhury.

13:47:03  5    Q.        I'm sorry.  Did you -- I'll rephrase the

13:47:06  6    question.

13:47:07  7              At any time from -- during the period from the

13:47:09  8    date that you handed Ms. Grewal the promissory note and

13:47:14  9    April 1st, 2001, did you request of her that she pay an

13:47:19  10   additional $120,000?

13:47:22  11   A.        I don't know.  Because I don't know what date I

13:47:25  12   gave her the note.

13:47:30  13   Q.        Put aside that date, whatever date it was, do

13:47:34  14   you recall any conversations between the date that you

13:47:37  15   gave the note to her and April 1st, 2001 in which you

13:47:42  16   requested that she invest an additional $120,000?

13:47:47  17   A.        If the note was given before the E-mail was

13:47:49  18   sent, then the answer would be yes because the E-mail

13:47:52  19   talks about it.  If the note was given after, then I

13:47:55  20   don't know if we had any face-to-face discussions or we

13:47:59  21   talked about it.

13:48:07  22   Q.        Did you have any discussions with Ms. Grewal

13:48:32  23   about the term promissory note when you handed it to

13:48:35  24   her?

3:48:36   25   A.        I don't remember.

| | | |
|---|---|---|
| 13:48:37 | 1 | Q.        Do you remember anything that she said or you |
| 13:48:40 | 2 | said when you handed her the promissory note? |
| 13:48:43 | 3 | A.        No. |
| 13:48:44 | 4 | Q.        You've had some discussions with Ms. Grewal in |
| 13:49:22 | 5 | the last couple of years about the monies that she sent |
| 13:49:30 | 6 | to you in December of 2000, correct? |
| 13:49:32 | 7 | A.        Yes. |
| 13:49:34 | 8 | Q.        Okay.  During any of those discussions, did you |
| 13:49:38 | 9 | tell her that you had expected to receive more than the |
| 13:49:46 | 10 | monies that you did and that was one of the reasons that |
| 13:49:50 | 11 | you weren't repaying the money? |
| 13:49:55 | 12 | MR. LEIDERMAN:  The question is did you say |
| 13:49:58 | 13 | such a thing to her.  Do you understand the question? |
| 13:50:00 | 14 | THE WITNESS:  I don't remember. |
| 13:50:02 | 15 | MR. BANCHERO:  Okay.  Let's mark as the next |
| 13:50:20 | 16 | exhibit in order a document labeled AC-020. |
| 13:50:26 | 17 | MR. LEIDERMAN:  AC-020. |
| 13:50:32 | 18 | (Plaintiff's Exhibit 8 was marked.) |
| 13:50:40 | 19 | Q.        BY MR. BANCHERO:  Do you recognize Exhibit 8? |
| 13:50:54 | 20 | A.        Um, yes, we produced it, I believe. |
| 13:50:56 | 21 | Q.        You did.  What is Exhibit 8? |
| 13:50:59 | 22 | A.        Um, I'm not sure. |
| 13:51:02 | 23 | Q.        Where did you find it? |
| 13:51:03 | 24 | A.        It was just a sheet in -- in a manila folder. |
| 3:51:11 | 25 | And it starts with 880, that's why I thought it was |

14:03:01   1    Q.        Okay.   Why did you sign the note in the amount

4:03:19    2    of $1 million rather than simply sign a note in the

14:03:23   3    amount of $880,000?

14:03:25   4              MR. LEIDERMAN:   Objection.   Argumentative.

14:03:30   5    Q.        BY MR. BANCHERO:   You may answer.

14:03:32   6    A.        I was expecting one million.

14:03:35   7    Q.        Fair enough.   You didn't get it.   So the fact

14:03:38   8    that you didn't get it, why does the note say $1 million

14:03:42   9    instead of $880,000?

14:03:44   10   A.        Because I was expecting one million, there's

14:03:48   11   nothing that stops -- stopped Ms. Grewal from sending it

14:03:52   12   in two lots, 880,000 plus 120,000.   She could have sent

14:03:58   13   the $120,000 at any time.

14:04:06   14   Q.        Did you ever write to Ms. Grewal and say that

14:04:10   15   you wanted to rescind the promissory note because she

14:04:16   16   hadn't given the additional $120,000?

14:04:20   17   A.        No.

14:04:23   18   Q.        Did there come a point in 2000 when you

14:04:39   19   realized you were not going to receive the additional

14:04:42   20   $120,000 from Ms. Grewal?

14:04:45   21   A.        In 2000?

14:04:46   22   Q.        Yes.   Pardon me.   2001.

14:04:47   23             I'll rephrase.

14:04:48   24             Did there come a time in 2001 when you realized

4:04:50    25   that you were not going to receive the additional

14:04:52  1    $120,000 from Ms. Grewal?

4:04:57   2    A.      I guess I did.  I mean, it's not something I

14:05:02  3    gave active thought to at that time.

14:05:04  4    Q.      Okay.  Did you discuss that with Ms. Grewal?

14:05:11  5            MR. LEIDERMAN:  When?

14:05:12  6            MR. BANCHERO:  In 2001.

14:05:14  7            THE WITNESS:  I know I asked for the additional

14:05:16  8    120,000.  I don't know what the dates were, if it was

14:05:23  9    the end of 2000, early 2001.  I don't remember.

14:05:26  10   Q.      BY MR. BANCHERO:  Did there come a time when

14:05:28  11   Ms. Grewal refused to provide the additional $120,000 to

14:05:33  12   you?

14:05:33  13   A.      I think the topic just sort of disappeared.  It

14:05:36  14   just wasn't discussed.

14:05:37  15   Q.      Was there ever a point when she told you that

14:05:39  16   she would refuse to give you an additional $120,000 in

14:05:45  17   investment capital?

14:05:46  18   A.      No.

14:05:47  19   Q.      Okay.  Did you ever demand that she give you

14:05:54  20   the term promissory note that you signed back to her?

14:05:58  21   A.      No.

14:06:10  22   Q.      Paragraph 18 states:

14:06:11  23            "Choudhury is informed and" believed --

14:06:13  24   "believes, and based thereon alleges, that Grewal acted

4:06:17   25   with malicious intent when she took advantage of

14:08:35    1    A.        Sometime in the second half of 2000.

.4:08:39    2    Q.        Okay.  Was it reached in a face-to-face

14:08:43    3    meeting?

14:08:43    4    A.        I don't recall.

14:08:45    5    Q.        What harm came to you because of Ms. Grewal's

14:09:30    6    refusal in 2000 to provide you with an additional

14:09:36    7    $120,000 in investment monies?

14:09:39    8    A.        When you say "harm," you mean physical harm?

14:09:43    9    You mean -- what kind of harm do you mean?

14:09:47    10   Q.        Not physical harm.  Did you suffer any

14:09:55    11   financial harm?

14:09:57    12   A.        I -- in order to get to one million, I put in

14:10:02    13   $120,000 to create one million.

