1  E. Jeffrey Banchero (SBN 93077)
   ejb@kastnerbanchero.com
2  Scott R. Raber (SBN 194924)
   srr@kastnerbanchero.com
3  KASTNER | BANCHERO LLP
   20 California Street, Seventh Floor
4  San Francisco, California 94111
   Telephone: (415) 398-7000
5  Facsimile: (415) 616-7000

6
   Attorneys for Plaintiff and Counter-Defendant
7  ELIZABETH GREWAL

8

9
                    UNITED STATES DISTRICT COURT
10
                   NORTHERN DISTRICT OF CALIFORNIA
11

12

13 ELIZABETH GREWAL,                          CASE NO. C-07-4218 CRB

14            Plaintiff,

15     v.                                     **PLAINTIFF ELIZABETH GREWAL'S
                                              TRIAL BRIEF**
16 AMIT CHOUDHURY,

17            Defendants.                     Trial Date:   August 4, 2008
                                              Time:         8:30 A.M.
18                                            Courtroom:    8, 19th Floor

19 AND RELATED COUNTERCLAIM                   (Before Hon. Charles R. Breyer)

20

21

22

23

24

25

26

27

28

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

# INTRODUCTION

This is, first and foremost, a *fraud* case. Amit Choudhury, learning that the plaintiff, Elizabeth Grewal, had inherited several million dollars, told her that, because of his status as a foreign national in the United States, he could invest her money off-shore and return the "interest" on the money to her "tax free." Grewal then sent Choudhury $880,000. But, instead of doing what he promised, he secretly used Grewal's money to fund the day-to-day operations of a newly acquired, high-risk software start-up he controlled, Finexa, Inc., which was in desperate need of cash to continue its operations. Choudhury did not tell Grewal that he was using her money to operate Finexa, and he did not tell David Hayford, Finexa's CFO, who, with Choudhury, co-founded Finexa and was intimately involved with its finances.

Choudhury prepared and delivered to Grewal a personal promissory note with a five-year term in the amount of $1 million. The note was part of Choudhury's scheme to defraud Grewal. He presented the note three weeks after using Grewal's money to purchase a $1 million certificate of deposit, which he immediately pledged to serve as collateral for a $1 million loan to Finexa. By giving Grewal the note, Choudhury sought to prevent, for the five-year term of the note, unwelcome inquiries from Grewal concerning his handling of her money.

We will demonstrate at trial that Choudhury lied to Grewal throughout the five-year term of the note and for another year and one-half after that – right up to this lawsuit, when Grewal's lawyers, through discovery, were able to learn the truth. *In seven years, Choudhury never disclosed to Grewal that he had spent her money on Finexa's operations and that the money was lost.* The money, he told her, was invested off-shore, exactly where he had promised it would be, and he was working on ways to return the money to her. Unfortunately for Grewal, none of Choudhury's statements about where the money was or when he would return it were true.

Grewal sues to recover compensatory and punitive damages for Choudhury's fraud and also to enforce the promissory note. Further, as the Court noted in its Order Denying Motions for Summary Judgment, dated May 30, 2008, Grewal can recover on her common counts "even if [the promissory note] is unenforceable … ." (Order, p. 8:24-25 & n. 3.) To recover on the common

-1-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

1  count for money lent, Grewal will demonstrate that Choudhury received money from Grewal
2  intended as a loan and never repaid it.  To recover on the common count for money had and
3  received for the "use and benefit" of plaintiff, Grewal will demonstrate that Choudhury received
4  money that was intended to be used for the benefit of Grewal – nothing more is required under this
5  count.  There is no evidence whatever that the $880,000 given to Choudhury was intended to be
6  used for anything other than "for the benefit of" Grewal.

## THE EVIDENCE PLAINTIFF WILL PRESENT AT TRIAL

9   In 2000, the defendant, Amit Choudhury, decided to acquire a French software company,
10  continue its European operations, and expand its operations in the United States.  He asked a
11  business-school classmate, David Hayford, to help him with the acquisition, and the first person
12  Choudhury hired, prior to the acquisition, was the plaintiff, Elizabeth Grewal.  Choudhury had
13  learned that Grewal had inherited several million dollars in marketable stocks and bonds from her
14  mother.
15  In October, 2000, Choudhury and Hayford acquired the French software company, which
16  became Finexa, Inc. ("Finexa").  Choudhury, who put up $500,000 or more for the acquisition,
17  became the CEO of Finexa and the owner of 2/3 of the company's stock.  Hayford, who did not
18  contribute money for the acquisition, became the CFO of Finexa and the owner of 1/3 of the
19  company's stock.  Immediately following the acquisition, Finexa became responsible for the
20  salaries of some forty employees located in Europe (formerly the employees of the French
21  corporation) and San Francisco, as well as operational expenses in the range of $250,000 to
22  $500,000 for the fourth quarter of 2000.  Because Finexa had no revenues, it had an immediate
23  need for cash.
24  Prior to the acquisition, Choudhury had assured Hayford he had millions of dollars at his
25  disposal in off-shore accounts.  These sums notwithstanding, Choudhury and Hayford created FXI
26  Investments, Inc. ("FXI") to raise money for Finexa's operations.  FXI's sole purpose was to take
27  in money from investors to be used by Finexa for its day-to-day operations.  Grewal was asked to
28

