# DECLARATION OF DAVID HAYFORD

E. Jeffrey Banchero (SBN 93077)
ejb@kastnerbanchero.com
Scott R. Raber (SBN 194924)
srr@kastnerbanchero.com
KASTNER | BANCHERO LLP
20 California Street, Seventh Floor
San Francisco, California 94111
Telephone: (415) 398-7000
Facsimile: (415) 616-7000

Attorneys for Plaintiff and Counter-Defendant
ELIZABETH GREWAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH GREWAL,<br><br>    Plaintiff,<br><br>    v.<br><br>AMIT CHOUDHURY,<br><br>    Defendants. | CASE NO. C-07-4218 CRB<br><br>**DECLARATION OF DAVID HAYFORD** |
| AND RELATED COUNTERCLAIM | |

I, David Hayford, declare:

1.   I have firsthand knowledge of the facts in this declaration. If called as a witness, I could and would testify competently to these facts.

2.   I met Amit Choudhury at the Northwestern University Kellogg School of Business in the early 1990s. We were classmates in the business school; in fact we were both assigned to "Section 66", which is a group of the top quantitative students of each incoming class. In the mid-1990s, I was CFO of BWAY Corporation, a NYSE company with headquarters in Atlanta, Georgia. At my recommendation, BWAY hired Amit, who previously had been working for Booz Allen & Hamilton, Inc., as a consultant. Amit asked me if, for the consulting contract, BWAY would send his consulting fees to an off-shore company, Amisil Holdings, Inc. Amit stated that he had organized the company in such a way that he was not the record owner of any shares in Amisil Holdings. As I recall, family members of a woman he was dating at the time, "Silvia" (hence, Amisil – a contraction of Amit and Silvia) were the record owners of shares in the company. Additionally, I recall that certain of Amit's family members might have also been shareholders. None of the owners of the record shares of Amisil Holdings, Amit said, were U.S. citizens. Amit stated he was the company's managing director and had complete authority over the firm's funds. After consulting with BWAY's external lawyers and accountants, who advised that BWAY could lawfully engage a firm incorporated in Cyprus to perform this consulting work as long the payments were for actual goods and services rendered to BWAY, and that is what was done. During Amit's engagement with BWAY, BWAY sent $500,000 to $1,000,000 to Amisil Holdings to compensate Amit and his consulting team for the work they performed. Repatriating those funds to pay for expenses and salaries incurred in the US, was the responsibility of Amisil.

3.   I left my job at BWAY in early 2000. At some point in the first half of 2000, Amit told me he had located a company, Sycomex S.A., which was shopping itself for sale. Sycomex was a company with headquarters in Paris, France and operations in Poland and Foster City, California, that had developed software for tracking assets in an investor's portfolio. Amit's idea was to acquire Sycomex and develop its software product for use in the United States by CPAs, registered-investment advisors, and other wealth managers. I had been involved in five or six

acquisitions at BWAY, and I was looking for a new project. Amit, in addition to his Technology consulting experience at Booze, Allen had recently been operating a successful hedge fund, so he had inside knowledge of both the technology and wealth management industries. I consented to assist Amit with the acquisition Sycomex. In the late spring or early summer of 2000, Amit and I met with the owners of Sycomex in Paris, France. My role with Amit was to assist in conducting due diligence on the merits of the company, including, in particular, a review of the finances of the company and its value as a potential acquisition.

4. Amit and I founded Finexa, Inc., a C-corporation organized under the laws of Delaware, just before Sycomex was acquired in October, 2000. We founded Finexa for the purpose of operating Sycomex's business and continuing its development of wealth-management software. We agreed that Amit would own 2/3 of Finexa and I would own 1/3. (These ownership percentages would naturally be reduced by future employee stock options and shares sold to outsiders to raise additional funds the company needed to grow.) We hired Elizabeth Grewal prior to consummating the acquisition of Sycomex.

5. Sycomex was purchased for something more than $500,000 in cash at closing, with a similar amount due to the sellers in October, 2001. In effect, Sycomex's operations were merged with Finexa's – the idea was to purchase Sycomex, continue its European operations, and expand its operations to the United States under the Finexa banner. Finexa would now be financially obligated for the Sycomex employees working in California, France and Poland. Thus, immediately following the acquisition, Finexa was responsible for the salaries of approximately 10 employees in Paris, France, 5 employees in Foster City, California and 15 employees in Poland, plus rents and other operational expenses in those offices. Finexa's headquarters were located at 2000 Van Ness Avenue suite # 500 in San Francisco, and Finexa commenced hiring US software developers, who we mostly located in Foster City, California.