14:10:08    14   Q.        This was the $120,000 that you put into the

14:10:20    15   certificate of deposit that you purchased?

14:10:27    16   A.        Yes.

14:10:27    17   Q.        Okay.  This was a certificate of deposit that

14:10:40    18   was issued by Golden Gate Bank in the amount of

14:10:45    19   $1 million?

14:10:46    20   A.        Yes.

14:10:46    21   Q.        This is also the certificate of deposit that

14:10:52    22   you redeemed?

14:11:05    23             MR. LEIDERMAN:  Do you understand that

14:11:06    24   question?

4:11:07     25             THE WITNESS:  Um, I think so.

14:11:12  1          If you're referring to the $1 million

.4:11:20  2  certificate of deposit that Golden Gate Bank -- I'm not

14:11:25  3  sure what the right term is -- closed, based on the

14:11:31  4  letter that was sent by -- or sent to them, which was

14:11:37  5  Exhibit Number -- sorry -- Exhibit Number 4, then yes.

14:11:52  6  Q.      BY MR. BANCHERO:  Okay.  That is, you received

14:11:53  7  the $120,000 back plus whatever return the certificate

14:12:01  8  of deposit provided when the certificate of deposit was

14:12:08  9  redeemed or turned back?

14:12:10  10  A.      No, I didn't receive it.  I think it was a

14:12:14  11  simultaneous transaction, as in the -- I believe they

14:12:17  12  closed the CD, and then they paid off as per that

14:12:24  13  letter.  So I never got it.  If it was there, it was

14:12:26  14  there for a second before it was taken away.

14:12:30  15  Q.      Well, you're referring to the fact that the

14:12:32  16  million dollars went into your personal bank account at

14:12:36  17  Golden Gate Bank and then it went to Golden Gate Bank to

14:12:45  18  pay off Finexa's line of credit, correct?

14:12:47  19  A.      I think that's what that letter states,

14:12:49  20  Exhibit 4.

14:12:50  21  Q.      Okay.  Now, apart from this $120,000, did you

14:12:56  22  suffer any other financial harm because of Elizabeth

14:12:59  23  Grewal's refusal to provide you with an additional

14:13:04  24  $120,000 in cash?

'4:13:05  25  A.      Um, not directly.  Not that I know of.

14:13:20  1    Q.        Any indirect financial harm that you suffered

4:13:25   2    as a result of Ms. Grewal's refusal to provide an

14:13:29  3    additional $120,000 in investments?

14:13:32  4    A.        Not that I know of at this time.

14:13:43  5    Q.        Paragraph 17 of Exhibit 9 refers to your

14:13:53  6    suffering damages, including without limitation the loss

14:13:58  7    of your own capital.

14:14:02  8              Does that refer to the loss of the $125,000

14:14:06  9    that you testified to a moment ago?

14:14:09  10   A.        I think you said 125,000.

14:14:13  11   Q.        Forgive me.  I'll rephrase.

14:14:16  12             Paragraph 17 of Exhibit 9 states that Grewal

14:14:20  13   caused Choudhury "to suffer damages, including without

14:14:23  14   limitation the loss of his own capital."

14:14:27  15             By the phrase "loss of his own capital," does

14:14:31  16   this refer to the $120,000 that you testified to a few

14:14:36  17   minutes ago?

14:14:38  18   A.        Well, I put $120,000 into what became the CD.

14:14:57  19   I believe this paragraph talks about signing the note

14:15:01  20   and attempting to enforce the note.  It doesn't talk

14:15:04  21   about the CD.

14:15:07  22   Q.        True.  I'm focusing on the phrase "including

14:15:11  23   without limitation the loss of his own capital."

14:15:15  24             This sentence states that because Grewal

4:15:19   25   induced you to sign the note and has attempted to

1              REPORTER'S CERTIFICATE

2         I certify that the foregoing proceedings in the

3   within-entitled cause were reported at the time and

4   place therein named; that said proceedings were reported

5   by me, a duly Certified Shorthand Reporter of the State

6   of California, and were thereafter transcribed into

7   typewriting

8              I further certify that I am not of counsel

9   or attorney for either or any of the parties to said

10  cause of action, nor in any way interested in the

11  outcome of the cause named in said cause of action.

12             IN WITNESS WHEREOF, I have hereunto set my

13  hand this  24th day of January , 2008.

14

15              _Colleen M. Redamonti_

                COLLEEN M. REDAMONTI, CRP, CSR
16              Certified Shorthand Reporter
                Certificate No. 7012

17

18

19

20

21

22

23

24

25

# EXIHIBIT 1

# Golden Gate Bank
## THE PRIVATE BANK

EXHIBIT NO. 1
DATE: 1-10-08
WITNESS: Choudhury
COLLEEN REDAMONTI, CSR 7012

AMIT CHOUDHURY
2200 LEAVENWORTH #305
SAN FRANCISCO CA  94133

30-1
1
6

NOW ACCOUNT:      2241161

12/01/00 THRU 12/29/00
DOCUMENT COUNT:      7
PAGE   1

=====================================================

NOW ACCOUNT 2241161

| | | |
|---|---|---|
| IMUM BALANCE | 6,983.33 | LAST STATEMENT 11/30/00      21,189.54 |
| AVAILABLE BALANCE | 465,963.42 | 8 CREDITS      1,148,732.25 |
| RAGE BALANCE | 465,970.31 | 17 DEBITS      1,129,815.19 |
| | | THIS STATEMENT 12/29/00      40,106.60 |

- - - - - - - - DEPOSITS - - - - - - - -

| #.....DATE.....AMOUNT | REF #.....DATE.....AMOUNT | REF #.....DATE.....AMOUNT |
|---|---|---|
| 12/07      50.00 | | |

- - - - - - - OTHER CREDITS - - - - - - - -

| PTION | DATE | AMOUNT |
|---|---|---|
| EPHONE TRANSFER CREDIT | 12/01 | 6,216.48 |
| MBURSE ATM SURCHARGE | 12/08 | 1.50 |
| E TRANSFER CREDIT | 12/13 | 880,000.00 |
| EPHONE TRANSFER CREDIT | 12/15 | 12,000.00 |
| MBURSE ATM SURCHARGE | 12/22 | 1.50 |
| E TRANSFER CREDIT | 12/22 | 250,000.00 |
| REST | 12/29 | 462.77 |

- - - - - - - - CHECKS - - - - - - - -

| CK #..DATE.....AMOUNT | CHECK #..DATE.....AMOUNT | CHECK #..DATE.....AMOUNT |
|---|---|---|
| 101*12/22    6,000.00 | 1373 12/19    99.00 | 1375*12/05    9,655.77 |
| 1371*12/05    3,000.00 | 1374 12/05    241.54 | 1932 12/05    3,601.50 |