-2-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

invest in FXI. She responded that she would invest $25,000. When told that the minimum investment was $50,000, she invested $50,000 – but no more. Hayford will testify that he and Choudhury were able to raise only $150,000-$200,000 through FXI, which included the $50,000 from Grewal. This amount of money was not nearly sufficient to operate Finexa.

Prior to closing the acquisition, and without informing Hayford, Choudhury met with Grewal and her husband (they are now divorced), Hardev Grewal, to "pitch" Grewal for money. Choudhury pre-arranged the meeting. His purpose was to induce Grewal to invest money with him personally. Grewal recalls vividly that Choudhury told her he was residing in the United States on an investor visa and that he could legally put money offshore. Choudhury, a foreign national, told Grewal that if she loaned him money the interest could come back tax free because there were tax treaties among different countries that permitted non-U.S. citizens to "gift" money into the United States tax free. (See Grewal Dep. Tr., p. 186:4-14.) Choudhury told Grewal essentially what he told Hayford: he had set up offshore entities to hold and invest monies and that "gifting" money into the country was perfectly legal. Hardev Grewal will corroborate Grewal's testimony. He recalls Choudhury telling them that he would place her money outside of the United States and that she would get back the money she loaned him without the return being a taxable event. Choudhury testified at deposition that he has no recollection of the meeting.

Choudhury used Grewal's money and $120,000 from another source to purchase a $1 million CD in his own name. The bank that issued the CD then loaned $1 million to Finexa, with the CD as collateral. Three months later, Finexa ran out of money and paid off the loan using the principal from the CD.

Hayford will testify that in late November and early December, 2000, he and Choudhury discussed using $1 million of *Choudhury's* money to purchase a certificate of deposit to collateralize a loan to Finexa from Golden Gate Bank. Hayford will testify Choudhury told him he wanted to be able to "get his money out" of Finexa, and by arranging a loan in this way, he could do so. "Amit stated that if he put his money directly into Finexa, new investors, which we were steadily pursuing, would not let him take his money back out of the business." (Declaration of

-3-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

David Hayford, p. 4:12-14, attached hereto.)[1]  Hayford will testify that Choudhury was closely involved in designing and implementing the Golden Gate Bank loan transaction and that he signed the papers with the bank.  (See Hayford Decl., p. 4:27-28.)[2]

Grewal had no idea Choudhury was planning to purchase a $1 million CD to collateralize a loan to Finexa when, on December 12, 2000, she wired $880,000 to Choudhury's personal bank account.  Choudhury took this money and an additional $120,000 from another source, purchased the $1 million CD *in his own name*, and closed the loan by which Finexa received a $1 million cash infusion – money it urgently needed.

Although Grewal worked with Choudhury at Finexa on a daily basis, she did not learn that Choudhury had used her money to obtain a loan from Golden Gate Bank rather than invest the money off-shore as promised, because Choudhury did not tell her.  Nor did Hayford know that Choudhury was using Grewal's money – instead of his own – to fund Finexa's operations.  Because of the importance of Hayford's testimony on this point – it will demonstrate to the jury Choudhury's fraud – we quote Hayford's declaration at some length:

> "Because I knew Amit had purchased the $1 million CD in his name with funds from his account, and because Amit led me to believe these were his personal funds, I believed at the time that the $1 million was Amit's money.  *Clearly if an external party had put up this much money for Finexa at that time I would have been involved in significant discussions, I would have been involved in the documentation and my personal percentage ownership would have been reduced as well as that of*

---

[1]  On October 25, 2007, Grewal identified David Hayford in her Rule 26(f) disclosures as a witness in this case.  Choudhury's lawyers, however, chose not to take his deposition.  As the trial date approached, this Court asked Magistrate Judge Edward Chen to conduct a settlement conference, which he did on July 16, 2008, on very short notice.  After the conference, Judge Chen requested that plaintiff submit a counter-demand to plaintiff's settlement offer, and that the parties return to his Court on July 22 for a second session.  In order to demonstrate the strength of Grewal's fraud claim and to support a counter-demand, plaintiff's counsel flew to Atlanta on Friday, July 18 to meet with Mr. Hayford and obtain his declaration.  Mr. Hayford signed the declaration on Monday, July 21; and plaintiff's counsel served it on defendant's counsel that very day.  On Tuesday, July 22, plaintiff tendered her counter-demand in advance of the second session of the settlement conference, which Judge Chen conducted that day.  The parties, however, were unable to conclude a settlement.