6. In addition to the monies paid to acquire Sycomex, Finexa had operational expenses during the last quarter of 2000 in the range of $250,000 to $500,000. I know this because I was Finexa's CFO at the time and oversaw the checking account through which all the company's funds were disbursed. By February, 2001, Finexa had about 11 U.S.-based employees

and had approximately 40 employees globally. During the first quarter of 2001, Finexa's operations were costing approximately $300,000 a month. During this period, Finexa had virtually no revenues from sales.

7. In early 2000, in the course of thanking me for arranging his consulting work with BWAY, Amit told me he personally had amassed $2 to $3 million cash and other assets, which he held in offshore accounts and he managed the investments through his hedge funds. Amit contributed the cash required to purchase Sycomex and to fund Finexa's initial operations. Amit informed me that the funds came from "his overseas accounts", but I had no detailed accounting documenting of the specific source of the funds transfers. This did not mean, however, that Amit and I were not intent on raising money from outside investors for Finexa's operations. To the contrary, at about the time of the Sycomex acquisition, Amit and I created FXI Investments, LLC. ("FXI"), a limited liability company whose sole purpose was to raise funds for Finexa. Money intended for Finexa would be raised by FXI and then transferred to Finexa through the purchase of shares in Finexa. To the extent an investor purchased an ownership interest in FXI, Amit's and my 2/3 – 1/3 ownership in Finexa would be diluted. In other words, the more investment money FXI took in for Finexa, the greater the dilution of Amit's and my ownership interest. Amit and I decided the minimum investment in FXI would be $50,000.

8. John Treat, who knew Amit as a co-worker at Booz Allen, invested $50,000 in FXI. I note from reading portions of Amit's deposition transcript that Amit also claims to have purchased a membership interest in FXI, although I do not remember if this was in his name personally or through one of the 5 corporations he was directing at the time. At some point in the fall of 2000, Elizabeth Grewal, who, as I mentioned, was an employee of Finexa's, told us that she was agreeable to investing $25,000 in Finexa and no greater amount. Amit explained to her that the minimum investment was $50,000, and that if she invested the money, the investment would be in FXI, not Finexa. Ms. Grewal then invested $50,000 in FXI. To my recollection, there may have been one or two other investors in FXI, which meant that FXI raised between $150,000 and $250,000 in cash. These monies were all then invested directly in Finexa stock and used by Finexa for its operations.

9. As the CFO of Finexa, I was acutely aware in November-December, 2000 of Finexa's need for cash to run its operations. Amit led me to believe that if (as it appeared) we were unsuccessful in raising money from outside investors, he had millions of dollars offshore from which he could draw, to fund Finexa's operations. He referred to this money as "dry powder" and said bringing the money to the United States was complicated, which meant we should raise as much money from outside investors as we could.

10. Although we made strong efforts to raise more money for FXI and Finexa from outside investors, we were unable to do so. This meant Finexa had an urgent need for cash to continue with its operations in December, 2000 and into the first quarter of 2001.

11. In late November or early December, I had at least two hour-long discussions in his office at 2000 Van Ness Avenue, Suite # 500, San Francisco, CA, 94109, with Amit about obtaining more money for Finexa, which, as noted, it urgently needed. Amit stated that if he put his money directly into Finexa, new investors, which we were steadily pursuing, would not let him take his money back out of the business. In order for him to get his money out of Finexa within, for example, a year's time – i.e., after Finexa began earning money or money was obtained from outside investors – he would prefer to lend the money to the company. During these meetings, Amit and I discussed using $1 million of Amit's money to purchase a certificate of deposit to collateralize a loan from Amit's bank, Golden Gate Bank, to Finexa. Amit would receive interest on the certificate of deposit, and Finexa would pay interest on the loan. A transaction Amit and I referred to as "reverse arbitrage", since the cost of the money to Finexa would be the interest on the promissory note to the bank, which, we understood, would be greater than the interest the bank paid to Amit on the CD. Amit would personally keep whatever interest was earned on the CD and Finexa would pay interest of approximately the Prime Rate.

12. After Amit made the introductions at his bank, I helped arrange the documentation of the loan with Golden Gate Bank in December, 2000, by which the bank issued a $1 million certificate of deposit to Amit and Amit pledged the certificate of deposit to the bank to collateralize a $1 million loan to Finexa. Amit was closely involved in designing and implementing the transaction, and he signed the papers with the bank. Although Amit was

traveling to Texas at or about this time, we were in constant communication as to the operations and financing of Finexa, including this CD collateralized loan transaction. Since I was living in Georgia at the time, and both Amit and I traveled a great deal, we were accustomed to transacting business remotely and were able to do this successfully with a great deal of communication via phone, email and fax.