INDICATES A GAP IN CHECK NUMBER SEQUENCE

- - - - - - - - OTHER DEBITS - - - - - - - -

| RIPTION | DATE | AMOUNT |
|---|---|---|
| SFER TO PRS NON-INTEREST ACCOUNT 2241162 | 12/01 | 79.00 |
| TRANSFER DEBIT-DOMESTIC | 12/01 | 4,000.00 |
| WITHDRAWAL FROM CHECKING 15135 PACIFIC PALISADES PAC | 12/04 | 301.50 |
| ALISADES CA00003371710 | | |
| WITHDRAWAL FROM CHECKING 15135 PACIFIC PALISADES PAC | 12/04 | 401.50 |
| ALISADES CA00003382204 | | |
| SFER TO PRS NON-INTEREST ACCOUNT 2241162 | 12/06 | 20.38 |
| HDRAWAL FROM CHECKING EMBARCADERO SAN FRANCISCO | 12/06 | 121.50 |
| AC00034018454600 | | |
| NNACLE PARTNERS | 12/15 | 3,000.00 |

* * * CONTINUED * * *
A MEMBER OF THE GREATER BAY BANCORP FAMILY

AC-001

PINE STREET • SAN FRANCISCO CA 94104 • TEL 415 421 9000



## THE PRIVATE BANK

AMIT CHOUDHURY
2200 LEAVENWORTH #305
SAN FRANCISCO CA  94133

30-1
1
6

NOW ACCOUNT:      2241161

12/01/00 THRU 12/29/00
DOCUMENT COUNT:        7
PAGE   2

=============================================================================

NOW ACCOUNT 2241161

- - - - - - - - - - OTHER DEBITS - - - - - - - - -

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| WITHDRAWAL FROM CHECKING POLK-GREEN SAN FRANCISCO CA000035507070700 | 12/20 | 121.50 |
| TELEPHONE TRANSFER DEBIT | | |
| TRANSFER TO CD 209593 | 12/22 | 100,000.00 |
| WITHDRAWAL FROM CHECKING LAX-TRML 7 DEPARTURES LOS | 12/27 | 1000,000.00 |
| ANGELES CA000036321295400 | 12/29 | 181.00 |

- - - - - - - - - - I N T E R E S T - - - - - - - - -

| | | | |
|---|---|---|---|
| AVERAGE LEDGER BALANCE: | 465,970.31 | INTEREST EARNED: | 462.77 |
| AVERAGE AVAILABLE BALANCE: | 465,963.42 | DAYS IN PERIOD: | 29 |
| INTEREST PAID THIS PERIOD: | 462.77 | ANNUAL PERCENTAGE YIELD EARNED: | 1.26% |
| INTEREST PAID 2000: | 647.70 | | |

- - - - - - - - - - DAILY BALANCE - - - - - - - -

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|---|---|
| 01 | 23,327.02 | 12/08 | 7,034.83 | 12/22 | 1,039,824.83 |
| 04 | 22,624.02 | 12/13 | 887,034.83 | 12/27 | 39,824.83 |
| 05 | 7,125.21 | 12/15 | 896,034.83 | 12/29 | 40,106.60 |
| 06 | 6,983.33 | 12/19 | 895,944.83 | | |
| 07 | 7,033.33 | 12/20 | 895,923.33 | | |

# EXIHIBIT 2



12/28/2000 17:08 FAX 1 415 986 6083   GOLDEN GATE BANK   · LOAN·SERVICE   @004/009
12/08/2000 88:36    703  6188    SILVERSPOON              PAGE 04
12/22/2000 15:32 FAX 1 415 986 6083   GOLDEN GATE BANK    @004

# PROMISSORY NOTE

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:** Finera, Inc.
2000 Van Ness Avenue #500
San Francisco, CA 84109

**Lender:** GOLDEN GATE BANK
344 PINE STREET
SAN FRANCISCO, CA 84104

**Principal Amount: $1,000,000.00**      **Interest Rate: 8.000%**      **Date of Note: December 21, 2000**

**PROMISE TO PAY.** Finera, Inc. ("Borrower") promises to pay to GOLDEN GATE BANK ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million & 00/100 Dollars ($1,000,000.00) or so much as may be outstanding, together with interest at the rate of 8.000% on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on September 29, 2001. In addition, Borrower will pay regular monthly payments of accrued unpaid interest beginning December 29, 2000, and all subsequent interest payments are due on the same day of each month after that. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Unless otherwise agreed or required by applicable law, payments will be applied first to accrued unpaid interest, then to principal, and any remaining amount to any unpaid collection costs and late charges.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $250.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, they will reduce the principal balance due.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**DEFAULT.** Borrower will be in default if any of the following happens: (a) Borrower fails to make any payment when due. (b) Borrower breaks any promise Borrower has made to Lender, or Borrower fails to comply with or to perform when due any other term, obligation, covenant, or condition contained in this Note or any agreement related to this Note, or in any other agreement or loan Borrower has with Lender. (c) Any representation or statement made or furnished to Lender by Borrower or on Borrower's behalf is false or misleading in any material respect either now or at the time made or furnished. (d) Borrower becomes insolvent, a receiver is appointed for any part of Borrower's property, Borrower makes an assignment for the benefit of creditors, or any proceeding is commenced either by Borrower or against Borrower under any bankruptcy or insolvency laws. (e) Any creditor tries to take any of Borrower's property on or in which Lender has a lien or security interest. This includes a garnishment of any of Borrower's accounts with Lender. (f) Any guarantor dies or any of the other events described in this default section occurs with respect to any guarantor of this indebtedness. (g) A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the indebtedness is impaired.

If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured (and no event of default will have occurred) if Borrower, after receiving written notice from Lender demanding cure of such default: (a) cures the default within fifteen (15) days; or (b) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, without notice, and then Borrower will pay that amount. Upon Borrower's failure to pay all amounts declared due pursuant to this section, including failure to pay upon final maturity, Lender, at its option, may also, if permitted under applicable law, increase the interest rate on this Note 5.000 percentage points. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower also will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also will pay any court costs, in addition to all other sums provided by law. This Note has been delivered to Lender and accepted by Lender in the State of California. If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of SAN FRANCISCO County, the State of California. This Note shall be governed by and construed in accordance with the laws of the State of California.

**COLLATERAL.** This Note is secured by the Collateral as described in that certain Assignment of Deposit Account dated December 21, 2000.

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following party or parties are authorized to request advances under the line of credit until Lender receives from Borrower at Lender's address shown above written notice of revocation of their authority: Amit Choudhury, Chief Executive Officer. Borrower agrees to be liable for all sums either: (a) advanced in accordance with the instructions of an authorized person or (b) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (a) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (b) Borrower or any guarantor ceases doing business or is insolvent; (c) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; or (d) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender.

EXHIBIT NO. 2
DATE: 1-10-08
WITNESS Choudhury
COLLEEN REDAMONTI, CSR 7012

AC-004

GOLDEN GATE BANK
SILVERSPOON    ˑ LOAN-SERVICE
GOLDEN GATE BANK

☑005/009
PAGE  05
☑005!