[2]  At deposition, Choudhury was asked, "Do you know how the line of credit with Golden Gate Bank came about"?  He replied, "I don't know." (Choudhury Dep. Tr., p. 28-22-29:2.)

-4-
**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

> *FXI.* It was clear to me that Amit using his money was one scenario in the original plan and as such would not have required any additional documentation or dilution of myself or FXI . . . . It wasn't until years later, within the past 12 months, that I learned that Amit had received $880,000 of the amount that he contributed from his Golden Gate bank account to Finexa, from Elizabeth Grewal, our employee at the time. *I was shocked*, because as a co-founder and CFO of Finexa, and as someone who was intimately involved with attempting to raise money for Finexa, I clearly needed to know in December, 2000 that Amit was using our employee's money in this way. In addition, I would have wanted to know why Amit was not transferring a membership interest in FXI or Finexa to Grewal in return for her $880,000, and how this might affect Amit's and my ownership shares in the enterprise. *Finexa was a high risk, technology start up and this magnitude of at risk investment should have controlled a significant share of the company*. Additionally, as CFO of Finexa at the time, I would have been personally involved in assuring the proper legal documentation of such a significant transaction, had it been known to me."

(Hayford Decl., p. 5:6-25; emphasis added.)

Grewal wanted something from Choudhury in writing to memorialize the $880,000 transfer. After several requests and the passage of a month's time, Choudhury wrote, signed, and presented Grewal with a Term Promissory Note, dated January 2, 2001, that provides for the payment of $1 million plus 4% interest per annum in five years. The note does not mention Finexa or otherwise recite that Grewal's money was being used to collateralize a loan to Finexa.

During the period from December 2000 to March 2001, with the possible exception of some monies from FXI, Finexa did not receive any cash other than the $1 million loan from Golden Gate Bank largely collateralized by Grewal's money, and it had virtually no revenues. As a result, Finexa ran out of money and all but ceased operations on March 30, 2001. The company terminated all of its employees and paid off the $1 million debt to Golden Gate Bank with the proceeds of the $1 million CD.

At deposition, Choudhury acknowledged that the CD was used to pay off the loan from Golden Gate Bank at the end of March 2001, but testified that "*[a]t that time I didn't know about it. And later on when I found out about it, I was very embarrassed about it*." (Choudhury Dep. Tr., pp. 49:21-50:5; see also 53:19.) Choudhury testified he did not learn of the loan pay-off for "probably" "a month or two," when Hayford informed him. (*Id.*, pp. 46:10-47:4.)

We will demonstrate at trial that this testimony is manifestly untrue. The events in question were the closing of a 40-employee company that Choudhury controlled as majority shareholder and

-5-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

CEO and paying off the company's million-dollar bank loan using a CD in Choudhury's name. Of course, Choudhury knew of and authorized the loan pay-off—as Hayford will confirm. Choudhury also arranged for the interest earned on the CD, approximately $14,000, to remain in his personal bank account. (Hayford Decl., pp. 6:16-7:9.) In other words, Choudhury knew what neither Hayford nor Grewal knew at the time – that he had used Grewal's $880,000 to pay off Finexa's debt to Golden Gate Bank and that he kept for his personal use three months' interest on Grewal's money.

As to the years following, the evidence discloses a tale of continued deception on Choudhury's part. Grewal would ask him about her money, where it was, and when it would be paid back. *Choudhury, in response, never told her the money was lost*. Instead, he dissembled. Choudhury told Grewal that her money was in an overseas account; he told her the monies were in a "family office" account in London; he told her the monies could not be returned to the United States just yet, because of tax problems or legal issues.

In the end, Choudhury paid Grewal nothing. In late 2006, six years after the money was transferred, Grewal demanded to be paid $1 million plus 4% annual interest. Choudhury refused, and this action followed.