13.   Because I knew Amit had purchased the $1 million CD in his name with funds from his account, and because Amit led me to believe these were his personal funds, I believed at the time that the $1 million was Amit's money. Clearly if an external party had put up this much money for Finexa at that time I would have been involved in significant discussions, I would have been involved in the documentation and my personal percentage ownership would have been reduced as well as that of FXI. It was clear to me that Amit using his money was one scenario in the original plan and as such would not have required any additional documentation or dilution of myself or FXI or the notification to me as co-founder, significant shareholder and CFO of Finexa, or to John Treat as managing member of FXI. It wasn't until years later, within the past 12 months, that I learned that Amit had received $880,000 of the amount that he contributed from his Golden Gate bank account to Finexa, from Elizabeth Grewal, our employee at the time. I was shocked, because as a co-founder and CFO of Finexa, and as someone who was intimately involved with attempting to raise money for Finexa, I clearly needed to know in December, 2000 that Amit was using our employee's money in this way. In addition, I would have wanted to know why Amit was not transferring a membership interest in FXI or Finexa to Grewal in return for her $880,000, and how this might affect Amit's and my ownership shares in the enterprise. Finexa was a high risk, technology start up and this magnitude of at risk investment should have controlled a significant share of the company. Additionally, as CFO of Finexa at the time, I would have been personally involved in assuring the proper legal documentation of such a significant transaction, had it been known to me.

14.   Elizabeth Grewal worked with Finexa on its marketing operations. Additionally, Ms. Grewal helped identify individuals whom Amit and I might solicit as potential investors in FXI, but she was not involved directly in the finances of Finexa. She did not work under me in

my role as CFO, and she had no role, for example, in Finexa's payroll, accounts payable, or other financial operations. She was not informed of the sources of cash Finexa used to finance the Sycomex acquisition or to fund its operations thereafter. She was present at a number of presentations to potential investors, during which past funding and future aspirations for funding would have been generally discussed and had received the offering documentation for her participation in FXI. I worked alongside Ms. Grewal throughout the period from December, 2000 to April, 2001, and I never knew or suspected that she had transferred $880,000 to Choudhury. Nor did Ms. Grewal ever tell me she was transferring this amount of money or any amount to Finexa, or "making an investment in Finexa" or words to that effect. I did know about her $50,000 investment in FXI, which, as I recall, she made sometime in the fall of 2000.

15. With the possible exception of some monies from FXI, Finexa did not receive any cash infusions other than the $1,000,000 loan from Golden Gate Bank, backed by the CD in Amit's personal account, during the period from December, 2000 to March, 2001, and it had virtually no revenues. As result, Finexa ran out of money and essentially all but ceased operations on Friday March 30, 2001.

16. On March 29th or 30th, 2001, in and around our offices at 561 c, Pilgram Drive, Foster City, California, I had detailed conversations with Amit about effectively ceasing Finexa's operations and paying off the $1 million loan to Golden Gate Bank. We had already closed most of Finexa's French office and would be effectively abandoned Finexa's operations in Poland. The lease was up soon in Foster City. Amit told me he would be contributing no more money to Finexa. We decided to terminate, and did officially terminate, all of Finexa's California employees as of March 30th, 2000. Since we were effectively shutting down, Amit and I discussed, and he agreed, that it made no sense to continue the "reverse arbitrage" with the CD; that is, we decided to cash-out the CD and pay off Finexa's loan from Golden Gate Bank with the $1 million principal of the CD, leaving the interest earned by the CD (approximately $14,000 as shown on his April 2001 bank statement) in Amit's personal account. (As he and I discussed at the time, to have delayed this transaction would have cost Amit's personal account about $2,000 a month in the interest differential between the CD rate and the loan rate.)

17. I have read the portion of Amit's deposition testimony in which he states he did not learn of the cash-out of the CD and loan pay-off until some weeks after April 1, 2001. This is not accurate, because, as noted, I discussed with him the wind-up of Finexa, including the CD cash-out and loan payoff, prior to this date. Ana Ramirez and I would have handled the paperwork but certainly on a transaction of this magnitude, involving Amit's personal account we would never have done so without Amit's direct and clear instructions. Ana did assist Amit in certain personal financial dealings but only with Amit's direct supervision. Other than assisting the paperwork for these CD transactions in my roll as CFO of Finexa, I never have been directly involved in any of Amit's personal banking of financial dealings.

18. I knew Amit in business school, worked with him at BWAY, and worked with him closely at Finexa. I have often said he has a photographic memory, but more to the point, he as in my experience an incredible capacity to remember conversations and events – his memory is "photographic" when it comes to recalling discussions, meetings, business dealings. He hears things and does not forget them. In addition, I know him to be a compulsive note taker. During the years we worked together at Finexa, he routinely took detailed notes in my presence, which he preserved in hard-bound notebooks. He told me this was a practice he began in his undergraduate, engineering-school days. Some years ago he told me he retained all of these notebooks in storage in his garage adjacent to his Leavenworth apartment address in San Francisco.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on this 21th day of July, 2008.

_____
David Hayford

7/21/08