12-21-2000
Loan No 5124

## PROMISSORY NOTE
### (Continued)

Page 2

**GENERAL PROVISIONS.** Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, protest and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan, or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE AND ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THE NOTE.**

BORROWER:

Finxos, Inc.

By: _____
Amit Choudhury, Chief Executive Officer

Fixed Rate. Line of Credit.

LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.28a (c) Concentrex 2000 All rights reserved. [CA-D20 E0.28 FINEXA68.LN]

AC-005

EXIHIBIT 3

12/28/2000 17:08 FAX 1 415 986 6083

12/08/2008  00:36   783938¨  ¨8

12/22/2000 15:32 FAX 1 415 986 6083

GOLDEN GATE BANK
SILVERSPOON
GOLDEN GATE BANK

· LOAN-SERVICE

☒006/009
PAGE  06
☒006

# ASSIGNMENT OF DEPOSIT ACCOUNT

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.

**Borrower:**  Finexa, Inc.
2000 Van Ness Avenue #606
San Francisco, CA 94109

**Grantor:**  Amit Choudhury

**Lender:**  GOLDEN GATE BANK
344 PINE STREET
SAN FRANCISCO, CA 94104

**THIS ASSIGNMENT OF DEPOSIT ACCOUNT** is entered into among Finexa, Inc. (referred to below as "Borrower"); and Amit Choudhury (referred to below as "Grantor"); and GOLDEN GATE BANK (referred to below as "Lender").

**ASSIGNMENT.** For valuable consideration, Grantor assigns and grants to Lender a security interest in the Collateral, including without limitation the deposit accounts described below, to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**DEFINITIONS.** The following words shall have the following meanings when used in this Agreement. Terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

Account. The word "Account" means the deposit account described below in the definition for "Collateral."

Agreement. The word "Agreement" means this Assignment of Deposit Account, as this Assignment of Deposit Account may be amended or modified from time to time, together with all exhibits and schedules attached to this Assignment of Deposit Account from time to time.

Borrower. The word "Borrower" means each and every person or entity signing the Note, including without limitation Finexa, Inc.

Collateral. The word "Collateral" means the following described deposit account:

Certificate of Deposit #205993 issued by Lender in an account not less than $1,000,000.00

together with (a) all interest, whether now accrued or hereafter accruing; (b) all additional deposits hereafter made to the Account; (c) any and all proceeds from the Account; and  (d) all renewals, replacements and substitutions for any of the foregoing.

In addition, the word "Collateral" includes all property of Grantor (however owned if owned by more than one person), in the possession of Lender (or in the possession of a third party subject to the control of Lender), whether existing now or later and whether tangible or intangible in character, including without limitation each and all of the following:

(a) All property to which Lender acquires title or documents of title.

(b) All property assigned to Lender.

(c) All promissory notes, bills of exchange, stock certificates, bonds, savings passbooks, time certificates of deposit, insurance policies, and all other instruments and evidences of an obligation.

(d) All records relating to any of the property described in this collateral section, whether in the form of writing, microfilm, microfiche, or electronic media.

Event of Default. The words "Event of Default" mean and include without limitation any of the Events of Default set forth below in the section titled "Events of Default."

Grantor. The word "Grantor" means Amit Choudhury. Any Grantor who signs this Agreement, but does not sign the Note, is signing this Agreement only to grant a security interest in Grantor's interest in the Collateral to Lender and is not personally liable under the Note except as otherwise provided by contract or law (e.g., personal liability under a guaranty or as a surety).

Guarantor. The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with the Indebtedness.

Indebtedness. The word "Indebtedness" means the indebtedness evidenced by the Note, including all principal and interest, together with all other indebtedness and costs and expenses for which Grantor or Borrower is responsible under this Agreement or under any of the Related Documents.

Lender. The word "Lender" means GOLDEN GATE BANK, its successors and assigns.

Note. The word "Note" means the note or credit agreement dated December 21, 2000, in the principal amount of $1,000,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for the note or credit agreement.

Related Documents. The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Except as otherwise required under this Agreement or by applicable law, (a) Borrower agrees that Lender need not tell Borrower about any action or inaction Lender takes in connection with this Agreement;  (b) Borrower assumes the responsibility for being and keeping informed about the Collateral; and  (c) Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Collateral or any delay by Lender in realizing upon the Collateral; and Borrower agrees to remain liable under the Note no matter what action Lender takes or fails to take under this Agreement.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Agreement is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full right, power and authority to enter into this Agreement and to pledge the Collateral to Lender; (c) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and  (d) Lender has made no representation to Grantor about Borrower or Borrower's creditworthiness.

**GRANTOR'S WAIVERS.** Except as prohibited by applicable law, Grantor waives any right to require Lender to (a) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness; (b) proceed against any person, including Borrower, before proceeding against Grantor; (c) proceed against any collateral for the



EXHIBIT NO.  3
DATE: 1-10-08
WITNESS: Chaudhury
COLLEEN REDAMONTI, CSR 12012

AC-006

12/28/2000 17:09 FAX 1 415 92 8083

12/08/2000 00:36    703939F 90

12/22/2000 15:33 FAX 1 415 98. 8083

GOLDEN GATE BANK
SILVERSPOON
GOLDEN GATE BANK

→ LOAN-SERVICE

@007/009
PAGE 07
@007

---

12-21-2000
Loan No 5124

## ASSIGNMENT OF DEPOSIT ACCOUNT
(Continued)

Page 2

Indebtedness, including Borrower's collateral, before proceeding against Grantor; (d) apply any payments or proceeds received against the Indebtedness in any order; (e) give notice of the terms, time, and place of any sale of any collateral pursuant to the Uniform Commercial Code or any other law governing such sale; (f) disclose any information about the Indebtedness, the Borrower, any collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or (g) pursue any remedy or course of action in Lender's power whatsoever.

Grantor also waives any and all rights or defenses arising by reason of (h) any disability or other defense of Borrower, any other guarantor or surety or any other person; (i) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness; (j) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Grantor and Lender; (k) any act of omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (l) any statute of limitations in any action under this Agreement or on the Indebtedness; or (m) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate.

Grantor waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Grantor's rights of subrogation and reimbursement against Borrower by the operation of Section 580d of the California Code of Civil Procedure, or otherwise.

This waiver includes, without limitation, any loss of rights Grantor may suffer by reason of any rights or protections of Borrower in connection with any anti-deficiency laws, or other laws limiting or discharging the Indebtedness or Borrower's obligations (including, without limitation, Section 726, 580a, 580b, and 580d of the California Code of Civil Procedure). Grantor waives ........................ ... ..... .... and which Grantor may have for any reason, which would affect or limit the amount of any recovery by Lender from Grantor following a nonjudicial sale or judicial foreclosure of any real or personal property security for the Indebtedness including, but not limited to, the right to any fair market value hearing pursuant to California Code of Civil Procedure Section 580a.