**A.    The Evidence Will Amply Support Grewal's Fraud Claim.**

Choudhury, who managed a hedge fund, held himself out as a shrewd and knowledgeable investor. He met with Grewal early in 2000 and reviewed her investment portfolio, advising her on what stocks and bonds to sell and what to keep. When, in September 2000, he told Grewal he would invest her money offshore and lawfully pay her interest on the money tax free, she believed him. Because Choudhury was an experienced investor, a foreign national who often traveled overseas, and who said he maintained offshore accounts, it was entirely reasonable for Grewal to rely on Choudhury's promise to invest her monies as he stated he would.

There is no dispute that Choudhury "did not perform the promised act" (CACI Model Jury Instructions, No. 1902). He did not invest Grewal's money offshore, and he did not repay it with interest, tax-free or otherwise. Instead, within days of receiving Grewal's money, he used it

-6-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

without Grewal's knowledge to purchase a CD in his own name, which he then used to collateralize a $1 million loan to a company, Finexa, which he controlled. Hayford, the company's CFO, will testify that Choudhury led him to believe that the money for the CD was Choudhury's money, and that if Hayford had known the money had come from one of Finexa's employees, red flags would have been raised. (Hayford Decl., p. 5:6-25.)

The evidence will show that Choudhury's surreptitious use of Grewal's money to fund Finexa was not some unfortunate error, as he implied at deposition, but rather a clever calculation on his part. Finexa was in urgent need of large amounts of cash, and Choudhury knew Grewal had about $3 million in liquid assets. He knew Grewal would not invest more money in FXI/Finexa, because she had invested $50,000 and had told him that this was as high as she would go. The only way Choudhury could meet Finexa's cash needs using Grewal's money was to take her money and tell her he was placing it in an interest-bearing offshore account for her benefit.

Choudhury's preparation and delivery of the promissory note (the note, we will show, is fully enforceable in its own right) was in furtherance of his fraud. He presented the note to her three weeks after he had pledged her money for the Finexa loan. For obvious reasons Choudhury did not want Grewal to know that he had secretly used her money to operate Finexa and had lost it. By signing a promissory note due in five years, he would not be obliged to tell her. Choudhury successfully used the note to put Grewal off for five years, giving himself five years to repay Grewal – should he choose to do so, which he did not.

Grewal's damages on the fraud claim, as her damages expert, Gregory A. Pinsonneault, will testify, amount to $1,552,899 as of August 4, 2008. This sum is the return of the money Choudhury induced Grewal to transfer to him by false promises, $880,000, plus pre-judgment interest on this amount from December 12, 2000, to August 4, 2008, at the applicable California pre-judgment interest rate of 10% simple interest.

Because the evidence in this case demonstrates that Choudhury committed fraud, Grewal will request that the Court instruct the jury to consider awarding her punitive damages.

-7-
**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

### B. The Promissory Note Is Not Invalid Because Of Choudhury's Claimed Mistake; Evidence Will Demonstrate The Note Is Fully Enforceable.

Choudhury claims that when he signed the promissory note and presented it to Grewal, he did so because he believed Grewal would send him an additional $120,000.[3]  Even if *arguendo* a jury were to believe this, it would provide no basis for finding the promissory note to be unenforceable. As the evidence will show, Choudhury did *not* issue the promissory note because of an *unconscious ignorance or forgetfulness of a fact* that is material to the note, which is the California Civil Code's definition of mistake in the formation of a contract. (See plaintiff's proposed Jury Instruction: Mistake – Definition, filed herewith.)

As we contend in plaintiff's Motion in Limine to Exclude Evidence of Prior Agreement or Contemporaneous Oral Agreement Contradicting the Terms of the Promissory Note, the note Choudhury drafted does *not* state "Choudhury shall pay Grewal $1,000,000 plus interest at 4% per annum once Grewal transfers an additional $120,000 to him." Rather, the note provides that Choudhury "*unconditionally* promises to pay to the order of Elizabeth Eilert Grewal" $1,000,000 plus interest at 4% per annum "*without set-off or counterclaim*." Given these unambiguous terms, the parol evidence rule bars Choudhury from claiming that the note is unenforceable because of an alleged prior promise by Grewal to transfer an additional $120,000 to him. (Code of Civil Procedure § 1856; see authorities cited in Plaintiff's Motion In Limine, *passim.*)

Because the promissory note is a written, integrated agreement enforceable on its face and the parol evidence rule bars Choudhury from introducing alleged oral statements that contradict its terms, we will move the Court under Rule 50(a) of the Fed. Rules of Civ. P. for judgment on this claim as a matter of law.