Grantor understands and agrees that the foregoing waivers are waivers of substantive rights and defenses to which Grantor might otherwise be entitled under state and federal law. The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Grantor acknowledges that Grantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Until all Indebtedness is paid in full, Grantor waives any right to enforce any remedy Lender may have against Borrower or any other guarantor, surety, or other person, and further, Grantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

If now or hereafter (a) Borrower shall be or become insolvent, and (b) the Indebtedness shall not at all times until paid be fully secured by collateral pledged by Borrower, Grantor hereby forever waives and relinquishes in favor of Lender and Borrower, and their respective successors, any claim or right to payment Grantor may have or hereafter have or acquire against Borrower, by subrogation or otherwise, so that at no time shall Grantor be or become a "creditor" of Borrower within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and warrants to Lender that:

**Ownership.** Grantor is the lawful owner of the Collateral free and clear of all loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

**Right to Grant Security Interest.** Grantor has the full right, power, and authority to enter into this Agreement and to assign the Collateral to Lender.

**No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Collateral except as provided in this Agreement.

**No Defaults.** There are no defaults relating to the Collateral, and there are no offsets or counterclaims to the same. Grantor will strictly and promptly do everything required of Grantor under the terms, conditions, promises, and agreements contained in or relating to the Collateral.

**Proceeds.** Any and all replacement or renewal certificates, instruments, or other benefits or proceeds related to the Collateral that are received by Grantor shall be held by Grantor in trust for Lender and immediately shall be delivered by Grantor to Lender to be held as part of the Collateral.

**LENDER'S RIGHTS AND OBLIGATIONS WITH RESPECT TO THE COLLATERAL.** While this Agreement is in effect, Lender may retain the rights to possession of the Collateral, together with any and all evidence of the Collateral, such as certificates or passbooks. This Agreement will remain in effect until (a) there is no longer any Indebtedness owing to Lender; (b) all other obligations secured by this Agreement have been fulfilled; and (c) Grantor, in writing, has requested from Lender a release of this Agreement.

**EXPENDITURES BY LENDER.** If not discharged or paid when due, Lender may (but shall not be obligated to) discharge or pay any amounts required to be discharged or paid by Grantor under this Agreement, including without limitation all taxes, liens, security interests, encumbrances, and other claims, at any time levied or placed on the Collateral. Lender also may (but shall not be obligated to) pay all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses shall become a part of the Indebtedness and, at Lender's option, will (a) be payable on demand; (b) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (i) the term of any applicable insurance policy or (ii) the remaining term of the Note, or (c) be treated as a balloon payment which will be due and payable at the Note's maturity. This Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of an Event of Default.

**LIMITATIONS ON OBLIGATIONS OF LENDER.** Lender shall use ordinary reasonable care in the physical preservation and custody of any certificate or passbook for the Collateral but shall have no other obligation to protect the Collateral or its value. In particular, but without limitation, Lender shall have no responsibility (a) for the collection or protection of any income on the Collateral; (b) for the preservation of rights against issuers of the Collateral or against third persons; (c) for ascertaining any maturities, conversions, exchanges, offers, tenders, or similar matters relating to the Collateral; nor (d) for informing the Grantor about any of the above, whether or not Lender has or is deemed to have knowledge of such matters.

**EVENTS OF DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Default on Indebtedness.** Failure of Borrower to make any payment when due on the Indebtedness.

**Other Defaults.** Failure of Grantor or Borrower to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or failure of Borrower to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Grantor or Borrower under this Agreement, the Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral documents to create a valid and perfected security interest or lien) at any time and for any reason.

12/28/2000 09:09 FAX 1 415 986 083
12/08/2000 08:36    703938F  3
12/22/2000 15:33 FAX 1 415 98. 6083

GOLDEN GATE BANK
SILVERSPOON    LOAN SERVICE
GOLDEN GATE BANK

@008/009
PAGE 08
@008

12-21-2000                **ASSIGNMENT OF DEPOSIT ACCOUNT**                Page 3
Loan No 5124                            (Continued)

Insolvency. The dissolution or termination of Grantor or Borrower's existence as a going business, the insolvency of Grantor or Borrower, the appointment of a receiver for any part of Grantor or Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor or Borrower.

Creditor or Forfeiture Proceedings. Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or Borrower or by any governmental agency against the Collateral or any other collateral securing the indebtedness. This includes a garnishment of any of Grantor or Borrower's deposit accounts with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor or Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor or Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor. Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or such Guarantor dies or becomes incompetent.

Adverse Change. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

Right to Cure. If any default, other than a Default on Indebtedness, is curable and if Grantor or Borrower has not been given a prior notice of a breach of the same provision of this Agreement, it may be cured (and no Event of Default will have occurred) if Grantor or Borrower, after Lender sends written notice demanding cure of such default, (a) cures the default within fifteen (15) days; or (b), if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

RIGHTS AND REMEDIES ON DEFAULT. Upon the occurrence of an Event of Default, or at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any rights or remedies that may be available at law, in equity, or otherwise:

Accelerate Indebtedness. Lender may declare all Indebtedness of Borrower ... ... due and payable, without notice of any kind to Grantor or Borrower.

Application of Account Proceeds. Lender may obtain all funds in the Account from the issuer of the Account and apply them to the Indebtedness in the same manner as if the Account had been issued by Lender. If the Account is subject to an early withdrawal penalty, that penalty shall be deducted from the Account before its application to the Indebtedness, whether the Account is with Lender or some other institution. Any excess funds remaining after application of the Account proceeds to the Indebtedness will be paid to Grantor or Borrower as the interests of Grantor or Borrower may appear. Borrower agrees, to the extent permitted by law, to pay any deficiency after application of the proceeds of the Account to the Indebtedness. Lender also shall have all the rights of a secured party under the California Uniform Commercial Code, even if the Account is not otherwise subject to such Code concerning security interests, and the parties to this Agreement agree that the provisions of the Code giving rights to a secured party shall nonetheless be a part of this Agreement.

Collect the Collateral. Lender may collect any of the Collateral and, at Lender's option and to the extent permitted by applicable law, may retain possession of the Collateral while suing on the Indebtedness.

Sell the Collateral. Lender may sell the Collateral, at Lender's discretion, as a unit or in parcels, at one or more public or private sales. Unless the Collateral is perishable or threatens to decline speedily in value, Lender shall give or mail to Grantor or Borrower, or any of them, notice at least ten (10) days in advance of the time and place of public sale, or of the date after which private sale may be made. Grantor and Borrower agree that any requirement of reasonable notice is satisfied if Lender mails notice by ordinary mail addressed to Grantor or Borrower, or any of them, at the last address Grantor or Borrower has given Lender in writing. If public sale is held, there shall be sufficient compliance with all requirements of notice to the public by a single publication in any newspaper of general circulation in the county where the Collateral is located, setting forth the time and place of sale and a brief description of the property to be sold. Lender may be a purchaser at any public sale.