Nor is it unusual, much less unlawful, for the maker of a promissory note to insert a principal amount greater than the amount loaned to him. *See, e.g., Riegel v. Wollenshlager* (1920) 49 Cal.App. 300, 301 (enforcing $20,000 promissory note although borrower received $19,400 loan) (rejecting borrower's claim that "there was no consideration [for the note] to the extent of

---

[3] The Court may note that notwithstanding defendant's present emphasis on the "mistake" defense, that defense is not included among twenty-three affirmative defenses set forth in the Answer.

-8-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

$600); *Wilbur v. Griffins* (1922) 56 Cal.App. 668, 669 & 674 (enforcing $45,600 promissory note although borrower received $38,000 loan) ("[t]here being a consideration for the note, the note must be held valid[;] *** it is not necessary that the consideration of a note [*i.e.*, the amount loaned] shall be equal in pecuniary value to the obligation incurred ***"); *Otis v. Eisner* (1935) 7 Cal.App.2d 496, 499 (enforcing $450,000 promissory note although borrower received $405,000 loan) ("[w]hen a bonus is paid for the making of a loan, it must be considered as interest and taken out of the principal at the time of the making of the loan, and interest then computed upon the remainder of the principal").  Here, the effective interest rate on an $880,000 loan that Grewal would receive if the face amount of the note plus 4% interest were paid in full is a reasonable 7.19%.

Plaintiff's expert, Mr. Pinsonneault, will testify that under the terms of the note Grewal should receive, as of August 4, 2008, the sum of $1,423,740.  This sum is comprised of return of principal, simple interest at 4% per annum for the five-year term of the note, plus pre-judgment interest for the period from January 1, 2006, to August 4, 2008.[4]

### C.    Grewal Will Prevail On The Common Counts.

As the Court noted in its May 30, 2008, Order Denying Cross-Motions for Summary Judgment, there is "substantial evidence establishing that the transaction was a loan because Choudhury agreed to return at a future time a sum equivalent to what he borrowed."  (5/30/08 Order, p. 8:22-23.)  The Court cited the promissory note as evidence that Choudhury intended to repay the entire principal; Grewal's testimony that she understood from conversations with Choudhury that he "would return the entire principal plus interest"; and Choudhury's admission that "at the time he signed the promissory note, he intended to repay the entire principal." (*Id.*, pp. 8:24-9:4.)  Grewal will adduce this testimony (and more) at trial demonstrating that Choudhury accepted as a loan the money she transferred to him and promised to repay it.

---

[4]  Mr. Pinsonneault's report is an exhibit to Plaintiff's Opposition to Defendant's Motion in Limine No. 4: To Exclude Expert Opinion Evidence Offered By Gregory A. Pinsonneault.

-9-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB

As the Court also noted in its order, Grewal can recover on her common count for money lent whether or not the promissory note is enforceable. (*Id.,* p. 8:24-25 and fn. 3.) Grewal will recover on this common-count claim by demonstrating that Choudhury received money from her intended as a loan; that Choudhury has not repaid any of the money (which is undisputed); and the amount of money lent (also undisputed.) See Plaintiff's Jury Instructions: Common Count – Money had and Received for Money Lent.

In addition, Grewal will prevail on her common count for money had and received for the use and benefit of Plaintiff. The CACI instruction states three elements for this claim: (i) that Choudhury received money that was intended to be used for the benefit of Grewal; (ii) that the money was not used for the benefit of Grewal; and (iii) that Choudhury has not given the money to Grewal. See Plaintiff's Jury Instructions: Common Count – Money had and Received for Use and Benefit of Plaintiff. It is difficult to imagine how Choudhury can defeat this claim, for evidence overwhelmingly establishes he "did not use the money for Grewal's benefit," and there is no evidence to the contrary. Nor is there a factual dispute about the amount of money Grewal transferred to him, or that he has failed to repay it to her.

Grewal's damages on the common counts are not unlike her damages in fraud. In both fraud and on the common counts, she is entitled to damages that make her whole for the money she transferred to Choudhury and of which she has not had the use since the date of the transfer. This amount, as the damages expert, Mr. Pinsonneault, will testify, is $880,000 plus simple interest at 10% per annum for the period from December 12, 2000, until the date of judgment—a total, as of August 4, 2008, of $1,552,899.

DATED: July 25, 2008                    Respectfully submitted,

                                        KASTNER | BANCHERO LLP

                                        By: _____/S/_____
                                            E. Jeffrey Banchero
                                            Scott R. Raber

                                        Attorneys for Plaintiff and Counter-Defendant
                                        ELIZABETH GREWAL

-10-

**PLAINTIFF ELIZABETH GREWAL'S TRIAL BRIEF**
Case No. C-07-4218 CRB