Register Securities. Lender may register any securities included in the Collateral in Lender's name and exercise any rights normally incident to the ownership of securities.

Sell Securities. Lender may sell any securities included in the Collateral in a manner consistent with applicable federal and state securities laws, notwithstanding any other provision of this or any other agreement. If, because of restrictions under such laws, Lender is or believes it is unable to sell the securities in an open market transaction, Grantor and Borrower agree that (a) Lender shall have no obligation to delay sale until the securities can be registered, (b) Lender may make a private sale to a single person or restricted group of persons, even though such sale may result in a price that is less favorable than might be obtained in an open market transaction, and (c) such a sale shall be considered commercially reasonable. If any securities held as Collateral are "restricted securities" as defined in the Rules of the Securities and Exchange Commission (such as Regulation D or Rule 144) or state securities departments under state "Blue Sky" laws, or if Grantor or Borrower, or any of them (if more than one), is an affiliate of the issuer of the securities, Grantor and Borrower agree that neither Grantor nor Borrower will neither sell nor dispose of any securities of such issuer without obtaining Lender's prior written consent.

Transfer Title. Lender may effect transfer of title upon sale of all or part of the Collateral. For this purpose, Grantor irrevocably appoints Lender as its attorney-in-fact to execute endorsements, assignments and instruments in the name of Grantor and each of them (if more than one) as shall be necessary or reasonable.

Application of Proceeds. Lender may apply any cash which is part of the Collateral, or which is received from the collection or sale of the Collateral, to (a) reimbursement of any expenses, including any costs of any securities registration, commissions incurred in connection with a sale, attorney fees as provided below and court costs, whether or not there is a lawsuit and including any fees on appeal, incurred by Lender in connection with the collection and sale of such Collateral, and (b) to the payment of the Indebtedness of Borrower to Lender, with any excess funds to be paid to Grantor as the interests of Grantor may appear.

Other Rights and Remedies. Lender shall have and may exercise any or all of the rights and remedies of a secured creditor under the provisions of the California Uniform Commercial Code, at law, in equity, or otherwise.

Deficiency Judgment. If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

Cumulative Remedies. All of Lender's rights and remedies, whether evidenced by this Agreement or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor or Borrower under this Agreement, after Grantor or Borrower's failure to perform, shall not affect Lender's right to declare a default and to exercise its remedies.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the

12-21-2000
Loan No 5124

# ASSIGNMENT OF DEPOSIT ACCOUNT
## (Continued)

Page 4

party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Agreement has been delivered to Lender and accepted by Lender in the State of California. If there is a lawsuit, Grantor and Borrower agree upon Lender's request to submit to the jurisdiction of the courts of SAN FRANCISCO County, State of California. This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**Attorneys' Fees; Expenses.** Grantor and Borrower agree to pay upon demand all of Lender's costs and expenses, including attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may pay someone else to help enforce this Agreement, and Grantor and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (and including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor and Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Multiple Parties; Corporate Authority.** All obligations of Grantor and Borrower under this Agreement shall be joint and several, and all references to Borrower shall mean each and every Borrower, and all references to Grantor shall mean each and every Grantor. This means that each of the persons signing below is responsible for all obligations in this Agreement.

**Notices.** All notices required to be given under this Agreement shall be given in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered or when deposited with a nationally recognized overnight courier or deposited in the United States mail, first class, postage prepaid, addressed to the party to whom the notice is to be given at the address shown above. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. To the extent permitted by applicable law, if there is more than one Grantor or Borrower, notice to any Grantor or Borrower will constitute notice to all Grantor and Borrowers. For notice purposes, Grantor and Borrower will keep Lender informed at all times of Grantor and Borrower's current address(es).

**Power of Attorney.** Grantor hereby appoints Lender as its true and lawful attorney-in-fact, irrevocably, with full power of substitution to do the following: (a) to demand, collect, receive, receipt for, sue and recover all sums of money or other property which may now or hereafter become due, owing or payable from the Collateral; (b) to execute, sign and endorse any and all claims, instruments, receipts, checks, drafts or warrants issued in payment for the Collateral; (c) to settle or compromise any and all claims arising under the Collateral, and, in the place and stead of Grantor, to execute and deliver its release and settlement for the claim; and (d) to file any claim or claims or to take any action or institute or take part in any proceedings, either in its own name or in the name of Grantor, or otherwise, which in the discretion of Lender may seem to be necessary or advisable. This power is given as security for the Indebtedness, and the authority hereby conferred is and shall be irrevocable and shall remain in full force and effect until renounced by Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

**Successor Interests.** Subject to the limitations set forth above on transfer of the Collateral, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waiver.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

BORROWER AND GRANTOR ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT OF DEPOSIT ACCOUNT AND AGREE TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 21, 2000.

BORROWER:

Finexa, Inc.

By: _____
Amit Choudhury, Chief Executive Officer

GRANTOR:

x _____
Amit Choudhury

LaserPro, Reg. U.S. Pat. & T.M. Off., Ver. 3.24 (c) Concentrex 2000 All rights reserved. [CA-E20 F3.20 F3.20 FINEXA061.LN]

EXIHIBIT 4

# FINEXA INC.

561C PILGRIM DRIVE
FOSTER CITY, CA 94404
Phone: (650) 357-7389  Fax: (650) 357-1717

## FACSIMILIE

| | |
|---|---|
| To: _Brian Plotner_ | From: _Amit Choudhury_ |
| Fax: _415.986.6083_ | Pages: _1 of 2_ |
| Phone: | Date: _3/30/01_ |
| Re: | CC: |

☐ **Urgent**  ☐ **For Review**  ☐ **Please Comment**  ☐ **Please Reply**  ☐ **Please Recycle**



EXHIBIT NO. _4_
DATE: _1-10-08_
WITNESS _Choudhury_
COLLEEN REDAMONTI, CSR 7012

The information on this facsimile transmission is private and confidential and the property of the sender. The information contained herein is privileged and is intended only for the use of the individual(s) or entities named above. If you have received this fax in error, please immediately notify us by telephone to arrange for its return to us (at our expense). If you are not the intended recipient, please be advised that any unauthorized disclosure, copying, distribution, or the taking of any action in reliance on the contents of this faxed information is strictly prohibited.

# FINEXA INC

2000 VAN NESS AVENUE, SUITE 500 • SAN FRANCISCO, CALIFORNIA 94109-3023 • TEL: 415.364.3705 • FAX: 415.364.3710

**AMIT CHOUDHURY**
*Chief Executive Officer*

March 30, 2001

Brian Plotner
Golden Gate Bank
344 Pine Street
San Francisco, CA 94104
Fax # 415.986.6083

Dear Brian,

Based on conversations with David Hayford, CFO of Finexa Inc., I am writing to authorize Golden Gate Bank to use my collateral to repay loan # 5124. Between Finexa Inc. and Golden Gate Bank.

It is my understanding that Finexa will pay the interest for March, and that on Monday April 2, 2001, I will have access to the residual interest from my CD.

If you have any questions please call me at 415.364.3701.

Thank you for your attention in this matter.

Sincerely,

Amit Choudhury

AC-011

# EXIHIBIT 5



### THE PRIVATE BANK

30-1
5
6

AMIT CHOUDHURY
2200 LEAVENWORTH #305
SAN FRANCISCO CA  94133

NOW ACCOUNT:      2241161

**03/31/01 THRU 04/30/01**
DOCUMENT COUNT:         11
PAGE    1

THE ENCLOSED STATEMENT INSERT DETAILS THE REVISED MISCELLANEOUS FEES
APPLICABLE TO YOUR ACCOUNT.

---

NOW ACCOUNT 2241161

---

| | | | |
|---|---|---|---|
| INIMUM BALANCE | 25,646.84 | LAST STATEMENT 03/30/01 | 7,563.22 |
| /G AVAILABLE BALANCE | 25,822.32 | 10 CREDITS | 1,030,062.19 |
| /ERAGE BALANCE | 25,963.71 | 14 DEBITS | 1,011,935.75 |
| | | THIS STATEMENT 04/30/01 | 25,689.66 |

- - - - - - - - - - *DEPOSITS* - - - - - - - - - - - -

| :F #.....DATE......AMOUNT | REF #.....DATE......AMOUNT | REF #.....DATE......AMOUNT |
|---|---|---|
| 9988 04/25     191.50 | 9989 04/04   4,000.00 | |

- - - - - - - - - *OTHER CREDITS* - - - - - - - -

| :SCRIPTION | DATE | AMOUNT |
|---|---|---|
| :ANSFER FROM 209464 | 04/02 | 11,357.33 |
| :ANSFER FROM 209593 | 04/02 | 1014,494.05 |
| :SCELLANEOUS CREDIT | 04/03 | 1.99 |
| :SCELLANEOUS CREDIT | 04/16 | 1.50 |
| :SCELLANEOUS CREDIT | 04/17 | 1.50 |
| :IMBURSE ATM SURCHARGE | 04/25 | 1.50 |
| :IMBURSE ATM SURCHARGE | 04/26 | 1.50 |
| :TEREST | 04/30 | 11.32 |

EXHIBIT NO. 5
DATE: 1-10-08
WITNESS: Choudhury
COLLEEN REDAMONTI, CSR 70

- - - - - - - - - *CHECKS* - - - - - - - - -

| :HECK #..DATE.....AMOUNT | CHECK #..DATE......AMOUNT | CHECK #..DATE......AMOUNT |
|---|---|---|
| 124 04/12   2,300.00 | 126 04/02     584.00 | 128 04/05   3,703.00 |
| 125 04/03   1,347.34 | 127 04/02   1,281.52 | 129 04/06      45.00 |

- - - - - - - - - *OTHER DEBITS* - - - - - - - -

| :SCRIPTION | DATE | AMOUNT |
|---|---|---|
| :AN PAYMENT | 04/02 | 1000,666.66 |
| :ANSFER TO PRS NON-INTEREST ACCOUNT 2241162 | 04/04 | 20.73 |
| :M WITHDRAWAL FROM CHECKING NORTHPNT-SFWY SAN FRANCISCO | 04/09 | 121.50 |
| :CA000009816243000 | | |
| :RE TRANSFER DEBIT-DOMESTIC | 04/11 | 1,500.00 |
| :M WITHDRAWAL FROM CHECKING BURLINGAME BURLINGAME | 04/16 | 121.50 |
| :CA000010417480700 | | |
| :ITHDRAWAL FROM CHECKING 951 EDGEWATER BLVD FOSTER CITY | 04/23 | 81.50 |
| :CA000011013232600 | | |

**\* \* \* C O N T I N U E D \* \* \***

# EXHIBIT 7

## TERM PROMISSORY NOTE

FOR VALUE RECEIVED Amit Choudhury ("Debtor") unconditionally promises to pay to the order of Elizabeth Eilert Grewal, ("Lender") on demand at San Francisco, California, the sum of $1,000,000 USD (One Million US Dollars). Debtor agrees to pay interest from the date of this Term Promissory Note on the said sum or the amount from time to time remaining unpaid at the rate per annum (calculated based on a 365 day year), which is equal to 4.0%. Such interest shall be calculated and payable upon maturity of this Note upon expiration of the term, which is deemed to be Five years.

The principal and interest of this Term Promissory Note shall be paid in US dollars without set-off or counterclaim.

Made at San Francisco, California, this 2nd day of January, 2001.

Debtor:                                    Lender:


_____                    _____
(Amit Choudhury)                           (Elizabeth Eilert Grewal)

EXHIBIT NO. 7
DATE: 1-10-08
WITNESS: Choudhury
COLLEEN REDAMONTI, CSR 7421

# Response to Request For Admission # 21

1  Harvey L. Leiderman (SBN 55838)
   HLeiderman@ReedSmith.com
2  David S. Reidy (SBN 225904)
   DReidy@ReedSmith.com
3  REED SMITH LLP
   Two Embarcadero Center, Suite 2000
4  San Francisco, CA  94111-3922

5  **Mailing Address:**
   P.O. Box 7936
6  San Francisco, CA  94120-7936

7  Telephone:    (415) 543-8700
   Facsimile:     (415) 391-8269
8

9  Attorneys for Defendant
   AMIT CHOUDHURY

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13

14  ELIZABETH GREWAL, an individual,        Case No.: C-07-4218 CRB

15              Plaintiff,                   **DEFENDANT AMIT CHOUDHURY'S**
                                             **SUPPLEMENTAL RESPONSES TO**
16        vs.                                **PLAINTIFF'S REQUESTS FOR**
                                             **ADMISSIONS, SET FIVE**
17  AMIT CHOUDHURY, an individual,

18              Defendant.                   Compl. Filed:    July 19, 2007
                                             Trial Date:      None
19

20                                           *Honorable Charles R. Breyer*

21  ─────────────────────────────

22  AMIT CHOUDHURY, an individual,

23              Counter-Claimant,

24        vs.

25  ELIZABETH GREWAL, an individual,

26              Counter-Defendant.

27  ─────────────────────────────

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  **PROPOUNDING PARTY:  Plaintiff ELIZABETH GREWAL**

2  **RESPONDING PARTY:    Defendant AMIT CHOUDHURY**

3  **SET NUMBER:              FIVE**

4

5      Defendant Amit Choudhury ("Choudhury") hereby supplements his responses to certain of

6  Plaintiff's Requests for Admissions, Set Five, as follows:

7                    **I.      PRELIMINARY STATEMENT**

8      Choudhury responds to the Requests based upon the investigation conducted in the time

9  available since service of the Requests.  As of the date of this Response, discovery is ongoing and,

10  therefore, Choudhury has had an insufficient opportunity to review all documents, interview all

11  witnesses and otherwise obtain information which may prove relevant in this case, including,

12  without limitation, through discovery of Plaintiff and/or third parties.  As a consequence,

13  Choudhury's Response is based upon information now known to Choudhury and which he believes

14  to be relevant to the subject matter covered by the Requests.  Choudhury reserves his right in the

15  future to: (a) make subsequent revision, supplementation or amendment to this Response based upon

16  any information, evidence, documents, facts and things which hereafter may be discovered, or the

17  relevance of which hereafter may be discovered; and/or (b) produce, introduce or rely upon

18  additional or subsequently acquired or discovered writings, evidence and information at trial or in

19  any pretrial proceedings held herein.

20             **II.      RESPONSES TO REQUESTS FOR ADMISSIONS**

21      **REQUEST FOR ADMISSION NO. 21:**

22      At no time during the period from January 2, 2001, to the date of Choudhury's counterclaim

23  – December 3, 2007 – did Amit Choudhury demand of Elizabeth Grewal that she pay him $120,000.

24      **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

25      Choudhury incorporates by reference his Preliminary Statement as though the same were set

26  forth herein.  Without waiving and subject to the rights reserved in the Preliminary Statement,

27  Choudhury responds as follows:

28

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

SUPPLEMENTAL RESPONSES TO REQUESTS FOR ADMISSIONS SET FIVE

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

1  Choudhury does not remember whether, after January 2, 2001, he demanded of Plaintiff that

2  she pay him $120,000.  Choudhury Depo. at 97-98; 107-108.  Choudhury therefore cannot admit or

3  deny the Request and, on that basis, denies the request.

4  **REQUEST FOR ADMISSION NO. 22:**

5  At no time during the period from February 1, 2001, to the date of Choudhury's counterclaim

6  – December 3, 2007 – did Amit Choudhury demand of Elizabeth Grewal that she pay him $120,000.

7  **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

8  Choudhury incorporates by reference his Preliminary Statement as though the same were set

9  forth herein.  Without waiving and subject to the rights reserved in the Preliminary Statement,

10  Choudhury responds as follows:

11  Choudhury does not remember whether, after January 2, 2001, he demanded of Plaintiff that

12  she pay him $120,000.  Choudhury Depo. at 97-98; 107-108.  Choudhury therefore cannot admit or

13  deny the Request and, on that basis, denies the request.

14

15  DATED:  February 7, 2008

16  REED SMITH LLP

17

18  By _____
    David S. Reidy
19  Attorneys for Defendant
    AMIT CHOUDHURY

20

21

22

23

24

25

26

27

28

C-07-4218 CRB                           – 3 –                           DOCSSFO-12487556.1

SUPPLEMENTAL RESPONSES TO REQUESTS FOR ADMISSIONS SET FIVE

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1

## PROOF OF SERVICE

2    Re:  *Grewal v. Chodhury*, USDC Northern District, Case No. C-07-4218 CRB

3          I am a resident of the State of California, over the age of eighteen years, and not a
party to the within action. My business address is REED SMITH LLP, Two Embarcadero Center,
4    Suite 2000, San Francisco, CA  94111-3922.  On **February 8, 2008**, I served the following
document(s) by the method indicated below:

5

6    **DEFENDANT AMIT CHOUDHURY'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S
REQUESTS FOR ADMISSIONS, SET FIVE**

7    ☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully
prepaid, in the United States mail at San Francisco, California addressed as set forth below.
8    I am readily familiar with the firm's practice of collection and processing of
correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal
9    Service on that same day with postage thereon fully prepaid in the ordinary course of
business.  I am aware that on motion of the party served, service is presumed invalid if the
10    postal cancellation date or postage meter date is more than one day after the date of deposit
for mailing in this Declaration.

11

12    ☐    by placing the document(s) listed above in a sealed envelope(s) and consigning it to an
express mail service for guaranteed delivery on the next business day following the date of
consignment to the address(es) set forth below.

13

14    ☐    by placing the document(s) listed above in a sealed envelope(s) and by causing personal
delivery of the envelope(s) to the person(s) at the address(es) set forth below.

15

16    **For Plaintiff, Elizabeth Grewal**

17    E. Jeffrey Banchero, Esq.
Kastner / Banchero LLP
18    20 California Street , 7th Floor
San Francisco, CA 94111
Tel:  (415) 398-7000

19

20          I declare under penalty of perjury under the laws of the United States that the above is
true and correct.  Executed on **February 8, 2008**, at San Francisco, California.

21

22

23                                                    Patricia Giatis

DOCSSFO-12487794.9

24

25

26

27

28

# Decl. of E. Grewal

E. JEFFREY BANCHERO (SBN 93077)
ejb@kastnerbanchero.com
SCOTT R. RABER (SBN 194924)
srr@kastnerbanchero.com
KASTNER | BANCHERO LLP
20 California Street, Seventh Floor
San Francisco, California 94111
Telephone: (415) 398-7000
Facsimile: (415) 616-7000

Attorneys for Plaintiff and Counter-Defendant
ELIZABETH GREWAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH GREWAL,<br><br>Plaintiff,<br><br>v.<br><br>AMIT CHOUDHURY,<br><br>Defendant.<br><br>────────────────<br><br>AND RELATED COUNTERCLAIM | CASE NO. C-07-4218 CRB<br><br>**DECLARATION OF ELIZABETH GREWAL IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PROMISSORY NOTE AND COMMON COUNT FOR MONEY LENT**<br><br>Date: May 23, 2008<br>Time: 10:00 A.M.<br>Courtroom:  8, 19th Floor<br><br>(Before Hon. Charles R. Breyer) |

DECL. OF ELIZABETH GREWAL IN SUP. OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON PROMISSORY NOTE AND COMMON COUNT FOR MONEY LENT
Case No. C-07-4218 CRB

1    I, ELIZABETH GREWAL, hereby declare:

2        1.      I am the plaintiff in this action. I submit this declaration in support of the motion

3    for summary judgment on the promissory note and the common count for money lent. I have

4    personal knowledge of each of the matters set forth herein, and if called upon I could testify

5    competently to them.

6        2.      In March, 2001, I was employed by Finexa, Inc. As Director of Marketing, I

7    reported to the defendant in this action, Amit Choudhury, Finexa's CEO.

8        3.      On or about March 15, 2001, I received a letter from Choudhury, dated March 15,

9    2001, a copy of which is attached hereto as Exhibit A. My signature appears at the bottom of the

10   letter.

11       4.      As I testified at my deposition, before I wired the $880,000 to Choudhury, I told

12   him that that was the amount that was coming and that this was all the money I was going to loan

13   him. Choudhury never requested or demanded that I loan him an additional $120,000 or any more

14   money at all. He said nothing about more loan money before he handed me the promissory note,

15   at the meeting I had with him in January, 2001, when he handed me the promissory note, or at any

16   time thereafter.

17       I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th

18   day of April, 2008, at Menlo Park, California.

19

20                                                   Elizabeth Grewal

21

22

23

24

25

26

27

28

                                                    2